

**Your Missouri Courts**

ase.net

Search for Cases by: [Select Search Method... ▼]

Judicial Links  |  eFiling  |  Help  |  Contact Us  |  Print     GrantedPublicAccess **Logoff GGREIMAN50**

**1922-CC11834 - CAMDEN COUNTY V DANNIE E WILLIAMS M D (E-CASE)**

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |

This information is provided as a service and is not considered an official court record.

**Click here to eFile on Case**
**Click here to Respond to Selected Documents**

Sort Date Entries: ● Descending    ○ Ascending

Display Options: [All Entries ▼]

---

**10/24/2019**    ☐ **Summons Issued-Circuit**
Document ID: 19-SMCC-21701, for HUNT FITZ DRUG, INC..

☐ **Summons Issued-Circuit**
Document ID: 19-SMCC-21700, for COMPREHENSIVE PAIN ASSOCIATES LLC.

☐ **Summons Issued-Circuit**
Document ID: 19-SMCC-21699, for INTERVENTIONAL CENTER FOR PAIN MANAGEMENT PC.

☐ **Summons Issued-Circuit**
Document ID: 19-SMCC-21698, for PADDA, GURPREET SINGH.

☐ **Summons Issued-Circuit**
Document ID: 19-SMCC-21697, for DELMAR PRIMARY CARE ASSOCIATES, LLC.

☐ **Summons Issued-Circuit**
Document ID: 19-SMCC-21696, for WILLIAMS, M.D., DANNIE E..

☐ **Motion Special Process Server**
Request for Appointment of Special Process Server.
    **Filed By:** JEFFREY J LOWE
    **On Behalf Of:** CAMDEN COUNTY

☐ **Filing Info Sheet eFiling**
    **Filed By:** JEFFREY J LOWE

☐ **Pet Filed in Circuit Ct**
Petition.
    **Filed By:** JEFFREY J LOWE
    **On Behalf Of:** CAMDEN COUNTY

☐ **Judge Assigned**

---

Case.net Version 5.14.0.16      Return to Top of Page      Released 10/24/2019

EXHIBIT 1

**1922-CC11834**

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

**MISSOURI CIRCUIT COURT**
**TWENTY-SECOND JUDICIAL CIRCUIT**
**ST. LOUIS CITY**

**CAMDEN COUNTY,**

                **Plaintiff,**

  **V.**

**DANNIE E. WILLIAMS, M.D.**
**Serve: 5621 Delmar Blvd, Unit 108**
      **St. Louis, MO 63112**

**DELMAR PRIMARY CARE**
**ASSOCIATES, LLC**
**Serve: Kenneth Hopson**
      **5621 Delmar Blvd, Unit 108**
      **St. Louis, MO 63112**

**GURPREET S. PADDA, M.D.**
**Serve: Harjot Padda**
      **3915 Brannon Ave.**
      **St. Louis, MO 63109**

**INTERVENTIONAL CENTER FOR PAIN**
**MANAGEMENT, P.C., d/b/a PADDA**
**INSTITUTE CENTER FOR**
**INTERVENTIONAL PAIN**
**MANAGEMENT**
**Serve: Harjot Padda**
      **3915 Brannon Ave.**
      **St. Louis, MO 63109**

**COMPREHENSIVE PAIN ASSOCIATES,**
**LLC**
**Serve: Harjot Padda**
      **3915 Brannon Ave.**
      **St. Louis, MO 63109**

**RICHARD S. SACKLER, M.D.**
**Serve: 5310 North Ocean Drive, Unit 801**
      **Riviera Beach, Florida 33404**

**TEVA PHARMACEUTICALS**
**INDUSTRIES, LTD.**
**Serve: 5 Basel Street**

**Cause No.**

**Division No.**

**JURY TRIAL DEMANDED**

1

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

**Petach Tikva 49131, Israel**

**TEVA PHARMACEUTICALS USA, INC.**
**Serve: Corporate Creations Network Inc.**
**12747 Olive Blvd., Ste. 300**
**St. Louis, MO 63141**

**CEPHALON, INC.**
**Serve: Missouri Secretary of State**
**600 W. Main Street**
**Jefferson City, MO 65102**

**JOHNSON & JOHNSON**
**Serve: One Johnson & Johnson**
**Plaza**
**New Brunswick, NJ 08901-1241**

**JANSSEN PHARMACEUTICALS, INC.,**
**f/k/a JANSSEN PHARMACEUTICA INC.**
**and ORTHO-MCNEIL-JANSSEN**
**PHARMACEUTICALS, INC.**
**Serve: CT Corporation**
**120 S. Central**
**St. Louis, MO 63105**

**NORAMCO, INC.**
**Serve: CT Corporation**
**120 S. Central**
**St. Louis, MO 63105**

**ENDO HEALTH SOLUTIONS INC.**
**Serve: Corporation Trust Company**
**1209 Orange Street**
**Wilmington, DE 19801**

**ENDO PHARMACEUTICALS INC.**
**Serve: Corporation Trust Company**
**1209 Orange Street**
**Wilmington, DE 19801**

**ALLERGAN PLC f/k/a ACTAVIS PLC**
**f/k/a ACTAVIS, INC., f/k/a WATSON**
**PHARMACEUTICALS, INC.**
**Serve: Morris Corporate Center III**
**400 Interpace Parkway**
**Parsippany, NJ 07054**

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

**WATSON LABORATORIES, INC.**
**Serve: 132 Business Center Drive**
**Corona, CA 92880**

**ACTAVIS LLC**
**Serve: Morris Corporate Center III**
**400 Interpace Parkway**
**Parsippany, NJ 07054**

**ACTAVIS PHARMA, INC. f/k/a WATSON**
**PHARMA, INC.,**
**Serve: Corporate Creations Network Inc.**
**12747 Olive Blvd., Ste. 300**
**St. Louis, MO 63141**

**MALLINCKRODT, PLC,**
**Serve: College Business & Technology Park**
**D15 TX2V, Blanchardstown Road N,**
**Blanchardstown, Dublin 15, Ireland**

**MALLINCKRODT LLC**
**Serve: CT Corporation**
**120 S. Central**
**St. Louis, MO 63105**

**SPECGX LLC**
**Serve: CT Corporation**
**120 S. Central**
**St. Louis, MO 63105**

**MCKESSON CORPORATION**
**Serve: Corporation Services Company**
**221 Bolivar St.**
**Jefferson City, MO 65101**

**CARDINAL HEALTH, INC.**
**Serve: CT Corporation**
**120 S. Central**
**St. Louis, MO 63105**

**AMERISOURCEBERGEN**
**CORPORATION**
**Serve: CT Corporation**
**120 S. Central**
**St. Louis, MO 63105**

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

**AMERISOURCEBERGEN DRUG**
**CORPORATION**
**Serve: CT Corporation**
         **120 S. Central**
         **St. Louis, MO 63105**

**HUNT FITZ DRUG, INC. D/B/A KELLER**
**APOTHECARY**
**Serve: Joe Fitzgerald**
**5346 Devonshire**
**St. Louis, MO 63109**

**EXPRESS SCRIPTS HOLDING**
**COMPANY**
**Serve: CSC – Lawyers Incorporating**
         **Service**
         **221 Bolivar St.**
         **Jefferson City, MO 65101**

**EXPRESS SCRIPTS PHARMACY, INC.,**
**Serve: CSC – Lawyers Incorporating**
         **Service**
          **221 Bolivar St.**
          **Jefferson City, MO 65101**

**EXPRESS SCRIPTS, INC.**
**Serve: CSC – Lawyers Incorporating**
         **Service**
         **221 Bolivar St.**
         **Jefferson City, MO 65101**

**WAL-MART, INC.**
**Serve: CT Corporation**
         **120 S. Central**
         **St. Louis, MO 63105**

**TARGET CORPORATION**
**Serve: CT Corporation**
         **120 S. Central**
         **St. Louis, MO 63105**

**WALGREEN COMPANY**
**Serve: The Prentice-Hall**
         **Corporation System**
         **221 Bolivar St.**

4

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Jefferson City, MO 65102

**CVS HEALTH CORPORATION**
**Serve: Corporation Trust Center**
1209 Orange Street
Wilmington, DE 19801

**CVS PHARMACY INC.**
**Serve: CT Corporation System**
120 South Central Ave
Saint Louis, MO 63105

**CAREMARK RX, LLC**
**Serve: The Corporation Trust Company**
1209 Orange Street
Wilmington, DE 19801

**CAREMARKPCS HEALTH, LLC**
**Serve: CT Corporation System**
120 South Central Ave
Saint Louis, MO 63105

**CAREMARK, LLC**
**Serve:  CT Corporation System**
120 South Central
St. Louis, MO 63105

**MISSOURI CVS LLC**
**Serve: CT Corporation System**
120 South Central Ave
Saint Louis, MO 63105

**MYLAN PHARMACEUTICALS INC.**
**Serve: Corporation Service Company**
600 N. 2nd St., Ste. 401
Harrisburg, PA 17101

**MYLAN N.V.**
**Serve: Corporation Service Company**
600 N. 2nd St., Ste. 401
Harrisburg, PA 17101

**DEPOMED, INC.**
**Serve: Arthur J. Higgins**
7999 Gateway Blvd., Ste. 300
Newark, CA 94560

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

**UNITED HEALTH GROUP**
**INCORPORATED**
**Serve: The Corporation Trust Company**
     **1209 Orange Street**
     **Wilmington, DE 19801**

**OPTUM, INC.**
**Serve:  CT Corporation System**
     **120 South Central**
     **St. Louis, MO 63105**

**OPTUMRX, INC.**
**Serve:  CT Corporation System**
     **120 South Central**
     **St. Louis, MO 63105**

          **Defendants.**

## PETITION

COMES NOW Plaintiff Camden County, by and through counsel, and hereby brings this action against Defendants Dannie E. Williams, M.D.; Delmar Primary Care Associates, LLC; Gurpreet S. Padda, M.D.; Interventional Center for Pain Management, P.C. d/b/a Center for Interventional Pain Management; Padda Institute; Center for Interventional Pain Management d/b/a Comprehensive Pain Associates, LLC; Richard S. Sackler, M.D.; Teva Pharmaceuticals Industries, Ltd.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica Inc. and Ortho-McNeil-Janssen Pharmaceuticals, Inc.; Noramco, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals Inc.; Allergan PLC f/k/a Actavis PLC; Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.; Watson Laboratories, Inc.; Actavis LLC; Actavis Pharma, Inc. f/k/a Watson Pharma Inc.; Mallinckrodt plc; Mallinckrodt LLC; SpecGx LLC; McKesson Corporation; Cardinal Health, Inc.; AmerisourceBergen Drug Corporation; AmerisourceBergen Corporation; Hunt Fitz Drug, Inc. d/b/a Keller Apothecary; Express Scripts Holding Company; Express Scripts Pharmacy, Inc.;

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Express Scripts, Inc.; Wal-Mart, Inc.; Target Corporation; Walgreen Company; CVS Health Corporation; CVS Pharmacy Inc.; Caremark Rx, LLC; CaremarkPCS Health, LLC; Caremark LLC; Missouri CVS LLC; Mylan Pharmaceuticals Inc.; Mylan N.V.; Depomed Inc.; United Health Group Inc.; Optum, Inc.; and OptumRx, Inc. (collectively referred to as "Defendants"), and alleges as follows:

## INTRODUCTION

This Petition is filed on behalf of Plaintiff Camden County, a Missouri county, against 44 Defendants who are opioid manufacturers, opioid distributors, pharmacies, pharmacy benefit managers, and physicians. This Petition seeks damages on behalf of Plaintiff for reimbursement of public costs expended fighting the opioid epidemic and for future costs to finance community efforts aimed at ending the crisis and repairing what harm has been done to Plaintiff. The misbranding and overabundance of opioids has caused death, abuse, addiction, crime, and social and familial destruction in this County. Plaintiff has paid for, and will continue to pay, significant costs to combat the harms of the opioid epidemic, including but not limited to, costs for law enforcement, prosecution, public safety, incarceration, medical care, addiction treatment, counseling and withdrawal services, family protective services, social services, and coroner services.  This is not a class action, but rather, an action on behalf of the County government to recover its damages.[1]

There are five categories of Defendants who are jointly and severally liable: (1) manufacturers; (2) distributors; (3) pharmacies; (4) pharmacy benefit managers (PBMs); and (5)

---

[1] To accept Defendants' anticipated characterization of an action brought by a local government to recover damages as a class action would potentially create federal jurisdiction under the Class Action Fairness Act for every lawsuit by a county or city that has more than 100 residents.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

physicians. Plaintiff asserts six counts:  public nuisance; negligence per se; negligence; fraud in the omission; fraud; and negligent misrepresentation.

Plaintiff generally asserts two theories of liability. The first theory involves the off label marketing of opioids to target the chronic pain market. In doing so, Defendants misrepresented that: (1) opioids were the proper treatment for chronic pain; (2) opioids were not addictive; (3) patients who were addicted to opioids were pseudo addicted and therefore not truly addicted; (4) non-steroid anti-inflammatory drugs (NSAIDS) were less effective than opioids for chronic pain; (5) there were no withdrawal symptoms associated with opioids; (6) opioid use could increase a patient's functionality; (7) opioids were a 12-hour pain relief pill; and (8) an increased dosage would not increase the probability that a patient would become addicted to opioids. Defendants, acting in concert with each other, engaged in, and continue to engage in, the advertising and marketing of dangerous opioids through deceptive advertisements, representatives who knowingly described the drugs in inaccurate or misleading ways, use of Key Opinion Leaders (KOL) in the community, use of front groups created and funded by Defendants, and corrupted scientific literature and studies.

The second theory of liability centers on Defendants' failure to develop adequate monitoring systems to track suspicious orders and, as a result, repeatedly failed to report suspicious orders. This failure to develop and track suspicious orders violated state and federal laws requiring any entity who manufacturers, distributes, orders and/or sells opioids to report any and all suspicious orders to the Missouri State Pharmaceutical Board ("the Board") and the Federal Drug Enforcement Agency ("the DEA"). Defendants' actions led to the creation of an illegal black market in St. Louis City for opioids, which flowed to Plaintiff Camden County

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

residents, resulting in substantial levels of opioid addition. Plaintiff Camden County has borne the costs for Defendants' failure to adequately monitor suspicious orders.

## THE PARTIES

### Plaintiff

1.      Plaintiff Camden County is a county organized under Missouri law, R.S.Mo. §46.064. Camden County is designated as a first-class county under R.S.Mo. §48.020. According to the Missouri Department of Health and Senior Services (MDHSS) statistics, between 2013 and 2017, Camden County incurred 24 deaths due to opioid overdoses. The County also incurred 212 emergency room visits in the same time period due to opioid misuse. Camden County further incurred significant costs to combat the harms of the opioid epidemic including, but not limited to, costs for law enforcement, prosecution, emergency medical services, prisons and/or jails, probation, public works, family protective services, addiction treatment, detox and rehabilitation facilities and services, social services, housing, and prevention and education programs.

### Defendants

### Manufacturer Defendants

2.      RICHARD S. SACKLER, M.D. ("Dr. Sackler" and/or "Purdue") is the former chairman and president of Purdue Pharma L.P.; Purdue Pharma Inc.; and The Purdue Frederick Company (collectively "Purdue") and a trustee of a trust with a limited partnership interest in an entity within the corporate ownership of Purdue. Dr. Sackler controlled Purdue's misconduct by directing deceptive sales and marketing practices within Purdue and sending hundreds of orders to executives and line employees. Dr. Sackler profited billions of dollars for himself and for his family from the sale of opioids.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

3.      CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Cephalon, Inc. is registered to do business in Missouri, however, because of its failure to produce annual registration reports, the Missouri Secretary of State has administratively revoked Cephalon, Inc.'s Missouri registration. TEVA PHARMACEUTICALS INDUSTRIES, LTD. is an Israeli corporation with its principal place of business in Petah Tivka, Israel. TEVA PHARMACEUTICALS USA, INC. is a wholly owned subsidiary of Teva Pharmaceuticals Industries, Ltd. and is a Delaware corporation with its principal place of business in Pennsylvania. Teva Pharmaceuticals Industries, Ltd. acquired Cephalon, Inc. in 2011. Teva Pharmaceuticals Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. are collectively referred to as either "Teva" and "Cephalon."

4.      JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON, a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Janssen Pharmaceuticals, Inc. was formerly known as ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., which in turn was formerly known as JANSSEN PHARMACEUTICA, INC. Ortho-McNeil-Janssen Pharmaceuticals, Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. Janssen Pharmaceutica Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. Johnson & Johnson is the only company that owns more than 10% of Janssen Pharmaceuticals, Inc.'s stock, and it corresponds with the FDA regarding Janssen's products. Upon information and belief, Johnson & Johnson controls the sale and development of Janssen Pharmaceutical's drugs, and Janssen Pharmaceutical's profits inure to Johnson &

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Johnson's benefit. Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and Johnson & Johnson collectively are referred to herein as "Janssen."

5.     NORAMCO, INC. ("Noramco") is a Delaware Corporation headquartered in Wilmington, Delaware. Noramco was a wholly owned subsidiary of Johnson & Johnson until July 2016.

6.     DEPOMED, INC. ("Depomed") is a California corporation with its principal place of business in Newark, California.

7.     ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS, INC. is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc. collectively are referred to herein as "Endo."

8.     ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired ALLERGAN PLC in March 2015, and the combined company changed its name to ALLERGAN PLC in March 2015. Prior to that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in October 2012; the combined company changed its name to Actavis, Inc. as of January 2013 and then to Actavis plc in October 2013. WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly owned subsidiary of ALLERGAN PLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey, and was formerly known as WATSON PHARMA, INC. ACTAVIS

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by Allergan plc, which uses them to market and sell its drugs in the United States. Allergan plc, Actavis plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. hereinafter collectively are referred to as "Actavis."

9.      MALLINCKRODT, PLC is an Irish public limited company with headquarters in the United Kingdom. MALLINCKRODT LLC is a limited liability company organized and existing under the laws of the State of Delaware and headquartered in St. Louis, MO. Mallinckrodt LLC is a wholly owned subsidiary of Mallinckrodt, plc. SPECGX LLC is a limited liability company existing under the laws of the State of Delaware and licensed to do business in Missouri. SpecGx LLC is a wholly owned subsidiary of Mallinckrodt plc. Mallinckrodt LLC and SpecGx LLC are licensed drug distributors in Missouri and operate distribution centers in Missouri. Mallinckrodt, plc, Mallinckrodt LLC, and SpecGx LLC are referred to collectively as "Mallinckrodt."

10.     MYLAN PHARMACEUTICALS INC. is a Dutch corporation headquartered in Canonsburg, Pennsylvania. Mylan Pharmaceuticals Inc. is a wholly owned subsidiary of MYLAN N.V., a Dutch corporation headquartered in Canonsburg, Pennsylvania. Mylan Pharmaceuticals Inc. and Mylan N.V are referred to collectively as "Mylan."

**Distributor Defendants**

11.     CARDINAL HEALTH, INC. ("Cardinal") operates as a licensed pharmacy wholesaler and drug distributor in Missouri. Cardinal is registered with the Missouri Secretary of State as an Ohio corporation. Cardinal operates distribution centers in Missouri.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

12.     MCKESSON CORPORATION ("McKesson") operates as a licensed pharmacy wholesaler and drug distributor in Missouri. McKesson is registered with the Missouri Secretary of State as a Delaware corporation with its principal place of business in San Francisco, California. McKesson operates distribution centers in Missouri.

13.     AMERISOURCEBERGEN DRUG CORPORATION operates as a licensed pharmacy wholesaler and drug distributor in Missouri. AMERISOURCEBERGEN CORPORATION is the parent company of AmerisourceBergen Drug Corporation and collectively are referred to as "AmerisourceBergen." AmerisourceBergen is registered with the Missouri Secretary of State as a Delaware corporation with its principal place of business in Pennsylvania. AmerisourceBergen operates distribution centers in Missouri.

## Pharmacy Defendants

14.     HUNT FITZ DRUG, INC. D/B/A KELLER APOTHECARY ("Keller Apothecary") is a Missouri corporation with its principal place of business in Missouri, located at 5346 Devonshire Avenue, St. Louis, MO 63109. Hunt Fitz Drug, Inc. d/b/a Keller Apothecary operates as a licensed pharmacy in Missouri.

15.     EXPRESS SCRIPTS PHARMACY, INC. is a Delaware corporation with its principal place of business in Missouri, located at One Express Way, St. Louis, MO 63121. Express Scripts Pharmacy, Inc. operates as a licensed pharmacy in Missouri. Express Scripts Pharmacy, Inc. is a wholly owned subsidiary of Express Scripts Holding Company.

16.     WAL-MART INC. ("Wal-Mart") is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Wal-Mart operates as a licensed pharmacy in Missouri.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

17.     TARGET CORPORATION ("Target") is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. In 2015, CVS Health Corporation acquired Target's pharmacy business. Target operates as a licensed pharmacy in Missouri.

18.     WALGREEN COMPANY ("Walgreens") is an Illinois corporation with its principal place of business in Deerfield, Illinois. Walgreens operates as a licensed pharmacy in Missouri.

19.     MISSOURI CVS LLC is a Missouri limited liability corporation operating as a licensed pharmacy throughout Missouri, including at least four locations in the City of St. Louis. CVS PHARMACY, INC. is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island. CVS Pharmacy, Inc. operates as a licensed pharmacy in Missouri. CVS Pharmacy, Inc. is registered to do business in Missouri. CVS Pharmacy, Inc. is a licensed drug distributor in Missouri and operates distribution centers in Missouri. Both Missouri CVS LLC and CVS Pharmacy, Inc. are wholly owned subsidiaries of CVS HEALTH CORPORATION, a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island.

**Pharmacy Benefit Manager Defendants**

20.     EXPRESS SCRIPTS HOLDING COMPANY is a Delaware corporation with its principal place of business in St. Louis, Missouri. EXPRESS SCRIPTS, INC. is incorporated in Delaware with its principal place of business located in St. Louis, Missouri. Express Scripts, Inc. is a pharmacy benefit management company and a wholly owned subsidiary of Express Scripts Holding Company. Express Scripts Holding Company, Express Scripts, Inc., and Express Scripts Pharmacy, Inc. are collectively referred to as "Express Scripts."

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

21.     CVS HEALTH CORPORATION, formerly known as CVS Caremark Corporation, is a Delaware corporation with its principal place of business located in Woonsocket, Rhode Island. CAREMARK RX, LLC is a Delaware limited liability company whose principal place of business is at the same location as CVS Health Corporation. On information and belief, CVS Health is the direct parent company of Caremark RX, LLC. Caremark RX, LLC, the parent of CVS Health's pharmacy services subsidiaries, is the immediate or indirect parent of many mail order, pharmacy benefit management, infusion, Medicare Part D, insurance, specialty mail and retail specialty pharmacy subsidiaries, all of which operate in the United States and its territories. CAREMARKPCS HEALTH, LLC, is a Delaware limited liability company with its principal place of business in Woonsocket, Rhode Island. On information and belief, CVS Health is the direct or indirect parent company of Caremark PCS Health, LLC. CAREMARK, LLC is a limited liability corporation organized under the laws of California with its headquarters in Woonsocket, Rhode Island. Caremark, LLC is a wholly owned subsidiary of CVS Health Corporation. Caremark, LLC is registered to do business in Missouri and the CVS Caremark Customer Care service center is located in Lee's Summit, MO. CVS Health Corporation, Missouri CVS LLC, CVS Pharmacy, Inc., Caremark RX, LLC, Caremark PCS Health, LLC, and Caremark, LLC are collectively referred to as either "CVS" or "Caremark."

22.     OPTUMRX, INC. is a California corporation with its headquarters in Irvine, California. OptumRx, Inc. is registered to do business in Missouri and may be served at CT Corporation System, 120 South Central Ave, Saint Louis, MO 63105. OptumRx, Inc. is a wholly owned subsidiary of UNITEDHEALTH GROUP, a Delaware corporation with its headquarters in Minnetonka, Minnesota.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

**Physician Defendants**

23.     DANNIE E. WILLIAMS, M.D. ("Dr. Williams") is a physician licensed to practice medicine in Missouri. Dr. Williams practices in St. Louis City, Missouri at 5621 Delmar Blvd, Suite 108, St. Louis, MO 63112.

24.     DELMAR PRIMARY CARE ASSOCIATES, LLC ("Delmar Primary Care") is a Missouri limited liability corporation with its principal place of business in St. Louis City, Missouri. Dr. Williams is the owner and member of Delmar Primary Care.

25.     GURPREET S. PADDA, M.D. is a physician licensed to practice medicine in Missouri. Dr. Padda's practices medicine in St. Louis City, Missouri at 5203 Chippewa Street, Suite 301, St. Louis, MO 63109. According to his website, Dr. Padda is board certified in anesthesiology and pain medicine.

26.     Dr. Padda serves as the President, Secretary, and Director of INTERVENTIONAL CENTER FOR PAIN MANAGEMENT, P.C. ("Interventional Center"), a Missouri professional corporation with its principal place of business St. Louis City, Missouri at 5203 Chippewa Street, Suite 301, St. Louis, MO 63109. Interventional Center operates under the fictitious name of PADDA INSTITUTE CENTER FOR INTERVENTIONAL PAIN MANAGEMENT ("Padda Institute"), of which Dr. Padda is the Medical Director. Dr. Padda's Interventional Center owns COMPREHENSIVE PAIN ASSOCIATES, LLC, a Missouri limited liability corporation. Interventional Center is the organizer and member of Comprehensive Pain Associates, LLC. Gurpreet S. Padda, M.D., Interventional Center for Pain Management, P.C. d/b/a Padda Institute Center for Interventional Pain Management, and Comprehensive Pain Associates, LLC are collectively referred to as "Dr. Padda."

**JURISDICTION AND VENUE**

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

27.     At all times relevant hereto, Defendants engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, marketing, promoting, distributing, labeling, packaging, and prescribing opioid products in the State of Missouri and the City of St. Louis.

28.     At all times relevant hereto, Delmar Primary Care Associates, LLC was a Missouri limited liability company with its headquarters and principal place of business in St. Louis City, Missouri. According to the Articles of Organization, the members of Delmar Primary Care Associates are Defendant Dr. Dannie E. Williams and Kenneth Hopson, who both are citizens of Missouri. Because both its members are citizens of Missouri, Delmar Primary Care Associates, LLC is a citizen of Missouri.

29.     At all times relevant hereto, Dr. Dannie E. Williams was a Missouri physician practicing in St. Louis City, Missouri and owner of Delmar Primary Care Associates, LLC located in St. Louis City, Missouri. Dr. Williams is a citizen of Missouri.

30.     At all times relevant hereto, Dr. Gurpreet S. Padda was a Missouri physician practicing in St. Louis City, Missouri and President, Secretary, and Director of Interventional Center for Pain Management, P.C. d/b/a Padda Institute Center for Interventional Pain Management and Comprehensive Pain Associates, LLC located in St. Louis City, Missouri. Dr. Padda is a citizen of Missouri.

31.     At all times relevant hereto, Interventional Center for Pain Management, P.C. d/b/a Padda Institute Center for Interventional Pain Management was a Missouri professional corporation with its headquarters and principal place of business in St. Louis City, Missouri.

32.     At all times relevant hereto, Comprehensive Pain Associates, LLC was a Missouri limited liability company with its headquarters and principal place of business in St. Louis City,

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Missouri. According to the Articles of Organization, the member of Comprehensive Pain Associates, LLC is Interventional Center for Pain Management, P.C. d/b/a Padda Institute Center for Interventional Pain Management, who is a citizen of Missouri. Because its member is a citizen of Missouri, Comprehensive Pain Associates, LLC is a citizen of Missouri.

33.     At all times relevant hereto, Mallinckrodt LLC was a Delaware limited liability company with its headquarters and principal place of business in St. Louis, Missouri.

34.     At all times relevant hereto, SpecGx LLC was a Delaware limited liability company with its headquarters and principal place of business in St. Louis, Missouri.

35.     At all times relevant hereto, Hunt Fitz Drug, Inc. d/b/a Keller Apothecary was a Missouri corporation with its headquarters and principal place of business in St. Louis City Missouri. Hunt Fitz Drug, Inc. d/b/a Keller Apothecary is a citizen of Missouri.

36.     At all times relevant hereto, Express Scripts Holding Company was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Express Scripts Holding Company is a citizen of Missouri.

37.     At all times relevant hereto, Express Scripts, Inc. was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Express Scripts, Inc. is a citizen of Missouri.

38.     At all times relevant hereto, Express Scripts Pharmacy, Inc. was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Express Scripts Pharmacy, Inc. is a citizen of Missouri.

39.     At all times relevant hereto, Missouri CVS LLC was a Missouri limited liability company with its headquarters and principal place of business in St. Louis, Missouri.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

40.     Because Camden County is a Missouri citizen and because Defendants Dr. Williams, Delmar Primary Care Associates, LLC, Dr. Gurpreet S. Padda, Interventional Center for Pain Management, P.C. d/b/a Padda Institute Center for Interventional Pain Management, Comprehensive Pain Associates, LL, Hunt Fitz Drug, Inc. d/b/a Keller Apothecary, Express Scripts Holding Company, Express Scripts, Inc., and Express Scripts Pharmacy, Inc. are Missouri citizens, diversity of citizenship and, therefore, federal jurisdiction, is lacking.

41.     Venue is proper in the City of St. Louis pursuant to RSMO 508.010(6) because Defendant Delmar Primary Care Associates LLC resides at 5621 Delmar Blvd, Suite 108, St. Louis, Missouri 63112, where its registered agent, Kenneth Hopson, is located. Moreover, Defendant Williams practices medicine in and can be found in St. Louis City at her business, Delmar Primary Case Associates, located at 5621 Delmar Blvd, Suite 108, St. Louis, Missouri 63112. Venue is proper in the City of St. Louis pursuant to RSMO 508.010(6) because Defendants Interventional Center for Pain Management, P.C. d/b/a Padda Institute Center for Interventional Pain Management and Comprehensive Pain Associates, LLC reside at 5203 Chippewa Street, Suite 301, St. Louis, Missouri 63109 and their registered agent, Harjot Padda, is located at 3815 Brannon Avenue, St. Louis, Missouri 63109. Moreover, Defendant Padda practices medicine in and can be found in St. Louis City at his businesses, Interventional Center for Pain Management, P.C. d/b/a Padda Institute Center for Interventional Pain Management and Comprehensive Pain Associates, LLC, located at 5203 Chippewa Street, Suite 301, St. Louis, Missouri 63109. Venue is proper in the City of St. Louis pursuant to RSMO 508.010(6) because Defendant Hunt Fitz Drug, Inc. d/b/a Keller Apothecary resides at 5346 Devonshire Avenue, St. Louis, Missouri 63109, where its registered agent, Joe Fitzgerald, is located. Further,

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Mallinckrodt can be found in the City of St. Louis at their complex located at 3501 North 2nd Street, St. Louis, Missouri 63147.

42.    Additionally, or in the alternative, venue is proper in the City of St. Louis pursuant to RSMO 508.010(4) in that the injury first occurred in St. Louis City. Due to Mallinckrodt's negligent, intentional, and/or reckless failure to properly monitor the distribution of opioids manufactured at Mallinckrodt's St. Louis City facility, St. Louis City became a market for the illegal sale and distribution of opioids diverted from their intended use for patients. Diverted opioids were sold and infiltrated Plaintiff Camden County. St. Louis City became a "source" city because of Mallinckrodt's failure to monitor and control their inventory. This injury was propounded by the negligent and/or intentional failure of Defendants to adequately supervise their distribution of opioids into St. Louis City and Plaintiff Camden County. Defendants failed to monitor, report, and halt shipment of massive orders of opioids despite having indications and/or suspicions of diversion, drug abuse, fraud and misuse of opioids.

43.    Prescription drug diversion is the unlawful channeling of regulated pharmaceuticals from legal sources to the illicit marketplace. (See "The Diversion of Prescription Opioid Analgesics," James Inciardi, 2014, https//www.ncbi.nim.nih.gov/pmc/articles). It is considered the transfer or interception of a prescription drug from a lawful to a unlawful purpose. Pursuant to the Missouri Code of State Regulations 20 CSR 2250-5.020,5.030, and 5.050 and the Controlled Substance Act, CSA 21 U.S.C. § 801-971, in order to prevent prescription drug diversion, all entities manufacturing, distributing, and/or ordering prescription opioids must report their activities regarding opioid products. The DEA is charged with collecting data from entities required to report opioid activity. The report generated is referred to as the Automated Reports and Consolidated Ordering

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

System ("ARCOS"), which is used to track and report opioid distribution and instances of possible diversion. In addition to reporting all orders in order to thwart diversion, Defendants have a duty to report to state and federal authorities all "suspicious orders." Under 21 CFR § 1301.74(b), "suspicious orders" include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. Reports track both the morphine milligram equivalent ("MME") and dosage units of opioids. The MME is a measurement tool developed by the Centers for Medicare and Medicaid Services ("CMS") to equate different opioid products into one standard value. The standard is morphine and its potency. ARCOS also tracks opioids as a dosage unit, which essentially equates to the number of pills or product, i.e. Fentanyl patch, manufactured, distributed and ordered.

44.     Between 2006 and 2014, ARCOS data for St. Louis City shows the extent of the illegal diversion market for opioids created by Defendants. (See Exhibits 1-3.) St. Louis City ARCOS data demonstrates that Defendants drove such a substantial amount of opioids into St. Louis City that a black market developed for the surrounding counties, including Plaintiff Camden County. For example, at the manufacturing level, referred to as "labelers," ARCOS date shows Mallinckrodt, through its subsidiary SpecGx, LLC, was responsible for 389,673,430 million MME in St. Louis City. Further, Actavis appears at 336,406,219 million MME, Purdue at 219,015,502 million MME, Par Pharmaceutical at 113,794,324 million MME, and Mylan at 69,826,070 million MME. These five Defendants represent 68.5% of the market share based on MME and 84.5% of market share based on dosage units. (See Exhibit 1.)

45.     Illustrative of Mallinckrodt's role in the diversion market in St. Louis City is its conduct in Tennessee. Emails were uncovered between a Tennessee pill mill operator and Victor Borelli, Mallinckrodt's national account manager. The pill mill operator emailed Mr. Borrelli

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

after receiving a shipment of 1,200 bottles of 30 milligram oxycodone bottles: "……Keep 'em coming. Flying out of here . It's like people are addicted to these things or something. Oh wait, people are." (https://www.washingtonpost.com/investigations/internal-drug-company-emails-show-indifference-to-opioid-epidemic-ship-ship-ship/2019/07/19/003d58f6-a993-11e9-a3a6-ab670962db05_story.html.) Mr. Borelli responded, "Just like Doritos. Keep eating. We'll make more."(Id.) Mallinckrodt, along with the other Defendants, have created a similar market in St. Louis City, which stretches to Plaintiff Camden County, by saturating the metropolitan area with over a billion opioid doses. Because of the Manufacturer Defendants', particularly Mallinckrodt's, role in the creation of a strong diversion market in St. Louis City, Plaintiff Camden County was first injured in St. Louis City pursuant to RSMO 508.010(4).

46.    Additionally, data regarding the Distributor Defendants indicates the extent to which they flooded the St. Louis City market. For instance, McKesson inundated St. Louis City with 10,581,231,457 billion MME and 617,894,339 dosage units. Walgreens flooded St. Louis City with 6,969,139,089 MME, and 488,191,715 dosage units, while AmerisourceBergen introduced 5,230,136,542 MME, and 426,004,050 dosage units. Walmart directed 4,801,293,237 MME, and 318,606,635 dosage units and Cardinal introduced 4,801,293,237 MME and 266,223,750 dosage units toward St. Louis City. Together, these five Distributor Defendants were responsible for flooding St. Louis City with over 270 billion MME's and over 2.2 billion dosage units of opioids. (See Exhibit 2.) This staggering amount of opioids laid the foundation for the development of illegal diversion markets in St. Louis City and Plaintiff Camden County as these prescription opioids were ordered by and distributed to pharmacies in St. Louis City. Upon information and belief, none of the Distributor Defendants, or any other Defendant, reported these suspicious orders to state or federal authorities during the time period depicted by

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

the ARCOS reports. Because of the Distributor Defendants' role in the creation of a strong diversion market in St. Louis City, Plaintiff Camden County was first injured in St. Louis City pursuant to RSMO 508.010(4).

47.    At all times relevant hereto, upon information and belief, Defendant Keller Pharmacy distributed the largest number of opioids in St. Louis City. At all times relevant hereto, Keller Pharmacy was located in southwest St. Louis City at the intersection of Brannon Avenue and Chippewa Street, conveniently located downstairs from Defendant Dr. Padda's pain management practices operating as a pill mill. Upon information and belief, Keller Pharmacy essentially acted as an "on site" pharmacy for Dr. Padda's pain management clinic. This St. Louis City neighborhood pharmacy ordered 6.9 million opioid dosage units and 93,153,057 MME's from Distributor Defendants during the time period between 2006 to 2014 as reported in ARCOS data. (See Exhibit 4.) A number of Walgreens stores throughout St. Louis City also ordered large amounts of opioids. For instance, a Walgreens pharmacy located at 7339 Gravois Ave, St. Louis, Missouri 63116 ordered 6,908,235 dosage units and 90,324,448 MME. (See Exhibit 3.) Additionally, a Walgreens pharmacy located at 3920 Hampton Ave, St. Louis, Missouri 63109 ordered 4,794,413 million dosage units and 54,962,431 MME and a Walgreens pharmacy located 41410 Broadway Ave, St. Louis, Missouri 63118 ordered 4,195,990 dosage units and 44,730,436 MME. (Id.) Finally, a Walgreens pharmacy located at 4218 Lindell Blvd, St. Louis, Missouri 63108 ordered 4,050,622 dosage units and 42,321,806 MME. (Id.) Upon information and belief, none of the above pharmacies reported suspicious orders to state or federal authorities. Importantly, these pharmacies are all close to Interstates directly connecting St. Louis City and Plaintiff Camden County. Geography is a key element in understanding the development and spread of the illegal diversion market. Upon information and belief, consumers

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

in the illegal opioid market traveling to and from Plaintiff Camden County use Interstates for quick, convenient access.

48.     Upon information and belief, the Pharmacy Defendants were aware of the dangers of the diversion market as the DEA held public seminars for pharmacies on April 5 and 6, 2014, warning of the spreading threat in the St. Louis metropolitan area, but Pharmacy Defendants did nothing.(https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/conf_2014/april_2014/index.html.)

49.     Upon information and belief, a crucial element in illegal drug markets is word of mouth and, through social media and text messages, drug dealers and users can quickly gage which pharmacies will fill "any prescription." Easy access to both a pharmacy and the black market is key for fueling supply and demand, which makes urban areas, such as St. Louis City the perfect environment for developing a strong diversion market due to the conduct of all Defendants. Because of the Pharmacy Defendants' role in the creation of a strong diversion market in St. Louis City, Plaintiff Camden County was first injured in St. Louis City pursuant to RSMO 508.010(4).

50.     Further, Plaintiff was first injured in St. Louis City pursuant to RSMO 508.010(4) because the actions of all Defendants, including Keller Apothecary, Mallinckrodt, and Express Scripts, led to the establishment of so-called pill mills. Dr. Williams's and Dr. Padda's operation of a pill mill in St. Louis City would not have been possible without Defendants' failure to properly monitor and report highly suspicious orders. Defendants created an opportunity for physicians like Dr. Williams and Dr. Padda to overprescribe and profit from the sale of highly addictive and diverted opioids. Further, Dr. Williams's and Dr. Padda's practice of prescribing

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

excessive amounts of opioids leads directly to the diversion of opioids from the original patient to the illegal market for opioids.

51.     Upon information and belief, Dr. Williams and Dr. Padda, at their practices in St. Louis City, prescribed opioids inappropriately and for no legitimate medical purpose and often after only cursory physical evaluations and exams. Upon information and belief, the goal of Dr. Williams and Dr. Padda was to profit from the dispensing of opioids. Upon information and belief, residents from Plaintiff Camden County traveled to Dr. Williams and Dr. Padda at their practices in St. Louis City when they were unable to obtain opioid prescriptions from physicians in their county of residence. Because of the Physician Defendants' role in the creation of a strong diversion market in St. Louis City, Plaintiff Camden County was first injured in St. Louis City pursuant to RSMO 508.010(4).

52.     Plaintiff Camden County was first injured in St. Louis City pursuant to RSMO 508.010(4) due to the failure of Defendants to perform their legal duties. Defendants failed to develop a tracking system for suspicious orders and failed to report suspicious orders, which directly created the illegal diversion market in St. Louis City. Defendants' supply of opioids fed the demand and addiction of residents of Plaintiff Camden County. The incredibly high numbers of opioids flooding into St. Louis City was fueled by pill mills and pharmacies and compounded by convenient interstate access to and from Plaintiff Camden County. At all times relevant hereto, upon information and belief, considerable factors, including but not limited to the astounding number of opioids flowing into St. Louis City by the Manufacturer and Distributor Defendants, easy access and the willingness of Physician Defendants to accelerate the flow of opioids into St. Louis City through questionable prescriptions, and the sheer volume of opioids ordered and  dispensed by the Pharmacy Defendants, demonstrate all Defendants' culpability in

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

creating the illegal opioid market in St. Louis City, which directly correlated to the heightened use of illegal prescription opioids, heroin, and/or fentanyl in Plaintiff Camden County.

## NATURE OF THE ACTION

53.     Plaintiff Camden County, in its capacity as a county governmental entity created under the statutory authority of the State of Missouri, brings this cause of action against the above-named Defendants.

54.     Hydrocodone is the most frequently prescribed drug in the United States.

55.     Oxycodone is a semi-synthetic narcotic analgesic. Oxycodone is marketed as OxyContin, Percodan, Darvocet, as well as its generic name Oxycodone.

56.     Hydrocodone and oxycodone are opiate pain-relieving medications having an addiction forming or addiction sustaining quality.

57.     By the 1990s, Defendants were confronting the limited market for opium-like painkillers ("opioids").

58.     Defendants knew that opioids were effective treatments for short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care. Yet they also knew—and had known for years—that opioids were addictive and subject to abuse, particularly when used long-term for chronic non-cancer pain (pain lasting three months or longer, hereinafter referred to as "chronic pain"), and should not be used except as a last-resort. Defendants further knew—and had known for years—that with prolonged use, the effectiveness of opioids wanes, requiring increases in doses and markedly increasing the risk of significant side effects and addiction.

59.     Defendants also knew that controlled studies of the safety and efficacy of opioids were limited to short-term use (not longer than 90 days), and in managed settings (*e.g.*, hospitals), where the risk of addiction and other adverse outcomes was much less significant.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Indeed, the U.S. Food and Drug Administration ("FDA") has expressly recognized that there have been no long-term studies demonstrating the safety and efficacy of opioids for long-term use.

60.    Prescription opioids, which include well-known brand-name drugs like OxyContin and Percocet, and generics like oxycodone and hydrocodone, are narcotics. They are derived from or possess properties similar to opium and heroin.  Like heroin, prescription opioids work by binding to receptors on the spinal cord and in the brain, dampening the perception of pain. Opioids also can create a euphoric high, which can make them addictive. At certain doses, opioids can slow the user's breathing, causing respiratory depression and, ultimately, death.

61.    Since passage of the Controlled Substances Act ("CSA") in 1970, opioids have been regulated as controlled substances. Controlled substances are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the highest. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally had been categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence. 21 U.S.C. § 812. Schedule II drugs may not be dispensed without an original copy of a manually signed prescription, which may not be refilled, from a doctor and filled by a pharmacist who both must be licensed by their state and registered with the DEA. 21 U.S.C. § 829. Opioids that have been categorized as Schedule II drugs include morphine (Avinza, Embeda, Kadian, MS Contin), fentanyl (Duragesic, Actiq, Fentora), methadone, oxycodone (OxyContin, Percocet, Percodan, Tylox), oxymorphone (Opana), and hydromorphone (Dilaudid, Palladone).

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

62.     Schedule III drugs are deemed to have a lower potential for abuse, but their abuse still may lead to moderate or low physical dependence or high psychological dependence. 21 U.S.C. § 812. Schedule III drugs may not be dispensed without a written or oral prescription, which may not be filled or refilled more than six months after the date of the prescription or be refilled more than five times. 21 U.S.C. § 829. Some opioids had been categorized as Schedule III drugs, including forms of hydrocodone and codeine combined with other drugs, like acetaminophen. However, in October 2013, the FDA, following the recommendation of its advisory panel, reclassified all medications that contain hydrocodone from Schedule III to Schedule II. *See* 21 C.F.R. § 1308.

63.     In order to expand the market for opioids and realize blockbuster profits, Defendants needed to change medical and public perception that would permit the use of opioids not just for acute and palliative care, but also for long periods of time to treat more common aches and pains, like lower back pain, arthritis, and headaches – in other words, chronic pain.

64.     Defendants, in conspiracy with each other and/or acting in concert through a sophisticated and highly deceptive marketing campaign that began in the late 1990s, deepened around 2006, and continues to the present, set out to, and did, reverse the popular and medical understanding of opioids. Chronic opioid therapy—the prescribing of opioids to treat chronic pain long-term—is now commonplace.

65.     To accomplish this reversal, Defendants spent hundreds of millions of dollars on: (a) developing and disseminating misleading scientific and educational materials and advertising that misrepresented the risks, benefits, and superiority of opioids used long-term to treat chronic pain; (b) deploying sales representatives who visited doctors and other prescribers and delivered misleading messages about the use of opioids; (c) recruiting prescribing physicians as paid

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

speakers as a means of both securing those physicians' future brand loyalty and extending their reach to the physicians' peers; (d) funding, assisting, encouraging, and directing certain doctors, known as Key Opinion Leaders (KOLs), to deliver scripted talks, prepare and present misleading studies as continuing medical education programs (CMEs), and serve on the boards and committees of professional societies and patient advocacy groups that delivered messages and developed guidelines supporting chronic opioid therapy; and (e) developing, funding, assisting, directing, and encouraging seemingly neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups"), such as the American Pain Foundation, which was primarily funded by Defendants, which developed educational materials and treatment guidelines urging doctors to prescribe and patients to use opioids long-term to treat chronic pain.

66.     These efforts, executed, developed, supported, and directed by Defendants, were designed to convince doctors and patients that the benefits of using opioids to treat chronic pain outweighed the risks and that opioids could be used safely by most patients. Defendants, along with the ostensibly neutral third parties that they recruited and supported, profited handsomely through their dissemination of these deceptions. KOLs and Front Groups saw their stature in the medical community elevated dramatically due to Defendants' funding, and Defendants saw an equally dramatic rise in their revenues.

67.     Working individually and with and through these Front Groups and KOLs, Defendants pioneered a new and far broader market for their potent and highly addictive drugs—the chronic pain market. Defendants persuaded doctors and patients that what they had long understood—that opioids are addictive drugs, unsafe in most circumstances for long-term use—was untrue, and quite the opposite, that the compassionate treatment of pain *required* opioids.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Ignoring the limitations and cautions in their own drugs' labels, Defendants:  (a) overstated the benefits of chronic opioid therapy, promised improvement in patients' function and quality of life, and failed to disclose the lack of evidence supporting long-term use; (b) trivialized or obscured opioids' serious risks and adverse outcomes, including the risk of addiction, overdose, and death; (c) overstated their superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives; and (d) mischaracterized the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms. There was, and is, no reliable scientific evidence to support Defendants' marketing claims, and there was, and is, a wealth of scientific evidence that these claims are false. Defendants also deceptively and unfairly marketed the drugs for indications and benefits that were outside of the drugs' labels and not supported by substantial evidence.

68.    Even Defendants' KOLs initially were very cautious about whether opioids were appropriate to treat chronic pain. Some of these same KOLs have since recanted their pro-opioid marketing messages and acknowledged that Defendants' marketing went too far. Yet despite the voices of renowned pain specialists, researchers, and physicians who have sounded the alarm on the overprescribing of opioids to treat chronic pain, Defendants continue to disseminate their misleading and unfair marketing claims to this day.

69.    Defendants' efforts were wildly successful. In 2012, health care providers wrote 259 million prescriptions for opioid painkillers—enough to medicate every adult in America around the clock for a month. Twenty percent of all doctors' visits in 2010 resulted in the prescription of an opioid, nearly double the rate in 2000. Opioids—once a niche drug—are now the most prescribed class of drugs—more than blood pressure, cholesterol, or anxiety drugs. While Americans represent only 4.6% of the world's population, they consume 80% of the

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

opioids supplied around the world and 99% of the global hydrocodone supply. Together, opioids generated $8 billion in revenue for drug companies in 2012 and until recently, have been increasing at a record pace.

70.     It was Defendants' marketing—and not any medical breakthrough—that rationalized prescribing opioids for chronic pain and opened the floodgates of opioid use and abuse.

71.     According to the U.S. Centers for Disease Control and Prevention (CDC), the nation has been swept up in an opioid-induced public health epidemic. According to the CDC, prescription opioid use contributed to 16,651 overdose deaths nationally in 2010; 16,917 in 2011; and 16,007 in 2012. One Defendant's own 2010 internal data shows it knew that the use of prescription opioids gave rise to 40% of drug-related emergency department visits in 2010 and 40% of drug poisoning deaths in 2008, and that the trend of opioid poisonings was increasing from 1999-2008. For every death, more than 30 individuals are treated in emergency rooms. By 2017, it has been reported that there are over 60,000 opioid related deaths in the U.S.

72.     The dramatic increase in opioid prescriptions to treat common chronic pain conditions has resulted in a population of addicts who seek drugs from doctors. When turned down by one physician, many of these addicts deploy increasingly desperate tactics—including doctor shopping, use of aliases, and criminal means—to satisfy their addiction.

73.     Defendants' opioid related misconduct causes heroin abuse. A 2015 study found 4 out of 5 heroin users reported that their addiction started with opioid pain relievers.[2] Defendants created a re-birth in the heroin industry by starting patients or any end user on the gateway drug of opioids and transforming opioid users into illegal heroin users and abusers.

---

[2] National Safety Council-Prescription Nation:  Addressing America's Drug Epidemic, 2016.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

74.     As alleged in this Petition, Defendants intentionally or recklessly failed to monitor their supply chain as required by state and federal law, distributed drugs into Plaintiffs Camden County and spawned pill mills, such as the one owned and operated by Dr. Williams at Delmar Primary Care Associates and Dr. Padda at Interventional Center for Pain Management, P.C. d/b/a Padda Institute Center for Interventional Pain Management and Comprehensive Pain Associates, LLC. Upon information and belief, Dr. Padda used Defendant Keller Apothecary as his and his patients' opioid dispensary.

75.     Efforts by doctors to reverse course for a chronic pain patient already on opioids long-term involve managing the physical suffering and psychological distress a patient endures while withdrawing from the drugs. A secondary criminal market, well stocked by a pipeline of drugs that are diverted to supply the market, often thwarts this process. Even though they never would have prescribed opioids in the first place, many doctors feel compelled to continue prescribing opioids to patients who have become dependent on them.

76.     According to the CDC, more than 12 million Americans ages 12 or older have used prescription painkillers without a prescription in 2010, and adolescents are abusing opioids in alarming numbers.

77.     Opioid abuse has not displaced heroin, but rather triggered resurgence in its use, imposing additional burdens on Plaintiff and local agencies that address heroin use and addiction. According to the CDC, the percentage of heroin users who also use opioid pain relievers rose from 20.7% in 2002-2004 to 45.2% in 2011-2013 and continues to grow.

78.     Defendants' course of conduct, individually and/or in concert with the KOLs and Front Groups with which they allied, violated and continues to violate local, state, and common law.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

79.     To redress and punish these violations, Plaintiff County seeks a judgment requiring Defendants to pay (a) restitution, (b) out of pocket costs, (c) disgorgement, (d) damages to abate the nuisance, (e) punitive damages, and (g) any other relief to which Plaintiff may be entitled. Plaintiff also requests that the Court enjoin Defendants' unlawful promotion of opioids and order them to correct their misrepresentations.

## FACTUAL ALLEGATIONS

### I.     THE SCIENCE BEHIND PAIN MEDICINE.

#### 1.    Safe and Effective Treatment of Chronic Pain Hinges on Informed Risk Management.

80.     The practice of medicine hinges on informed risk management. Prescribers must weigh the potential risks and benefits of each treatment option, as well as the risk of non-treatment. Accordingly, the safe and effective treatment of chronic pain requires that a physician be able to weigh the relative risks of prescribing opioids against both (a) the relative benefits that may be expected during the course of opioid treatment and (b) the risks and benefits of alternatives.

81.     This bedrock principle of full disclosure is particularly important in the context of chronic opioid therapy because of the risk that patients will become physically and psychologically dependent on the drugs and find it difficult to manage or terminate their use.

82.     The FDA-approved drug labels on each of Defendants' opioids do not advise physicians how to maximize the benefit and minimize risk for patients on long-term chronic opioid therapy. The labels contain no dosing cap above which it would be unsafe for any doctor to prescribe to any patient. Nor do any of the labels provide a duration limit, after which the risks to a patient might increase. Thus, doctors and patients rely more heavily on educational

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

materials, such as treatment guidelines, CMEs, scientific and patient education articles and websites, to inform their treatment decisions.

83.     Due to concerns about their addictive properties, opioids have been regulated at the federal level as controlled substances by the DEA since 1970. The labels for scheduled opioid drugs carry black box warnings of potential addiction and serious, life-threatening, or fatal respiratory depression, the result of an excessive dose.

84.     Most patients with more than a few weeks of opioid therapy will experience withdrawal symptoms if opioids are discontinued, commonly referred to as dependence. Once dependent, a patient experiences deeply unpleasant symptoms when his or her current dose of opioids loses effect and is not promptly replaced with a new dose. Among the symptoms reported in connection with opioid withdrawal are: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long opioids were used.

85.     Dr. Andrew Kolodny, Chief Medical Officer for Phoenix House, a national addiction treatment program, has explained the effect of opioids as akin to hijacking the brain's reward system, which in turn convinces a user that the drug is needed to stay alive.  A patient's fear of the unpleasant effects of discontinuing opioids combined with the negative reinforcement during a period of actual withdrawal can drive a patient to seek further opioid treatment—even where ineffective or detrimental to quality of life—simply to avoid the deeply unpleasant effects of withdrawal.

86.     When under the continuous influence of opioids over a period of time, patients grow tolerant to their analgesic effects. As tolerance increases, a patient typically requires

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

progressively higher doses in order to obtain the same levels of pain reduction to which he or she has become accustomed. At higher doses, the effects of withdrawal are more substantial, thus leaving a patient at a much higher risk of addiction. The FDA has acknowledged that available data suggest a relationship between increased doses and the risk of adverse effects.

87.     Patients receiving high doses of opioids as part of long-term opioid therapy are three to nine times more likely to suffer overdose from opioid-related causes than those on low doses. As compared to available alternative pain remedies, scholars have suggested that tolerance to the respiratory depressive effects of opioids develops at a slower rate than tolerance to analgesic effects. Accordingly, the practice of continuously escalating doses to match pain tolerance can, in fact, lead to overdose even where opioids are taken as recommended.

88.     Correct use and abuse of these agents are not mutually exclusive. It is difficult to determine whether a patient is physically dependent, psychologically dependent, or addicted. Drug-seeking behaviors, which are signs of addiction, will exist and emerge when opioids are suddenly not available, the dose is no longer effective, or tapering of a dose is undertaken too quickly.

89.     Between 30% and 40% of long-term users of opioids experience problems with opioid use disorders.

90.     Each of these risks and adverse effects—dependence, tolerance, and addiction—is fully disclosed in the labels for each of Defendants' opioids. They are not, however, contained in Defendants' advertising and marketing materials.  Prior to Defendants' deceptive marketing scheme, each of these risks was well-recognized by doctors and seen as a reason to use opioids to treat chronic pain sparingly and only after other treatments had failed.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

91.     Opioids vary by duration. Long-acting opioids are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, 12 hours. Purdue's OxyContin and MS Contin, Janssen's Nucynta ER and Duragesic, Endo's Opana ER, and Actavis's Kadian are all examples of long-acting opioids. In addition, opioids may be taken in short-acting formulations, which last for approximately four to six (4-6) hours. Short-acting opioids may be taken in addition to long-acting opioids to address episodic pain. Cephalon's Actiq and Fentora are particularly fast-acting drugs that are explicitly indicated only for use in conjunction with continuous opioid therapy. Defendants promoted the idea that pain should be treated first by taking long-acting opioids continuously and then, additionally, by taking short-acting, rapid-onset opioids.

92.     While it was once thought that long-acting opioids would not be as susceptible to abuse and addiction as short-acting ones, this view has been discredited. OxyContin's label now states, as do all labels of Schedule II long-acting opioids, that the drug exposes users to risks of addiction, abuse, and misuse, which can lead to overdose and death.  The FDA has required extended release and long-acting opioids to adopt Risk Evaluation Mitigation Strategies on the basis that they present a serious public health crisis of addiction, overdose, and death.

93.     In 2013, in response to a petition to restrict the labels of long-acting opioid products, the FDA noted the grave risks of opioids, the most well-known of which include addiction, overdose, and even death. The FDA further warned that even proper use of opioids under medical supervision can result in life-threatening respiratory depression, coma, and death. The FDA required that—going forward—opioid makers of long-acting formulations clearly communicate these risks in their labels. Thus, the FDA confirmed what had initially been accepted practice in the treatment of pain—that the adverse outcomes from opioid use include

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

addiction, unintentional overdose, and death and that long-acting or extended release opioids should be used only when alternative treatments are inadequate.

94.     Notably, in reaching its conclusion, the FDA did not rely on new or otherwise previously unavailable scientific studies regarding the properties or effects of opioids.

### 2. The Benefits Offered by Long-Term Opioid Use Are Unproven and Contradicted.

95.     Despite the fact that opioids now are routinely prescribed, there never has been evidence of their safety and efficacy for long-term use. Defendants always have been aware of these gaps in knowledge. While promoting opioids to treat chronic pain, Defendants have failed to disclose the lack of evidence to support their use long-term and have failed to disclose the contradictory evidence that chronic opioid therapy actually makes patients sicker.

96.     There are no controlled studies of the use of opioids beyond 16 weeks, and no evidence that opioids improve patients' pain and function long-term. The first random, placebo-controlled studies appeared in the 1990s, and revealed evidence only for short-term efficacy and only in a minority of patients. A 2004 report reviewed 213 randomized, controlled trials of treatments for cancer pain and found that, while opioids had short-term efficacy, the data was insufficient to establish long-term effectiveness. Subsequent reviews of the use of opioids for cancer and non-cancer pain consistently note the lack of data to assess long-term outcomes. For example, a 2007 systematic review of opioids for back pain concluded that opioids have limited, if any, efficacy for back pain and that evidence did not allow judgments regarding long-term use. Similarly, a 2011 systematic review of studies for non-cancer pain found that evidence of long-term efficacy is poor. One year later, a similar review reported poor evidence of long-term efficacy for morphine, tramadol, and oxycodone, and fair evidence for transdermal fentanyl, which is approved only for use for certain cancer pain.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

97.     Increasing duration of opioid use is strongly associated with an increasing prevalence of mental health conditions, such as depression, anxiety, post-traumatic stress disorder, or substance abuse, increased psychological distress, and greater health care utilization.

98.     As a pain specialist noted in an article titled *Are We Making Pain Patients Worse?*, "Opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."

99.     This is true both generally and for specific pain-related conditions. Studies of the use of opioids long-term for chronic lower back pain have been unable to demonstrate an improvement in patients' function. Instead, research consistently shows that long-term opioid therapy for patients who have lower back injuries does not cause patients to return to work or physical activity. This is due partly to addiction and other side effects.

100.     As many as 30% of patients who suffer from migraines have been prescribed opioids to treat their headaches. Users of opioids had the highest increase in the number of headache days per month, scored significantly higher on the Migraine Disability Assessment (MIDAS), and had higher rates of depression, compared to non-opioid users. A survey by the National Headache Foundation found that migraine patients who used opioids were more likely to experience sleepiness, confusion, and rebound headaches, and reported a lower quality of life than patients taking other medications.

101.     The lack of evidence for the efficacy of opioid use long-term has been well-documented nationally in the context of workers' compensation claims, where some of the most detailed data exists. Claims involving workers taking opioids are almost four times as likely to

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

reach costs of over $100,000 than claimants not taking opioids, as these patients suffer greater side effects and are slower to return to work. Even adjusting for injury severity and self-reported pain score, receiving an opioid for more than seven days and receiving more than one opioid prescription increased the risk that the patient would be on work disability one year later. A prescription for opioids as the first treatment for a workplace injury doubled the average length of the claim.

102.    In 2018, the first randomized clinical trial making a head to head comparison between opioids and other non-narcotic pain medication found no significant difference in pain management function between the two groups over 12 months.

**3.    Defendants' Impact on the Perception and Prescribing of Opioids.**

103.    Before Defendants began their marketing campaign, generally accepted standards of medical practice dictated that opioids should only be used short-term, or acute, pain, pain relating to recovery from surgery, or for cancer or palliative care. In those instances, the risks of addiction are low or of little significance.

104.    In 1986, the World Health Organization (WHO) published an analgesic ladder for the treatment of cancer pain. The WHO recommended treatment with over-the-counter or prescription acetaminophen or NSAIDs first, and then use of unscheduled or combination opioids, and then stronger (Schedule II or III) opioids if pain persisted. The WHO ladder pertained only to the treatment of cancer pain, and did not contemplate the use of narcotic opioids for chronic pain—because the use of opioids for chronic pain was not considered appropriate medical practice at the time.

105.    Studies and articles from the 1970s and 1980s made clear the reasons to avoid opioids. Scientists observed negative outcomes from long-term opioid therapy in pain

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

management programs:  opioids' mixed record in reducing pain long-term and failure to improve patients' function; greater pain complaints as most patients developed tolerance to opioids; opioid patients' diminished ability to perform basic tasks; their inability to make use of complementary treatments like physical therapy due to the side effects of opioids; and addiction. Leading authorities discouraged, or even prohibited, the use of opioid therapy for chronic pain.

106.    In 1986, Dr. Russell Portenoy, who later became Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York while at the same time serving as a top spokesperson for drug companies, published an article reporting that few substantial gains in employment or social function could be attributed to the institution of opioid therapy.

107.    In 1994, Dr. Portenoy noted that tolerance, the potential for side effects, worsening disability, mental clouding, withdrawal, and addiction could constitute compelling reasons to reject long-term opioid administration as a therapeutic strategy in all but the most desperate cases of chronic nonmalignant pain.

108.    Defendants, through their misleading promotion of opioid use for chronic nonmalignant pain, changed the then-existing perception that there could not be a significant number of chronic pain patients who were successfully managed with opioids.

## II.    DEFENDANTS PROMOTED THEIR BRANDED PRODUCTS THROUGH DIRECT MARKETING TO PRESCRIBERS AND CONSUMERS.

109.    Defendants' direct marketing proceeded on two tracks, serving two related purposes. First, Defendants worked through branded and unbranded marketing to build confidence in long-term opioid use by overstating its benefits and downplaying its risks, and thereby expand the chronic pain market. In addition, Defendants worked through their own staffs

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

of sales representatives, physician speakers whom those representatives recruited, and advertising in medical journals to claim their share of that broader market. Defendants directed all of this activity through carefully designed marketing plans that were based on extensive research into prescriber habits and the efficacy of particular sales approaches and messages.

### 1. Defendants Relied Upon Branded Advertisements.

110.    Defendants engaged in widespread advertising campaigns touting the benefits of their branded drugs. Defendants published print advertisements in a broad array of medical journals, ranging from those aimed at specialists, such as the *Journal of Pain* and *Clinical Journal of Pain*, to journals with wider medical audiences, such as the *Journal of the American Medical Association*. Defendants' advertising budgets peaked in 2011, when they collectively spent more than $14 million on medical journal advertising of opioids, nearly triple what they spent in 2001. The 2011 total includes $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.

111.    A number of these branded advertisements deceptively portrayed the benefits of opioid therapy for chronic pain.

### 2. Defendants Relied Upon Their Sales Forces and Recruited Physician Speakers.

112.    Each Defendant, acting in conspiracy with each other and/or acting in concert with each other, promoted the use of opioids for chronic pain through detailers— sales representatives who visited individual physicians and their staff in their offices—and small group speaker programs. By establishing close relationships with doctors, Defendants' sales representatives were able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to differentiate their opioids and to address individual prescribers' concerns

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

about prescribing opioids for chronic pain. Representatives were trained on techniques to build these relationships.

113.    Defendants developed sophisticated plans to select prescribers for sales visits based on their specialties and prescribing habits. In accordance with common industry practice, Defendants purchase and closely analyze prescription sales data from IMS Health that allows them to track, precisely, the rates of initial prescribing and renewal by individual doctors of every manufacturer of opioids, which in turn allows them to target, tailor, and monitor the impact of their appeals.

114.    Defendants' sales representatives have visited hundreds of thousands of doctors, including thousands of visits to Missouri prescribers, including those in St. Louis City, such as Dr. Williams and Dr. Padda, and Plaintiff Camden County, and as described herein, spread misinformation regarding the risks, benefits, and superiority of opioids for the treatment of chronic pain. These representatives also appeared in Plaintiff Camden County. This misinformation includes deceptive and unfair claims regarding the risks of opioids for chronic pain, particularly the risks of addiction, withdrawal, and high doses, as well as the benefits.

115.    Each Defendant carefully trained its sales representatives to deliver company-approved messages designed to generate prescriptions of that company's drugs in particular and opioids in general. Pharmaceutical companies exactingly direct and monitor their sales representatives—through detailed action plans, trainings, tests, scripts, role-plays, supervisor tag-alongs, and other means—to ensure that individual detailers deliver the desired messages and do not veer off-script. Pharmaceutical companies likewise require their detailers to deploy sales aids reviewed, approved, and supplied by the company and forbid them to use promotional materials not approved by the company's marketing and compliance departments. Sales representatives'

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

adherence to their corporate training typically is included in their work agreements. Departing from their company's approved messaging can and does lead to severe consequences, including termination of employment.

116.    Besides carefully training their sales representatives, Defendants also used surveys of physicians—conducted by third-party research firms—to assess how well their core messages came across to prescribers. These verbatim recollections of detailers' messages are an integral tool in ensuring consistent message delivery. They also help Defendants gauge physicians' perceptions of, and willingness to prescribe, a particular Defendant's drugs.

117.    In addition to making sales calls, Defendants' detailers also identified doctors to serve, for payment, on Defendants' speakers' bureaus and to attend programs with speakers and meals paid for by Defendants. Defendants almost always select physicians who are so-called product loyalists, since one question they will be asked is whether they prescribe the drug themselves.

118.    These speaker programs and associated speaker training serve three purposes: they provide an incentive to doctors to prescribe, or increase their prescriptions of, a particular drug; they provide a forum in which to further market to the speaker him or herself; and they provide an opportunity to market to the speaker's peers. Defendants grade their speakers, and future opportunities are based on speaking performance, post-program sales, and product usage. Defendants also track the prescribing of event attendees to determine whether they wrote more prescriptions after attending the program than before. Defendants devoted significant resources to these programs in order to increase their sales.

119.    Like the sales representatives who select them, speakers are expected to stay on message—indeed, they agree in writing to follow the slide decks provided to them. Importantly,

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

the FDA regards promotional talks as part of product labeling and requires their submission for review. Speakers thus give the appearance of providing independent, unbiased presentations on opioids, when in fact they are presenting a script prepared by Defendants' marketing departments. Although meal-based speaker events are more expensive to host and typically have lower attendance than CMEs, they are subject to less professional scrutiny and thus afford Defendants greater freedom in the messages they present.

120.    Defendants devoted massive resources to these direct sales contacts with prescribers. In 2014, Defendants collectively spent $168 million on detailing branded opioids to physicians nationwide. This figure includes $108 million spent by Purdue, $34 million by Janssen, $13 million by Cephalon, $10 million by Endo, and $2 million by Actavis. The total figure is more than double Defendants' collective spending on detailing in 2000.

121.    Defendants have spent hundreds of millions of dollars promoting their opioids through their respective sales forces because they understand that detailers' sales pitches are effective. Defendants saw their aggregate sales climb with their promotional spending and also saw an increase in the number of prescriptions written by the physicians they targeted for detailing.

### 3. Defendants Directed These Promotional Efforts Through Detailed Marketing Plans.

122.    Defendants guided their efforts to expand opioid prescribing through comprehensive marketing and business plans for each drug. These documents, based on the companies' extensive market research, laid out ambitious plans to bring in new prescribers and increase overall prescribing of Defendants' opioids.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

a.   Targeting categories of prescribers

123.   Defendants targeted, by zip codes and other local boundaries, individual health care providers for detailing. Defendants chose their targets based on the potential for persuading a provider to prescribe, ease of in-person access, and the likelihood of higher numbers of prescriptions at higher doses, with no correlation to demonstrated need or demand for opioid therapy, or to risk of abuse. On information and belief, Plaintiff will show in discovery of Defendants' own data, combined with the DEA's automation of reports and consolidated orders system (ARCOS), that Defendants knew when and how many units of pills were being shipped to Plaintiff County.

124.   Collectively, Defendants' marketing plans evince dual strategies, which often operated parallel to one another. Defendants' sales representatives continued to focus their detailing efforts on pain specialists and anesthesiologists, who are the highest-volume prescribers of opioids but are also, as a group, more educated than other practitioners about opioids' risks and benefits. Seeking to develop market share and expand sales, Defendants targeted increasing numbers and types of prescribers, including internists and general practitioners.

b.   Increasing "direct to consumer" marketing

125.   Defendants knew that physicians were more likely to prescribe their branded medications when patients asked for those medications. Endo's research, for example, found that such communications resulted in greater patient brand loyalty with longer durations of Opana ER therapy and fewer discontinuations. Defendants increasingly took their opioid sales campaigns directly to consumers, including through purported patient-focused education and support materials. These took the form of pamphlets, videos, or other publications that patients could view in their physician's office, as well as employer and workers' compensation plan initiatives

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

to drive demand for access through the employer audience by highlighting cost of disease and productivity loss.

126.    Defendants also knew that one of the largest obstacles to patients starting and remaining on their branded opioids—including by switching from a competitor's drug—was out-of-pocket cost. They recognized they could overcome this obstacle by providing patients financial assistance with their insurance co-payments, and each of the Defendants did so through vouchers and coupons distributed during detailing visits with prescribers. A 2008 Actavis business review, for example, highlighted co-pay assistance, good for up to $600 per patient per year, as a way to drive conversions to Kadian from competitor drugs like Avinza and MS Contin. In 2012, Janssen planned to distribute 1.5 million savings cards worth $25 each.

        c.    <u>Differentiating each brand</u>

127.    Purdue's OxyContin was the clear market leader in prescription opioid therapy, with 30% of the market for analgesic drugs in 2012. Meanwhile, by 2010, Defendants faced increasing pushback from the medical community and regulators based on the growing problems of opioid addiction and abuse. Both market conditions prompted Defendants to pursue product differentiation strategies—and particularly an emphasis on their products being less subject to diversion, abuse, and addiction—as a means of grabbing market share from Purdue and other competitors.

        d.    <u>Moving beyond office visits</u>

128.    Defendants sought to reach additional prescribers by expanding beyond traditional sales calls and speaker events to new channels for their messages. For their sales forces, these included marketing to prescribers through voice mail, postcards, and email—so-called e-detailing.  Defendants also created new platforms for their speakers by implementing

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

peer to peer programs such as teleconferences and webinars that were available to prescribers nationally. These programs allowed Defendants to use this more seemingly credible vehicle to market to, among other hard-to-reach audiences, prescribers at hospitals, academic centers, and other locations that limit or prohibit in-person detailing. Employing these new approaches, each Defendant relied heavily on speakers to promote its drugs.

### 4. Defendants Marketed Opioids in Missouri Using the Same Strategies and Messages They Employed Nationwide.

129.    Defendants employed the same marketing plans and strategies and deployed the same messages in Missouri as they did nationwide. Across the pharmaceutical industry, core message development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that Defendants' messages are accurately and consistently delivered across marketing channels—including detailing visits, speaker events, and advertising—and in each sales territory. Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

130.    Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and nationally coordinated advertising. Defendants' sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide desks, and supervisors rode along with them periodically to both check on their performance and compliance.

131.    As they did nationwide, Defendants extensively tracked the prescribing behavior of Missouri-area health care providers and used that data to target their detailing and speaker-recruiting efforts. Top prescribers of opioids were profiled at the city, region, zip code, and

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

sometimes facility levels, with information about their specialty, prescribing patterns (including product and dose), product loyalty and refill history. Providers' prescribing volume was ranked and sorted into details.

132.    As described herein, misrepresentations and deceptions regarding the risks, benefits, and superiority of opioid use to treat chronic pain were part and parcel of Defendants' marketing campaigns in Missouri.

133.    Defendants' representatives marketed their drugs as safe, with low risk of addiction or lower risk than competing opioids, and touted that their company's product was the drug of choice for chronic pain conditions such as low back pain and osteoarthritis. Defendants' representatives also repeatedly claimed or implied that their drugs had minimal or low abuse potential; were safer than other pain medications; and, in the case of Cephalon's Actiq and Fentora, were appropriate for off-label uses.

## III.    DEFENDANTS USED "UNBRANDED" MARKETING TO EVADE REGULATIONS AND CONSUMER PROTECTION LAWS.

134.    In addition to their direct marketing efforts, Defendants in conspiracy with each other and/or acting in concert with each other, used unbranded, third-party marketing, which they deployed as part of their national marketing strategies for their branded drugs. Each Defendant executed these strategies through a network of third-party KOLs and Front Groups, with which it acted in concert by funding, assisting, encouraging, and directing their efforts, while at the same time exercising substantial control over the content of the messages these third parties generated and disseminated, and distributing certain of those materials themselves. As with their other marketing strategies, Defendants' unbranded marketing created and relied upon an appearance of independence and credibility that was undeserved but central to its effectiveness. Unlike their

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

direct promotional activities, Defendants' unbranded marketing allowed them to evade the oversight of federal regulators and gave them greater freedom to expand their deceptive messages.

       1. **Regulations Governing Branded Promotion Require that it be Truthful, Balanced, and Supported by Substantial Evidence.**

135.   Drug companies that make, market, and distribute opioids are subject to generally applicable rules requiring truthful marketing of prescription drugs. A drug company's branded marketing, which identifies and promotes a specific drug, must:  (a) be consistent with its label and supported by substantial scientific evidence; (b) not include false or misleading statements or material omissions; and (c) fairly balance the drug's benefits and risks. The regulatory framework governing the marketing of specific drugs reflects a public policy designed to ensure that drug companies, which are best suited to understand the properties and effects of their drugs, are responsible for providing prescribers with the information they need to accurately assess the risks and benefits of drugs for their patients.

136.   Further, Defendants under the FDA Regulations are prohibited from marketing drugs that are misbranded. A drug is misbranded if it lacks adequate directions for use or if the label is false or misleading in any particular. Adequate directions for use are directions under which the layman can use a drug safely and for the purposes for which it is intended. Labeling includes more than the drug's physical label; it also includes all other written, printed, or graphic matter accompanying the drug, including promotional material. The term accompanying is interpreted broadly to include promotional materials—posters, websites, brochures, books, and the like—disseminated by or on behalf of the manufacturer of the drug. A drug is misbranded if it is marketed for use other than for which the drug is approved. Thus, Defendants' promotional materials are part of their drugs' labels and required to be accurate, balanced, and not misleading.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

137.    Labeling is misleading if it is not based on substantial evidence, if it materially misrepresents the benefits of the drug, or if it omits material information about or minimizes the frequency or severity of a product's risks. Promotion that fails to present the most important risks of the drug as prominently as its benefits lacks fair balance and are deceptive.

### 2. Defendants Deployed Front Groups and Doctors to Disseminate Unbranded Information on Their Behalf.

138.    Drug companies market both directly and indirectly, using third party validators (such as scientists, physicians, or patient or professional organizations) that appear to be independent and therefore more credible:

> A firm is responsible for the content generated by its employees or any agents acting on behalf of the firm who promote the firm's product. For example, if an employee or agent of a firm, such as a medical science liaison or paid speaker (e.g., a key opinion leader) acting on the firm's behalf, comments on a third-party site about the firm's product, the firm is responsible for the content its employee or agent provides. A firm is also responsible for the content on a blogger's site if the blogger is acting on behalf of the firm.

139.    In addition to being carried out directly or through third parties, drug companies' promotional activity can be branded or unbranded; unbranded marketing refers not to a specific drug, but more generally to a disease state or treatment. By using unbranded communications, drug companies can sidestep the regulatory framework, governing branded communications.

140.    Defendants disseminated many of their false, misleading, imbalanced, and unsupported statements indirectly, through KOLs and Front Groups, and in unbranded marketing materials. These KOLs and Front Groups were important elements of Defendants' marketing plans, which specifically contemplated their use, because they seemed independent and therefore outside of FDA oversight. Through unbranded materials, Defendants presented information and instructions concerning opioids generally that were contrary to, or at best, inconsistent with

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

information and instructions listed on Defendants' branded marketing materials and drug labels and with Defendants' own knowledge of the risks, benefits and advantages of opioids. Defendants did so knowing that unbranded materials.

141.    Defendants' sales representatives distributed third-party marketing material that was deceptive to Defendants' target audiences. Defendants are responsible for these materials.

142.    Defendants took an active role in guiding, reviewing, and approving many of the misleading statements issued by these third parties, ensuring that Defendants were consistently aware of their content. By funding, directing, editing, and distributing these materials, Defendants exercised control over their deceptive messages and acted pursuant to an agreement with these third parties and other manufacturer and Distributor Defendants to fraudulently promote the use of opioids for the treatment of chronic pain.

143.    The third-party publications Defendants assisted in creating and distributing did not include the warnings and instructions nor were they consistent with the risks and benefits known to Defendants. For example, these publications either did not disclose the risks of addiction, abuse, misuse, and overdose, affirmatively denied that patients faced a serious risk of addiction and that there were no clinical trials supporting opioid use for long term and/or chronic pain.

144.    By acting through third parties, Defendants were able to give the false appearance that the messages reflected the views of independent third parties. Later, Defendants would cite to these sources as independent corroboration of their own statements. As one physician adviser to Defendants noted, third-party documents not only had greater credibility, but broader distribution, as doctors did not push back at having materials from, for example, the non-profit American Pain Foundation (APF) on display in their offices, as they might with first party, drug

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

company pieces. Nevertheless, the independence of these materials was a ruse—Defendants were in close contact with these third parties, paid for and were aware of the misleading information they were disseminating about the use of opioids to treat chronic pain, and regularly helped them to tailor and distribute their misleading, pro-opioid messaging.

145.    As part of a strategic marketing scheme, Defendants spread and validated their deceptive messages through the following vehicles:  (a) KOLs, who could be counted upon to write favorable journal articles and deliver supportive CMEs; (b) a body of biased and unsupported scientific literature; (c) treatment guidelines; (d) CMEs; (e) unbranded patient education materials; and (f) Front Group patient-advocacy and professional organizations, which exercised their influence both directly and through Defendant-controlled KOLs who served in leadership roles in those organizations.

a.    <u>Defendants' Use of KOLs</u>

146.    Defendants cultivated a small circle of doctors who, upon information and belief, were selected and sponsored by Defendants solely because they favored the aggressive treatment of chronic pain with opioids. Defendants' support helped these doctors become respected industry experts. In return, these doctors repaid Defendants by touting the benefits of opioids to treat chronic pain.

147.    Pro-opioid doctors have been at the hub of Defendants' promotional efforts, presenting the appearance of unbiased and reliable medical research supporting the broad use of opioid therapy for chronic pain. KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs supportive of chronic opioid therapy. They have served on committees that developed treatment guidelines that strongly encourage the use of opioids to treat chronic pain (even while acknowledging the lack of evidence in support of that

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

position) and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. Defendants were able to exert control of each of these modalities through their KOLs.

148.    In return, the KOLs' association with Defendants provided money as well as prestige, recognition, research funding, and avenues to publish. This positioned them to exert even more influence in the medical community.

149.    Although some KOLs initially may have advocated for more permissive opioid prescribing with honest intentions, Defendants cultivated and promoted only those KOLs who could be relied on to help broaden the chronic opioid therapy market. Defendants selected, funded, and elevated those doctors whose public positions were unequivocal and supportive of using opioids to treat chronic pain. These doctors' professional reputations were then dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by the drug companies.

150.    Defendants cited and promoted favorable studies or articles by these KOLs. By contrast, Defendants did not support, acknowledge, or disseminate the publications of doctors critical of the use of chronic opioid therapy. Indeed, one prominent KOL sponsored by Defendants, Russell Portenoy, stated that a drug company told him that research critical of opioids (and the doctors who published that research) would never obtain funding. In fact, Defendants never funded a randomized controlled clinical trial on the safety and efficacy of the use of opioids to treat chronic pain or long term use. Some KOLs have even gone on to become direct employees and executives of Defendants, like Dr. David Haddox, Purdue's Vice President of Risk Management, or Dr. Bradley Galer, Endo's former Chief Medical Officer.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

151.    Defendants provided substantial opportunities for KOLs to participate in research studies on topics Defendants suggested or chose, with the predictable effect of ensuring that many favorable studies appeared in the academic literature. As described by Dr. Portenoy, drug companies would approach him with a study that was well underway and ask if he would serve as the study's author. Dr. Portenoy regularly agreed.

152.    Defendants also paid KOLs to serve as consultants or on their advisory boards and give talks or present CMEs, typically over meals or at conferences. From 2000 on, Cephalon, for instance, has paid doctors more than $4.5 million for programs relating to its opioids.

153.    These KOLs were carefully vetted to ensure that they were likely to remain on-message and supportive of a pharmaceutical industry agenda. One measure was a doctor's prior work for trusted Front Groups.

154.    Defendants kept close tabs on the content of the misleading materials published by these KOLs. In many instances, they also scripted what these KOLs said—as they did with all their recruited speakers. The KOLs knew or deliberately ignored the misleading way in which they portrayed the use of opioids to treat chronic pain to patients and prescribers, but they continued to publish those misstatements to benefit themselves and Defendants, all the while causing harm to Missouri prescribers and patients.

i.      *Russell Portenoy*

155.    Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom Defendants identified and promoted to further their marketing campaign. Dr. Portenoy received

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

research support, consulting fees, and honoraria from Cephalon, Endo, Janssen, and Purdue (among others), and was a paid consultant to Cephalon and Purdue.

156.    Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society (APS) / American Academy of Pain Medicine (AAPM) Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1997 and again in 2009. He was also a member of the board of APF, an advocacy organization almost entirely funded by Defendants.

157.    Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations. He appeared on *Good Morning America* in 2010 to discuss the use of opioids long-term to treat chronic pain. On information and belief, on this widely watched program, broadcast in Missouri and across the country, Dr. Portenoy claimed:  Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted.

158.    On information and belief, and to his credit, Dr. Portenoy has recently admitted that he gave innumerable lectures in the late 1980s and '90s about addiction that weren't true. These lectures falsely claimed that fewer than 1% of patients would become addicted to opioids. According to Dr. Portenoy, because the primary goal was to destigmatize opioids, he and other doctors promoting them overstated their benefits and glossed over their risks. Dr. Portenoy also conceded that data about the effectiveness of opioids does not exist. Dr. Portenoy has candidly stated that he taught about pain management and opioids in manner that reflects information.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

          ii.     *Lynn Webster*

159.    Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President in 2013 and is a current board member of AAPM, a front group that ardently supports chronic opioid therapy. He is a Senior Editor of *Pain Medicine*, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue. At the same time, Dr. Webster was receiving significant funding from Defendants (including nearly $2 million from Cephalon).

160.    Dr. Webster had been under investigation for overprescribing by the DEA, which raided his clinic in 2010. More than 20 of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses. Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. As evidence of Defendants' conspiracy and/or acting in concert of action, versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen, and Purdue. In 2011, Dr. Webster presented, via webinar, a program sponsored by Purdue titled, *Managing Patient's Opioid Use: Balancing the Need and the Risk*. Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements as a way to prevent overuse of prescriptions and overdose deaths.  This webinar was available to and was intended to reach Missouri doctors.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

161.    Dr. Webster also was a leading proponent of the concept of pseudoaddiction, the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to *increase* a patient's dose of opioids. As he and a co-author wrote in a book entitled *Avoiding Opioid Abuse While Managing Pain* (2007), when faced with signs of aberrant behavior, increasing the dose "in most cases    should be the clinician's first response." On information and belief, Endo distributed this book to doctors. Years later, on information and belief, Dr. Webster reversed himself, acknowledging that pseudoaddiction became too much of an excuse to give patients more medication.

        b.    <u>Purported Research That Lacked Supporting Evidence</u>

162.    Rather than find a way to actually test the safety and efficacy of opioids for long-term use, Defendants led everyone to believe that they already had. Defendants created a body of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of long-term use; (b) appeared to be the result of independent, objective research; and (c) was thus more likely to shape the perceptions of prescribers, patients and payers. This literature was, in fact, marketing material focused on persuading doctors and consumers that the benefits of long-term opioid use outweighed the risks.

163.    To accomplish this, Defendants—sometimes through third-party consultants and/or advocacy organizations—commissioned, edited, and arranged for the placement of favorable articles in academic journals. Defendants' internal documents reveal plans to submit research papers and so-called studies to long lists of journals, including back-up options and last resort, fast-track application journals that they could use if the pending paper was rejected everywhere else.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

164.    Defendants coordinated the timing and publication of manuscripts, abstracts, posters/oral presentations, and educational materials in peer-reviewed journals and other publications to support the launch and sales of their drugs. The plans for these materials did not originate in the departments within the Defendant organizations that were responsible for research, development or any other area that would have specialized knowledge about the drugs and their effects on patients, but in Defendants' marketing departments and with Defendants' marketing and public relations consultants. Defendants often relied on data on file or presented posters, neither of which are subject to peer review. They also published their articles not through a competitive process, but in paid journal supplements, which allowed Defendants to publish, in nationally circulated journals, studies supportive of their drugs.

165.    Defendants also made sure that favorable articles were disseminated and cited widely in the medical literature, even where references distorted the significance or meaning of the underlying study. Most notably, Purdue promoted a 1980 reference in the well-respected *New England Journal of Medicine*:  J. Porter & H. Jick, *Addiction Rare in Patients Treated with Narcotics*, 302(2) *New Eng. J. Med.* 123 (1980) ("Porter-Jick Letter"). It is cited 856 times as one of the most piece of literature supporting the safe use of opioids to treat long term pain in Google Scholar, and 86 times since 2010. It appears as a reference in two CME programs in 2012 sponsored by Purdue and Endo. Defendants and those acting on their behalf fail to reveal that this so-called article is actually a letter-to-the-editor, not a peer-reviewed study or any kind of study at all. The Porter-Jick Letter, reproduced in full below, describes a review of the charts of hospitalized patients who had received opioids. Because it was a 1980 study, standards of care almost certainly would have limited opioids to acute or end-of-life situations, not chronic pain. It

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

was also a purported study of hospitalized patients, which were predominately treated with opioids for acute post-surgical pain, which is the labeled purpose for opioids.

---

**ADDICTION RARE IN PATIENTS TREATED WITH NARCOTICS**

*To the Editor:* Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients[1] who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients,[2] Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

JANE PORTER
HERSHEL JICK, M.D.
Boston Collaborative Drug
Surveillance Program
Waltham, MA 02154                    Boston University Medical Center

1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D. Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical patients. J Clin Pharmacol. 1978; 18:180-8.

---

166.    The Porter-Jick Letter notes that, when these patients' records were reviewed, it found almost no references to signs of addiction, though there is no indication that caregivers were instructed to assess or document signs of addiction. None of these serious limitations is disclosed when Defendants or those acting on their behalf cite the Porter-Jick Letter, typically as the sole scientific support for the proposition that opioids are rarely addictive, even when taken long-term. In fact, Dr. Jick later complained that his letter had been distorted and misused.

167.    Defendants worked not only to create or elevate favorable studies in the literature, but also to discredit or bury negative information. Defendants' studies and articles often targeted articles that contradicted Defendants' claims or raised concerns about chronic opioid therapy. In order to do so, Defendants—often with the help of third-party consultants—targeted a broad range of media to get their message out, including negative review articles, letters to the editor, commentaries, case-study reports, and newsletters.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

168.    Defendants' strategies—first, to plant and promote supportive literature and then, to cite the pro-opioid evidence in their promotional materials, while failing to disclose evidence that contradicts those claims—are flatly inconsistent with their legal obligations. The strategies were intended to, and did, knowingly and intentionally distort the truth regarding the risks, benefits and superiority of opioids for chronic pain relief and distorted prescribing patterns as a result.

c.    <u>Treatment Guidelines</u>

169.    Treatment guidelines have been particularly important in securing acceptance for chronic opioid therapy. They are relied upon by doctors, especially the general practitioners and family doctors targeted by Defendants, who are otherwise not experts, nor trained, in the treatment of chronic pain. Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications. Furthermore, Endo's internal documents indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

i.    *FSMB*

170.    The Federation of State Medical Boards (FSMB) is a trade organization representing the various state medical boards in the United States. The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians. The FSMB finances opioid- and pain-specific programs through grants from Defendants.

171.    As further evidence of Defendants' conspiracy and/or acting in concert, in 1998, the FSMB developed *Model Guidelines for the Use of Controlled Substances for the Treatment*

60

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

*of Pain* (FSMB Guidelines), which, on information and belief,  FSMB admitted was produced in collaboration with pharmaceutical companies.  The FSMB Guidelines taught not that opioids could be appropriate in limited cases or after other treatments had failed, but that opioids were essential for treatment of chronic pain, including as a first prescription option. The FSMB Guidelines failed to mention risks relating to respiratory depression and overdose, and they discussed addiction only in the sense that so-called inadequate understandings of addiction can lead to inadequate pain control.

172.    A 2004 iteration of the FSMB Guidelines and the 2007 book adapted from the 2004 guidelines, *Responsible Opioid Prescribing*, also make these same claims. These guidelines were posted online and were available to and intended to reach Missouri physicians.

173.    *Responsible Opioid Prescribing* was backed largely by drug manufacturers, including Cephalon, Endo, and Purdue. The FSMB financed the distribution of *Responsible Opioid Prescribing* by its member boards by contracting with drug companies, including Endo and Cephalon, for bulk sales and distribution to sales representatives (for distribution to prescribing doctors).

174.    In all, 163,131 copies of *Responsible Opioid Prescribing* were distributed to state medical boards (and through the boards, to practicing doctors), and the FSMB benefitted by earning approximately $250,000 in revenue and commissions from their sale. The FSMB website describes the book as the leading continuing medication education (CME) activity for prescribers of opioid medications.

175.    Drug companies relied on FSMB guidelines to convey the message that under-treatment of pain would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription decisions were

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

documented. FSMB turned doctors' fear of discipline on its head—doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught that they would be punished instead if they failed to prescribe opioids to their patients with pain.

176.    FSMB, more recently, has moderated its stance. Although the 2012 revision of *Responsible Opioid Prescribing* continues to teach that pseudoaddiction is real and that opioid addiction risk can be managed through risk screening, it no longer recommends chronic opioid therapy as a first choice after the failure of over-the-counter medication and has heightened its addiction and risk warnings.

ii.    *AAPM/APS Guidelines*

177.    AAPM and the APS are purportedly professional medical societies, each of which received substantial funding from Defendants from 2009 to 2013 (with AAPM receiving over $2 million). This concurrent funding of AAPM and APS to promote opioid use is further evidence of Defendants' conspiracy and/or acting in concert. They issued a consensus statement in 1997, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low. The co-author of the statement, Dr. Haddox, was at the time a paid speaker for Purdue. Dr. Portenoy was the sole consultant. The consensus statement, which also formed the foundation of the FSMB Guidelines, remained on AAPM's website until 2011. The statement was taken down from AAPM's website only after a doctor complained, though it lingers on the internet elsewhere.

178.    AAPM and APS issued their own guidelines in 2009 (AAPM/APS Guidelines) and continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Cephalon, Endo, and Purdue.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

179.    The 2009 Guidelines promote opioids as safe and effective for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited 732 times in academic literature, were disseminated in Missouri during the relevant time period, are still available online, and were reprinted in the *Journal of Pain*.

180.    Defendants widely referenced and promoted the 2009 Guidelines without disclosing the acknowledged lack of evidence to support them.

### iii.        *American Geriatrics Society*

181.    The American Geriatrics Society (AGS), a nonprofit organization serving health care professionals who work with the elderly, disseminated guidelines regarding the use of opioids for chronic pain in 2002's *The Management of Persistent Pain in Older Persons* (hereinafter 2002 AGS Guidelines) and 2009's *Pharmacological Management of Persistent Pain in Older Persons* (hereinafter 2009 AGS Guidelines). The 2009 AGS Guidelines included the following recommendations: "All patients with moderate to severe pain  should be considered for opioid therapy (low quality of evidence, strong recommendation)," and "the risks of addiction are exceedingly low in older patients with no current or past history of substance abuse." These recommendations, which continue to appear on AGS's website, are not supported

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

by any study or other reliable scientific evidence. Nevertheless, they have been cited more than 278 times in Google Scholar since their 2009 publication.

182.    AGS contracted with Defendants Endo, Purdue, and Janssen to disseminate the 2009 Guidelines, and to sponsor CMEs based on them. These Defendants were aware of the content of the 2009 Guidelines when they agreed to provide funding for these projects. The 2009 Guidelines were released at the May 2009 AGS Annual Scientific Meeting and first published online on July 2, 2009. AGS submitted grant requests to Defendants including Endo and Purdue beginning July 15, 2009. Internal AGS discussions in August 2009 reveal that it did not want to receive up-front funding from drug companies, which would suggest drug company influence, but would instead accept commercial support to disseminate the publication. However, by drafting the guidelines knowing that pharmaceutical company funding would be needed, and allowing these companies to determine whether to provide support only after they have approved the message, AGS ceded significant control to these companies. As further evidence of Defendants' conspiracy and/or acting in concert. Endo, Janssen, and Purdue all agreed to provide support to distribute the guidelines.

183.    According to one news report, AGS has received $344,000 in funding from opioid makers since 2009. Five of 10 of the experts on the guidelines panel disclosed financial ties to Defendants, including serving as paid speakers and consultants, presenting CMEs sponsored by Defendants, receiving grants from Defendants, and investing in Defendants' stock. The Institute of Medicine recommends that, to ensure an unbiased result, fewer than 50% of the members of a guidelines committee should have financial relationships with drug companies.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

iv.  *Guidelines That Did Not Receive Defendants' Support*

184.   The extent of Defendants' influence on treatment guidelines is demonstrated by the fact that independent guidelines—the authors of which did not accept drug company funding—reached very different conclusions. The 2012 *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain*, issued by the American Society of Interventional Pain Physicians (ASIPP), warned that "the recent revelation that the pharmaceutical industry was involved in the development of opioid guidelines as well as the bias observed in the development of many of these guidelines illustrate that the model guidelines are not a model for curtailing controlled substance abuse and may, in fact, be facilitating it." ASIPP's Guidelines further advise that "therapeutic opioid use, specifically in high doses over long periods of time in chronic non-cancer pain starting with acute pain, not only lacks scientific evidence, but is in fact associated with serious health risks including multiple fatalities, and is based on emotional and political propaganda under the guise of improving the treatment of chronic pain." ASIPP recommends long-acting opioids in high doses only in specific circumstances with severe intractable pain and only when coupled with continuous adherence monitoring,  in well-selected populations, in conjunction with or after failure of other modalities of treatments with improvement in physical and functional status and minimal adverse effects.

185.   Similarly, the 2011 *Guidelines for the Chronic Use of Opioids*, issued by the American College of Occupational and Environmental Medicine, recommend against the routine use of opioids in the management of patients with chronic pain, finding at least moderate evidence that harms and costs exceed benefits based on limited evidence, while conceding there may be patients for whom opioid therapy is appropriate.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

186.    The *Clinical Guidelines on Management of Opioid Therapy for Chronic Pain*, issued by the U.S. Department of Veterans Affairs (VA) and Department of Defense (DOD) in 2010, notes that their review:

> Revealed the lack of solid evidence based research on the efficacy of long-term opioid therapy. Almost all of the randomized trials of opioids for chronic non-cancer pain were short-term efficacy studies. Critical research gaps include: lack of effectiveness studies on long-term benefits and harms of opioids ; insufficient evidence to draw strong conclusions about optimal approaches to risk stratification ; lack of evidence on the utility of informed consent and opioid management plans ; and treatment of patients with chronic non-cancer pain at higher risk for drug abuse or misuse.

d.    Continuing Medical Education

187.    CMEs are ongoing professional education programs provided to doctors. Doctors are required to attend a certain number and, often, type of CME programs each year as a condition of their licensure. These programs are delivered in person, often in connection with professional organizations' conferences, and online, or through written publications. Doctors rely on CMEs not only to satisfy licensing requirements, but to get information on new developments in medicine or to deepen their knowledge in specific areas of practice. Because CMEs typically are delivered by KOLs who are highly respected in their fields, and are thought to reflect these physicians' medical expertise, they can be especially influential with doctors.

188.    The countless doctors and other health care professionals who participate in accredited CMEs constitute an enormously important audience for opioid reeducation. As one target, Defendants aimed to reach general practitioners, whose broad area of focus and lack of specialized training in pain management made them particularly dependent upon CMEs and, as a result, especially susceptible to Defendants' deceptions.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

189.    In all, Defendants sponsored CMEs that were delivered thousands of times, promoting chronic opioid therapy and supporting and disseminating the deceptive and biased messages described in this Complaint. These CMEs, while often generically titled to relate to the treatment of chronic pain, focus on opioids to the exclusion of alternative treatments, inflate the benefits of opioids, and frequently omit or downplay their risks and adverse effects.

190.    On information and belief, the American Medical Association (AMA) has recognized that support from drug companies with a financial interest in the content being promoted creates conditions in which external interests could influence the availability and/or content of the programs and urges that, when possible, CMEs should be provided without such support or the participation of individuals who have financial interests in the educational subject matter.

191.    Dozens of CMEs that were available to and attended or reviewed by Missouri doctors during the relevant time period did not live up to the AMA's standards.

192.    The influence of Defendants' funding on the content of these CMEs is clear. One study by a Georgetown University Medical Center professor compared the messages retained by medical students who reviewed an industry-funded CME article on opioids versus another group who reviewed a non-industry-funded CME article. The industry-funded CME did not mention opioid-related death once; the non-industry-funded CME mentioned opioid-related death 26 times. Students who read the industry-funded article more frequently noted the impression that opioids were underused in treating chronic pain. The take away of those reading the non-industry-funded CME mentioned the risks of death and addiction much more frequently than the other group. Neither group could accurately identify whether the article they read was industry-

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

funded, making clear the difficulty health care providers have in screening and accounting for source bias.

193.    By sponsoring CME programs put on by Front Groups like APF, AAPM, and others, Defendants could expect messages to be favorable to them, as these organizations were otherwise dependent on Defendants for other projects. The sponsoring organizations honored this principle by hiring pro-opioid KOLs to give talks that supported chronic opioid therapy. Defendant-driven content in these CMEs had a direct and immediate effect on prescribers' views on opioids. Producers of CMEs and Defendants measured the effects of CMEs on prescribers' views on opioids and their absorption of specific messages, confirming the strategic marketing purpose in supporting them.

e.      Unbranded Patient Education

194.    Pharmaceutical industry marketing experts see patient-focused advertising, including direct-to-consumer marketing, as particularly valuable in increasing market share by bringing awareness to a particular disease that the drug treats. Evidence also demonstrates that physicians are willing to acquiesce to patient demands for a particular drug—even for opioids and for conditions for which they are not generally recommended. On information and belief, an Actavis marketing plan, for example, noted that direct-to-consumer marketing affects prescribing decisions. Recognizing this fact, Defendants put their relationships with Front Groups to work to engage in largely unbranded patient education about opioid treatment for chronic pain. There have been studies that show for every dollar a drug company spends on direct to consumer advertising, they profit approximately $4.00.

195.    The drug companies expect that they will recoup their investment in direct-to-consumer advertisements because they will capture at least some of any additional prescriptions

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

that result from patients asking their doctor about drugs that can treat their pain. Doctors also may review direct-to-consumer materials sales representatives give them to distribute to patients.

f.      Defendants' Use of Front Groups

196.    As noted above, Defendants Mallinckrodt, Cephalon, Endo, Janssen, Depomed, Mylan, and Purdue entered into arrangements with numerous organizations to promote opioids. These organizations depend upon Defendants for significant funding and, in some cases, for their survival. They were involved not only in generating materials and programs for doctors and patients that supported chronic opioid therapy, but also in assisting Defendants' marketing in other ways—for example, responding to negative articles and advocating against regulatory changes that would constrain opioid prescribing. They developed and disseminated pro-opioid treatment guidelines; conducted outreach to groups targeted by Defendants, such as veterans and the elderly; and developed and sponsored CMEs that focused exclusively on use of opioids to treat chronic pain. Defendants funded these Front Groups in order to ensure supportive messages from these seemingly neutral and credible third parties, and their funding did, in fact, ensure such supportive messages. (See Fueling an Epidemic a U.S. Senate Homeland Security Committee parting member report, 2018).

197.    Several representative examples of such Front Groups are highlighted below, but there are others, too, such as APS, AGS, FSMB, American Chronic Pain Association (ACPA), AAPM, American Society of Pain Educators (ASPE), NPF, and PPSG.

i.      *American Pain Foundation*

198.    The most prominent of Defendants' Front Groups was APF, which received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. Endo alone provided more than half that funding; Purdue was next, at $1.7 million.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

199.    APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes—including death—among returning soldiers. APF also engaged in a significant multimedia campaign—through radio, television and the internet—to educate patients about their right to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach Missourians.

200.    In addition to Drs. Perry Fine, Russell Portenoy, and Scott Fishman, who served on APF's Board and reviewed its publications, another board member, Lisa Weiss, was an employee of a public relations firm that worked for both Purdue and APF.

201.    In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million. By 2011, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit. As one of its board members, Russell Portenoy, explained, the lack of funding diversity was one of the biggest problems at APF.

202.    APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors. It was often called upon to provide patient representatives for Defendants' promotional activities, including for Purdue's *Partners Against*

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

*Pain* and Janssen's *Let's Talk Pain*. As laid out below, APF functioned largely as an advocate for the interests of Defendants, not patients. Indeed, on information and belief, as early as 2001, Purdue told APF that the basis of a grant was Purdue's desire to strategically align its investments in nonprofit organizations that share its business interests.

203.    In practice, APF operated in close collaboration with opioid makers. On several occasions, representatives of the drug companies, often at informal meetings at Front Group conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

204.    APF assisted in other marketing projects for drug companies. One project funded by another drug company—*APF Reporter's Guide:   Covering Pain and Its Management* (2009)—recycled text that was originally created as part of the company's training document.

205.    The close relationship between APF and the drug company was not unique, but mirrors relationships between APF and Defendants. APF's clear lack of independence—in its finances, management, and mission—and its willingness to allow Defendants to control its activities and messages support an inference that each Defendant that worked with it was able to exercise editorial control over its publications.

206.    Indeed, the U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to APF's credibility as an objective and neutral third party and Defendants stopped funding it. Within days of being targeted by Senate investigation, on information and belief, APF's board voted to dissolve the

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

organization due to irreparable economic circumstances and, on further information and belief, APF ceased to exist, effective immediately.

ii.      *The American Academy of Pain Medicine*

207.    The American Academy of Pain Medicine, with the assistance, prompting, involvement, and funding of Defendants, issued treatment guidelines and sponsored and hosted medical education programs essential to Defendants' deceptive marketing of chronic opioid therapy.

208.    AAPM received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event—its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an exclusive venue or offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Defendants Endo, Purdue, Cephalon and Actavis were members of the council and presented deceptive programs to doctors who attended this annual event.

209.    On information and belief, AAPM is viewed internally by Endo as industry friendly, with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications. The conferences sponsored by AAPM heavily emphasized sessions on opioids, approximately 37 out of roughly 40 sessions at one conference alone. AAPM's presidents have included top industry-supported KOLs Perry

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Fine, Russell Portenoy, and Lynn Webster. Dr. Webster was even elected president of AAPM while under a DEA investigation.

210.    AAPM's staff understood they and their industry funders were engaged in a common task. Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

### 3.    Defendants Acted In Concert with KOLs and Front Groups in the Creation, Promotion, and Control of Unbranded Marketing.

211.    Like cigarette makers that engaged in an industry-wide effort to misrepresent the safety and risks of smoking. As further evidence of Defendants conspiracy and/or acting in concert, Defendants worked with each other and with the Front Groups and KOLs they funded and directed to carry out a common scheme to deceptively market the risks, benefits, and superiority of opioids to treat chronic pain.

212.    Defendants acted through and with the same network of Front Groups, funded the same KOLs, and often used the very same language and format to disseminate the same deceptive messages. These KOLs have worked reciprocally with Defendants to promote misleading messaging regarding the appropriate use of opioids to treat chronic pain. Although participants knew this information was false and misleading, these misstatements were nevertheless disseminated to Missouri prescribers and patients.

213.    On information and belief, one vehicle for their collective collaboration was Pain Care Forum (PCF). PCF began in 2004 as an APF project with goals of offering a setting where multiple organizations can share information and promote and support taking collaborative action regarding federal pain policy issues. APF President Will Rowe described the Forum as a deliberate effort to positively merge the capacities of industry, professional associations, and patient organizations.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

214.   PCF is comprised of representatives from opioid manufacturers and distributors (including Cephalon, Endo, Janssen, and Purdue); doctors and nurses in the field of pain care; professional organizations (*e.g.*, American Academy of Pain Management, APS, and American Society of Pain Educators); patient advocacy groups (*e.g.*, APF and ACPA); and other like-minded organizations (*e.g.*, FSMB and Wisconsin Pain & Policy Studies Group), almost all of which received substantial funding from Defendants. Upon information and belief, the same type of organizations were created in Missouri.

215.   PCF, for example, developed and disseminated so-called consensus recommendations for a Risk Evaluation and Mitigation Strategy (REMS) for long-acting opioids, which the FDA required in 2009 to communicate the risks of opioids to prescribers and patients. This was critical because a REMS that went too far in narrowing the uses or benefits or highlighting the risks of chronic opioid therapy would deflate Defendants' marketing efforts. The recommendations, drafted by Will Rowe of APF, claimed that opioids were essential to the management of pain and that the REMS should acknowledge the importance of opioids in the management of pain and should not introduce new barriers. On information and belied, Defendants worked with PCF members to limit the reach and manage the message of the REMS, which enabled them to maintain, and not undermine, their deceptive marketing of opioids for chronic pain.

### 4.   Defendants Targeted Vulnerable and Lucrative Populations.

#### a.   The Elderly

216.   Elderly patients taking opioids have been found to suffer elevated fracture risks, a greater risk for hospitalizations, and increased vulnerability to adverse drug effects and interactions, such as respiratory depression, which, as Defendants acknowledge in their labels

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

(but not in their marketing), occurs more frequently in elderly patients. A 2010 paper in the Archives of Internal Medicine reported that elderly patients who used opioids had a significantly higher rate of death, heart attacks, and strokes than users of NSAIDs. Defendants' targeted marketing to the elderly and the absence of cautionary language in their promotional materials flies in the face of scientific evidence and their own labels, and creates a heightened risk of serious injury to elderly patients.

217.    Defendants also promoted the notion—also without adequate scientific foundation—that the elderly are particularly unlikely to become addicted to opioids. AGS's 2009 Guidelines, for example, which Mallinckrodt publicized, described the risk of addiction as exceedingly low in older patients with no current or past history of substance abuse.  Yet, a 2010 study examining overdoses among long-term opioid users found that patients 65 or older were among those with the largest number of serious overdoses.

218.    Defendants' efforts have paid off. Since 2007, prescriptions for the elderly have grown at twice the rate of prescriptions for adults between the ages of 40 and 59. In Missouri, use of chronic opioid therapy by elderly patients is significant. Many seniors start on opioids to treat chronic back pain or arthritis.

    b.    Veterans

219.    Veterans, too, are suffering greatly from the effects of Defendants' targeted marketing. A 2008 survey showed prescription drug abuse among military personnel doubled from 2002 to 2005, and then nearly tripled again over the next three years. In 2009, military doctors wrote 3.8 million prescriptions for narcotic pain pills—four times as many as they did in 2001. Further, one-third of veterans prescribed opioids as of 2012 remained on take-home opioids for more than 90 days. Although many of these veterans are returning from service with

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

traumatic injuries, the increase in opioid prescribing is disproportionate to the population and, in far too many cases, unsuited for their treatment. Among former service members receiving VA services nationally in a single year (2005), 1,013 had died of accidental drug overdoses—double the rate of the civilian population.

220.    Plaintiff County has a substantial veteran population.

221.    Opioids are particularly dangerous to veterans. According to a study published last year in the 2013 Journal of American Medicine, veterans returning from Iraq and Afghanistan who were prescribed opioids have a higher incidence of adverse clinical outcomes, like overdoses and self-inflicted and accidental injuries; 40% of veterans with post-traumatic stress disorder received opioids and benzodiazepines (anti-anxiety drugs) that, when mixed with alcohol, can cause respiratory depression and death. Yet, according to a VA Office of Inspector General Report, 92.6% of veterans who were prescribed opioid drugs were also prescribed benzodiazepines. Again, as with elderly patients, Defendants both purposefully sought to increase opioid prescribing to this vulnerable group and omitted from their promotional materials the known, serious risks opioids posed to them.

222.    *Exit Wounds*, a 2009 publication sponsored by Purdue, distributed by APF with grants from Janssen and Endo, and written as a personal narrative of one veteran, describes opioids as underused and the gold standard of pain medications and fails to disclose the risk of addiction, overdose, or injury. It notes that opioid medications increase a person's level of functioning and that long experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications.  The book also asserts that denying a person opioid pain medication because he or she has a history of substance abuse or addiction is contrary to the model guidelines for prescribing opioids, published by the U.S.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Federation of State Medical Boards.  As laid out above, the FSMB itself received support from Defendants during the time it created and published its guidelines.

223.    *Exit Wounds* minimizes the risks from chronic opioid therapy and does not disclose the risk that opioids may cause fatal interactions with benzodiazapines, which were taken by a significant number of veterans. It is not the unbiased narrative of a returning war veteran. It is pure marketing, sponsored by Mallinckrodt. Yet, Janssen, for example, supported the marketing effort, and its insufficient disclosures, despite acknowledging on the label for its opioid Duragesic that its use with benzodiazepines may cause respiratory depression, hypotension, and profound sedation or potentially result in coma.  A similar warning is found on the labels of other Defendants' opioids.

224.    The deceptive nature of *Exit Wounds* is obvious in comparing it to guidance on opioids published by the VA and DOD in 2010 and 2011. The VA's *Taking Opioids Responsibly* describes opioids as dangerous.  It cautions against taking extra doses and mentions the risk of overdose and the dangers of interactions with alcohol. The list of side effects from opioids includes decreased hormones, sleep apnea, hyperalgesia, addiction, immune system changes, birth defects and death—none of which is disclosed in *Exit Wounds*.

## IV.    DEFENDANTS USED FALSE MARKETING AND ADVERTISING TACTICS WITH CHRONIC PAIN PATIENTS AND FAILED TO REPORT SUSPICIOUS ORDERS

### 1.    Mylan Targeted Non-Cancer Treatment Physicians and Funded    False Publications and Presentations

225.    Defendant Mylan manufactured their generic version of the Fentanyl patch under the brand name Mylan-Fentanyl Matrix Patch. Mylan falsely marketed their patch product to doctors for an effective treatment for chronic neck and back pain and for other off-label pain

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

conditions. Mylan utilized KOL's and was a participant in the financial support of various front groups, including, but not limited to the American Pain Society. Mylan timed their payments to this group to coincide with their launch of intermediate dosage strengths for its Fentanyl Transdermal System, which was their attempt to access the chronic pain market. Their payments were part of an overall education process for prescribing doctors about the availability of the intermediate strengths (Homeland Security Report, ranking member, 2018, part two, page 6).

**2.      Mylan Failed to Report Suspicious Sales as Required.**

226.    Missouri law and federal law imposes on all registrants the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

227.    Mylan is a registrant under Missouri law which requires manufacturers of Schedule II controlled substances to register with the State of Missouri.

228.    Mylan failed to design and operate a system to disclose suspicious orders of controlled substances and/or failed to notify the appropriate DEA field division of suspicious orders. Mylan's failure to timely report these and other suspicious sales violated Missouri laws.

**3.      Mallinckrodt**

229.    Mallinckrodt manufactures, markets, sells and distributes pharmaceutical drugs in Missouri. Mallinckrodt is the largest U.S. supplier of opioid pain medications and among the top ten generic pharmaceutical manufacturers in the United States, based on prescriptions.

230.    Among the drugs it distributes are the following:

| Exalgo | Opioid agonist indicated for opioid-tolerant patients for | Schedule II |
| (hydromorphone | management of pain severe enough to require daily, around- | |

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

| | | |
|---|---|---|
| hydrochloride extended release) | the-clock, long-term opioid treatment and for which alternative treatment options (*e.g.,* non-opioid analgesics) are inadequate. The FDA approved the 8, 12, and 16 mg tablets of Exalgo in March 2010 and 32 mg tablet in August 2012. | |
| Roxicodone (oxycodone hydrochloride) | Brand-name instant-release form of oxycodone hydrochloride. Indicated for the management of pain severe enough to require an opioid analgesic and for which alternative treatments are inadequate. Acquired from Xanodyne Pharmaceuticals in 2012. Strengths range up to 30 mg per pill. Nicknames include Roxies, blues, and stars. | Schedule II |
| Xartemis XR (oxycodone hydrochloride and acetaminophen) | The FDA approved Xartemis XR in March 2014 for the management of acute pain severe enough to require opioid treatment and in patients for whom alternative treatment options are ineffective, not tolerated or would otherwise be inadequate. It was the first extended-release oral combination of oxycodone and acetaminophen. | Schedule II |
| Methadose (methadone hydrochloride) | Branded generic product. Opioid agonist indicted for treatment of opioid addiction. | Schedule II |
| Morphine sulfate extended release | Generic product | Schedule II |
| Fentanyl extended release | Generic product | Schedule II |
| Fentanyl citrate | Generic product | Schedule II |
| Oxycodone and acetaminophen | Generic product | Schedule II |
| Hydrocodone bitartrate and acetaminophen | Generic product | Schedule II |
| Hydromorphone hydrochloride | Generic product | Schedule II |
| Hydromorphone hydrochloride extended release | Generic product | Schedule II |
| Naltrexone hydrochloride | Generic product | Schedule II |
| Oxymorphone hydrochloride | Generic product | Schedule II |
| Methadone hydrochloride | Generic product | Schedule II |
| Oxycodone hydrochloride | Generic product | Schedule II |

231.    Mallinckrodt purchased Roxicodone from Xandodyne Pharmaceuticals in 2012.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

232.    Mallinckrodt debuted Xartemis (MNK-795) at the September 4-7, 2013 PAINWeek in Las Vegas.

233.    Mallinckrodt's opioids were widely prescribed throughout Missouri and Plaintiff County. The vast majority of these drugs were manufactured in St. Louis City.

### 4.      Mallinckrodt Funded False Publications and Presentations

234.    Similar to other Manufacturer Defendants, Mallinckrodt provided substantial funding to purportedly neutral organizations that disseminated false messaging about opioids.

235.    For example, until at least February 2009, Mallinckrodt provided an educational grant to Pain-Topics.org, a now-defunct website that touted itself as a noncommercial resource for healthcare professionals, providing open access to clinical news, information, research, and education for a better understanding of evidence-based pain-management practices. Among other content, the website included a handout entitled Oxycodone Safety Handout for Patients, which advised to practitioners that patients' fears of opioid addiction should be dispelled. On information and belief, the handout included several false and misleading statements concerning the risk of addiction associated with prescription opioids:

> Will you become dependent on or addicted to oxycodone? After a while, oxycodone causes physical dependence. That is, if you suddenly stop the medication you may experience uncomfortable withdrawal symptoms, such as diarrhea, body aches, weakness, restlessness, anxiety, loss of appetite, and other ill feelings. These may take several days to develop. This is not the same as addiction, a disease involving craving for the drug, loss of control over taking it or compulsive use, and using it despite harm. Addiction to oxycodone in persons without a recent history of alcohol or drug problems is rare.

236.    Additionally, on information and belief, the FAQ section of Pain-Topics.org contained the following false and misleading information downplaying the dangers of prescription opioid use:

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

**Pseudoaddiction** – has been used to describe aberrant patient behaviors that may occur when pain is undertreated (AAPM 2001). Although this diagnosis is not supported by rigorous investigation, it has been widely observed that patients with unrelieved pain may become very focused on obtaining opioid mediations, and may be erroneously perceived as drug seeking.  Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated. Along with this, two related phenomena have been described in the literature. (Alford et al. 2006):

> **Therapeutic dependence** – sometimes patients exhibit what is considered drug seeking because they fear the reemergence of pain and/or withdrawal symptoms from lack of adequate medication; their ongoing quest for more analgesics is in the hopes of insuring a tolerable level of comfort.

> **Pseudo-opioid-resistance** – other patients, with adequate pain control, may continue to report pain or exaggerate its presence, as if their opioid analgesics are not working, to prevent reductions in their currently effective doses of medication.

> Patient anxieties about receiving inadequate pain control can be profound, resulting in demanding or aggressive behaviors that are misunderstood by healthcare practitioners and ultimately detract from the provision of adequate pain relief.

237.    Another document available on the website, Commonsense Oxycodone Prescribing & Safety, falsely suggested that generic oxycodone is less prone to abuse and diversion that branded oxycodone. On information and belief, the website touted that it has been observed that generic versions of popularly abused opioids usually are less appealing; persons buying drugs for illicit purposes prefer brand names because they are more recognizable and the generics have a lower value on the street, which also makes them less alluring for drug dealers.

238.    In November 2016, Mallinckrodt paid Dr. Scott Gottlieb, the new commissioner of the FDA, $22,500 for a speech in London. Commissioner Gottlieb has also received money from the Healthcare Distribution Alliance, an industry-funded organization that pushes the agenda of large pharmaceutical wholesalers, and he has often criticized efforts aimed at regulating the pharmaceutical opioid market.

239.    Mallinckrodt also made thousands of payments to physicians nationwide, including to Missouri physicians.

**5.     The DEA Investigates Suspicious Orders of Mallinckrodt**

240.    In 2008, the DEA and federal prosecutors launched an investigation into Mallinckrodt, charging that the company ignored red flags and supplied – and failed to report – suspicious orders for its generic oxycodone between 2008 and 2012. On information and belief, the investigation uncovered that, from 2008 to 2012, Mallinckrodt sent approximately 500 million tablets of oxycodone into a single state, Florida, accounting for 66 percent of all oxycodone sold in the state. According to the internal government documents obtained by the Washington Post, Mallinckrodt's failure to report could have resulted in nearly 44,000 federal violations and exposed it to $2.3 billion in fines.

241.    In May 2014, Mallinckrodt posted a video titled Red Flags:  Pharmacists Anti-Abuse Video.  The video is a thinly veiled attempt to divert responsibility for the opioid epidemic away from manufacturers and wholesalers, and toward individual pharmacists. The video is further evidence of Defendants' conspiracy and/or action in concert sponsored by the Anti-Diversion Industry Working Group, which is composed of Cardinal Health, Actavis, McKesson, Mallinckrodt, and AmerisourceBergen, all of whom are conveniently missing from the list of those responsible.

242.    Despite learning from the DEA that generic opioids seized in a Tennessee drug operation were traceable to one of its Florida distributors, Sunrise Wholesale of Broward County, Mallinckrodt in the following six weeks sent 2.1 million tablets of oxycodone to Sunrise. In turn, Sunrise sent at least 92,400 oxycodone tablets to a single doctors over an 11-month period, who, in one day, prescribed 1,000 to a single patient.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

243.    According to documents obtained by the Washington Post, investigators also found scores of alleged violations at Mallinckrodt. Those violations included the failure to keep accurate records, to document transfers of drugs and to secure narcotics.

244.    On information and belief, Plaintiff believes Mallinckrodt committed these same violations in Missouri leading to the flood of opioids and the increase of the use of opioids in Plaintiff County.

245.    During the DEA's investigation, Mallinckrodt sponsored the Healthcare Distribution Alliance (known as the Healthcare Distribution Management Association until 2016), an industry-funded organization that represents pharmaceutical distributors. The HAD initiated the Ensuring Patient Access and Effective Drug Enforcement Act of 2016 (enacted April 19, 2016), which requires the DEA to give notice of violations and an opportunity to comply, to pharmacies and distributors, before withdrawing licenses. This Act substantially lessened the DEA's ability to regulate manufacturers and wholesalers.

246.    In April 2017, Mallinckrodt reached an agreement with the DEA and the U.S. Attorneys for the United States District Courts for the Eastern District of Michigan and the Northern District of New York to pay $35 million to resolve a probe of the distribution of its opioid medications. Mallinckrodt finalized the settlement on July 11, 2017, agreeing to pay $35 million while admitting no wrongdoing.

247.    On information and belief, Plaintiff asserts that Mallinckrodt undertook the very same conduct and acts associated with their guilty plea in Missouri and, specifically, in Plaintiff County. Their acts, or failure to act, have directly led to the overabundance of opioids in Plaintiff County causing damage and continuing to cause damage.

### 6.    Mallinckrodt Failed to Report Suspicious Sales as Required

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

248.   Both Missouri and federal law impose on all registrants the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. Suspicious orders include orders of unusual size, orders deviating substantially form a normal pattern, and orders of unusual frequency.

249.   Mallinckrodt is a registrant under Missouri law and the federal CSA. 21 C.F.R. § 1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

250.   Mallinckrodt failed to design and operate a system to disclose suspicious orders of controlled substances and/or failed to notify the appropriate DEA field division of suspicious orders.

## V.   EACH DEFENDANT ENGAGED IN DECEPTIVE MARKETING, BOTH BRANDED AND UNBRANDED, THAT TARGETED AND REACHED MISSOURI PRESCRIBERS.

251.   Defendants—and the Front Groups and KOLs who depended on and worked alongside them—were able to affect a sea change in medical opinion in favor of accepting opioids as a medically necessary long-term treatment for chronic pain. As set forth below, each Defendant contributed to that result through a combination of both direct marketing efforts and third-party marketing efforts over which that Defendant exercised editorial control. These deceptive and misleading statements were directed to and reached Missouri prescribers and patients, with the intent of distorting their views on the risks, benefits, and superiority of opioids for treatment of chronic pain.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

252.    Defendants engaged in their deceptive marketing campaign, both nationwide and in Missouri, using a number of strategies. Defendants trained their sales forces and recruited physician speakers to deliver these deceptive messages and omissions, and they in turn conveyed them to prescribers. Defendants also broadly disseminated promotional messages and materials, both by delivering them personally to doctors during detailing visits and by mailing deceptive advertisements directly to prescribers. Because they are disseminated by Defendant drug manufacturers and relate to Defendants' drugs, these materials are considered labeling, which means Defendants are liable for their content.

### 1.    Actavis

253.    As described below, Actavis promoted its branded opioid, Kadian, through a highly deceptive marketing campaign that it carried out principally through its sales force and recruited physician speakers. As internal documents indicate, this campaign rested on a series of misrepresentations and omissions regarding the risks, benefits, and superiority of opioids, and indeed incorporated each of the types of deceptive messages. Based on the highly coordinated and uniform nature of Actavis's marketing, and as confirmed by both verbatim message data and prescriber interviews, Actavis conveyed these deceptive messages to Missouri prescribers. Actavis did so with the intent that Missouri prescribers and/or consumers would rely on the messages in choosing to use opioids to treat chronic pain.

### a.    Actavis's Deceptive Direct Marketing

254.    On information and belief, to help devise its marketing strategy for Kadian, Actavis commissioned a report from one of its consultants in January 2005 about barriers to market entry. The report concluded that two major challenges facing opioid manufacturers in 2005 were (i) overcoming concerns regarding the safety and tolerability of opioids, and (ii) the

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

fact that physicians have been trained to evaluate the supporting data before changing their respective practice behavior.  To do that, the report advocated a publication strategy based on placing in the literature key data that influence members of the target audience with an emphasis on ensuring that the message is believable and relevant to the needs of the target audience. This would entail the creation of effective copy points backed by published references and developing and placing publications that demonstrate the efficacy of opioids and their safety and positive side effect profile. According to the report, this would allow physicians to reach a mental agreement and change their practice behavior without having first evaluated supporting data, which Actavis (and other Defendants) had none.

255.    The consulting firm predicted that this manufactured body of literature would, in turn, provide greater support for the promotional message and add credibility to the brand's advocates based on either actual or ***perceived*** 'scientific exchange' in relevant medical literature. To this end, on information and belief, it planned for three manuscripts to be written during the first quarter of 2005. Of these, the neuropathic pain manuscript will provide evidence demonstrating Kadian is as effective in patients with presumptive neuropathic pain as it is in those with other pain types; the elderly subanalysis  will provide clinicians with evidence that Kadian is efficacious and well tolerated in appropriately selected elderly patients and will be targeted to readers in the geriatrics specialty; and the QDF/BID manuscript will call attention to the fact that Kadian is the only sustained-release opioid to be labeled for once or twice daily use. In short, Actavis knew exactly what each study would show—and how that study would fit into its marketing plan—before it was published. Articles matching Actavis's descriptions later appeared in the *Journal of Pain* and the *Journal of the American Geriatrics Society.*

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

256.    To ensure that messages based on this science reached individual physicians, Actavis deployed sales representatives, or detailers, to visit prescribers in Missouri and across the country. At the peak of Actavis's promotional efforts in 2011, the company spent $6.7 million on detailing.

257.    To track its detailers' progress, Actavis's sales and marketing department actively monitored the prescribing behavior of physicians. It tracked the Kadian prescribing activity of individual physicians, and assessed the success of its marketing efforts by tabulating how many Kadian prescriptions a prescriber wrote after he or she had been detailed.

258.    Actavis also planned to promote Kadian by presenting at conferences of organizations where it believed it could reach a high concentration of pain specialists. Its choice of conferences also was influenced by the host's past support of opioids. For example, Actavis documents show that Actavis presented papers concerning Kadian at an annual meeting of AGS because AGS's guidelines support the use of opioids.

259.    Actavis targeted prescribers using both its sales force and recruited physician speakers, as described below.

i.    *Actavis's Deceptive Sales Training*

260.    Actavis's sales representatives targeted physicians to deliver sales messages that were developed centrally and deployed uniformly across the country. These sales representatives were critical in delivering Actavis's marketing strategies and talking points to individual prescribers.

261.    Actavis's strategy and pattern of deceptive marketing is evident in its internal training materials. On information and belief, a sales education module titled Kadian Learning System trained Actavis's sales representatives on the marketing messages—including deceptive

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

claims about improved function, the risk of addiction, the false scientific concept of pseudoaddiction, and opioid withdrawal—that sales representatives were directed and required, in turn, to pass on to prescribers in Missouri.

262.   The sales training module, dated July 1, 2010, includes the misrepresentations documented in this Complaint, starting with its promise of improved function. The sales training instructed Actavis sales representatives that most chronic benign pain patients do have markedly improved ability to function when maintained on chronic opioid therapy, when, in reality, available data demonstrate that patients on chronic opioid therapy are *less likely* to participate in daily activities like work. The sales training also misleadingly implied that the dose of prescription opioids could be escalated without consequence and omitted important facts about the increased risks of high dose opioids. First, Actavis taught its sales representatives, who would pass this message on to doctors, that pain patients would not develop tolerance to opioids, which would require them to receive increasing doses:  Although tolerance and dependence do occur with long-term use of opioids, many studies have shown that tolerance is limited in most patients with Chronic pain.  Second, Actavis instructed its sales personnel that opioid doses are titrated to pain relief, and so no ceiling dose can be given as to the recommended maximal dose. Actavis failed to explain to its sales representatives and, through them, to doctors the greater risks associated with opioids at high doses.

263.   Further, the 2010 sales training module highlighted the risks of alternate pain medications without providing a comparable discussion of the risks of opioids, painting the erroneous and misleading impression that opioids are safer. Specifically, the document claimed that NSAIDs prolong the bleeding time by inhibiting blood platelets, which can contribute to bleeding complications and can have toxic effects on the kidney.  Accordingly, Actavis coached

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

its sales representatives that the potential toxicity of NSAIDs limits their dose and, to some extent, the duration of therapy since they should only be taken short term.  By contrast, the corresponding section related to opioids neglects to include a *single* side effect or risk associated with the use of opioids, including from long-term use.

264.    This sales training module also severely downplayed the main risk associated with Kadian and other opioids—addiction. It represented that there is no evidence that simply taking opioids for a period of time will cause substance abuse or addiction and, instead, it appears likely that most substance-abusing patients in pain management practices had an abuse problem before entering the practice.  This falsely suggests that few patients will become addicted, that only those with a prior history of abuse are at risk of opioid addiction, and that doctors can screen for those patients and safely prescribe to others. To the contrary, opioid addiction will affect a significant population of patients; while patients with a history of abuse may be more prone to addiction, all patients are at risk, and doctors may not be able to identify, or safely prescribe to, patients at greater risk.

265.    The sales training also noted that there were various signs associated with substance abuse, including past history or family history of substance or alcohol abuse, frequent requests to change medication because of side effects or lack of efficacy, and a social history of dysfunctional or high-risk behaviors including multiple arrests, multiple marriages, abusive relationships, etc.  This is misleading, as noted above, because it implies that only patients with these kinds of behaviors and history become addicted to opioids.

266.    Further, the sales training neglected to disclose that no risk-screening tools related to opioids have ever been scientifically validated. The AHRQ recently issued an Evidence Report that could identify no study that had evaluated the effectiveness of various risk mitigation

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

strategies—including the types of patient screening implied in Actavis's sales training—on outcomes related to overdose, addiction, abuse or misuse.

267.    The sales training module also directed representatives to counsel doctors to be on the lookout for the signs of pseudoaddiction, which were defined as behaviors (that mimic addictive behaviors) exhibited by patients with inadequately treated pain.  The concept of pseudoaddiction is unsubstantiated and meant to mislead doctors and patients about the risks and signs of addiction.

268.    Finally, the 2010 national training materials trivialized the harms associated with opioid withdrawal by explaining that physical dependence simply requires a tapered withdrawal should the opioid medication no longer be needed.  This, however, overlooks the fact, that the side effects associated with opiate withdrawal are severe and a serious concern for *any person* who wishes to discontinue long-term opioid therapy.

269.    The Kadian Learning System module dates from July 2010, but Actavis sales representatives were passing deceptive messages on to prescribers even before then. A July 2010 "Dear Doctor" letter issued by Actavis indicated that between June 2009 and February 2010, Actavis sales representatives distributed promotional materials that omitted and minimized serious risks associated with Kadian.  Certain risks that were misrepresented included the risk of misuse, abuse, and diversion of opioids and, specifically, the risk that opioid agonists have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion.

270.    Actavis's documents also indicate that the company continued to deceptively market its drugs after 2010. Specifically, a September 2012 Kadian Marketing Update, and the HCP Detail aid continued therein, noted that Kadian's steady state plasma levels ensured that

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Kadian produced higher trough concentrations and a smaller degree of peak-to-trough fluctuations than other opioids.

271.   Actavis also commissioned surveys of prescribers to ensure Kadian sales representatives were promoting the steady-state message. That same survey—paid for and reviewed by Actavis—found repeated instances of prescribers being told by sales representatives that Kadian had low potential of abuse or addiction. This survey also found that prescribers were influenced by Actavis's messaging. A number of Kadian prescribers stated that they prescribed Kadian because it was without the addictive potential and would not be posing high risk for addiction.  As a result, Actavis's marketing documents celebrated a perception among doctors that Kadian had low abuse potential.

272.   Finally, the internal documents of another Defendant, Endo, indicate that pharmaceutical sales representatives employed by Mallinckrodt, Endo, Actavis, and Purdue discussed the AAPM/APS Guidelines with doctors during detailing visits. These guidelines deceptively concluded that the risk of addiction is manageable for patients regardless of past abuse histories.

ii.      *Actavis's Deceptive Speakers Training*

273.   Actavis also increasingly relied on speakers—physicians whom Actavis recruited to market opioids to their peers—to convey similar marketing messages. Actavis set a goal to train 100 new Kadian speakers in 2008 alone, with a plan to set up power lunch teleconferences connecting speakers to up to 500 participating sites nationwide. Actavis sales representatives, who were required to make a certain number of sales visits each day and week, saw the definition of sales call expanded to accommodate these changes; such calls now included physicians' breakfast & lunch meetings with Kadian advocate/speaker.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

274.    A training program for Actavis speakers included training on many of the same messages found in the Kadian Learning System, as described below. The deceptive messages in Actavis's speakers' training are concerning for two reasons:  (a) the doctors who participated in the training were themselves prescribing doctors, and the training was meant to increase their prescriptions of Kadian; and (b) these doctors were trained, paid, and directed to deliver these messages to other doctors who would write prescriptions of Kadian.

275.    Consistent with the training for sales representatives, Actavis's speakers' training falsely minimized the risk of addiction posed by long-term opioid use. Actavis claimed, without scientific foundation, that opioids could be used with minimal risk in chronic pain patients without a history of abuse or addiction.  The training also deceptively touted the effectiveness of so-called Risk Tools, such as the Opioid Risk Tool, in determining the risk for developing aberrant behaviors in patients being considered for chronic opioid therapy. In recommending the use of these screening tools, the speakers' training neglected to disclose that none of them has been scientifically validated.

276.    The speakers' training also referred to pseudoaddiction as a condition characterized by behaviors, such as drug hoarding, that outwardly mimic addiction but are in fact driven by a desire for pain relief and usually signal undertreated pain.  It then purported to assist doctors in identifying those behaviors that *actually* indicated a risk of addiction from those that did not. Behaviors it identified as more suggestive of addiction included prescription forgery, injecting oral formulations, and multiple dose escalations or other nonadherence with therapy despite warnings.  Identified as less suggestive of addiction were aggressive complaining about the need for more drugs, requesting specific drugs, drug hoarding during periods of reduced symptoms, and unapproved use of the drug to treat another symptom.  By portraying the risks in

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

this manner, the speakers' training presentation deceptively gave doctors a false sense of security regarding the types of patients who can become addicted to opioids and the types of behaviors these patients exhibit.

277.   The speakers' training downplayed the risks of opioids, while focusing on the risks of competing analgesics like NSAIDs. For example, it asserted that Acetaminophen toxicity is a major health concern.  The slide further warned that Acetaminophen poisoning is the most common cause of acute liver failure in an evaluation of 662 US Subjects with acute liver failure between 1998-2003, and was titled Opioids can be a safer option than other analgesics. However, in presenting the risks associated with opioids, the speakers' training focused on nausea, constipation, and sleepiness, and ignored the serious risks of hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, and dizziness; increased falls and fractures in the elderly, neonatal abstinence syndrome, and potentially fatal interactions with alcohol or benzodiazepines. As a result, the training exaggerated the risks of NSAIDs, both absolutely and relative to opioids, to make opioids appear to be a more attractive first-line treatment for chronic pain.

278.   The speakers' training also misrepresented the risks associated with increased doses of opioids. For example, speakers were instructed to start low and titrate until patient reports adequate analgesia and to set dose levels based on patient need, not on predetermined maximal dose.  However, the speakers' training neglected to warn speakers (and speakers' bureau attendees) that patients on high doses of opioids are more likely to suffer adverse events.

279.   The misleading messages and training materials Actavis provided to its sales force and speakers were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, without complete and accurate information about the risks, benefits, and

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

alternatives. This deception was national in scope and included Missouri. For example, they were carried into Missouri by Actavis's sales representatives during detailing visits as well as made available to Missouri patients and prescribers through websites and ads, including ads in prominent medical journals. They have also been delivered to Missouri prescribers by Actavis's paid speakers, who were required by Actavis policy and by FDA regulations to stay true to Actavis's nationwide messaging.

280. Once trained, Actavis's sales representatives and speakers were directed to, and did, visit potential prescribers in Missouri, as elsewhere, to deliver their deceptive messages. These contacts are demonstrated by Actavis's substantial effort in tracking the habits of individual Missouri physicians in prescribing Kadian, and by the direct evidence of Actavis detailing Missouri prescribers.

281. The experiences of specific prescribers confirm both that Actavis's national marketing campaign included the misrepresentations, and that the company disseminated these same misrepresentations to Missouri prescribers and consumers. In particular, these prescriber accounts reflect that Actavis detailers omitted or minimized the risk of opioid addiction; claimed or implied that opioids were safer than NSAIDs; and overstated the benefits of opioids, including by making claims of improved function.

### 2. Cephalon

282. At the heart of Cephalon's deceptive promotional efforts was a concerted and sustained effort to expand the market for its branded opioids, Actiq and Fentora, far beyond their FDA-approved use in opioid-tolerant cancer patients. Trading on their rapid-onset formulation, Cephalon touted its opioids as the answer to breakthrough pain—a term its own KOL allies planted in the medical literature—whether cancer pain or not. Cephalon promoted this message

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

through its sales force, paid physician speakers, advertisements, and CMEs, even after the FDA issued the company warnings and rejected an expanded drug indication.

283.     Even as it promoted Actiq and Fentora off-label, Cephalon also purveyed many of the deceptive messages. It did so both directly—through detailing visits and speaker programs—and through the publications and CMEs of its third-party partners. These messages included misleading claims about functional improvement, addiction risk, pseudoaddiction, and the safety of alternatives to opioids.

284.     Based on the highly coordinated and uniform nature of Cephalon's marketing, and as confirmed by both verbatim message data and prescriber interviews, Cephalon conveyed these deceptive messages to Missouri prescribers. The materials that Cephalon generated in collaboration with third parties also were distributed or made available in Missouri. Cephalon distributed these messages, or facilitated their distribution, in Missouri with the intent that Missouri prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

a.     Cephalon's Deceptive Direct Marketing

285.     Like the other Defendants, Cephalon directly engaged in misleading and deceptive marketing of its opioids through its sales force and branded advertisements. These messages were centrally formulated and intended to reach prescribers nationwide, including those practicing in the Missouri area. Cephalon also spent the money necessary to promote aggressively its opioid drugs, setting aside $20 million to market Fentora in 2009 alone.

i.     *Cephalon's Fraudulent Off-Label Marketing of Actiq and Fentora*

286.     Chief among Cephalon's direct marketing efforts was its campaign to promote deceptively its opioids for off-label uses. Cephalon reaps significant revenue from selling its

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

opioids for treatment of chronic non-cancer pain. However, neither of its two opioid drugs—Actiq or Fentora—is approved for this purpose. Instead, both have indications that are very clearly and narrowly defined to limit their use to a particular form of cancer pain. Despite this restriction and in order to claim its piece of the broader chronic non-cancer pain market, Cephalon deceptively and unlawfully marketed Actiq and then Fentora for patients and uses for which they were not safe, effective, or allowed, causing prescriptions to be written and paid and, grievously, patients to be injured and die.  Cephalon's efforts to expand the market for its drugs beyond cancer pain extended to Missouri prescribers, few of whom were oncologists and at least one of whom was surprised to have received Cephalon's sales pitches because he ran a purported headache clinic.

(a)    Cephalon launched its fraudulent marketing
scheme for Actiq

287.    Cephalon's Actiq is a powerful opioid narcotic that is delivered to the bloodstream by a lollipop lozenge that dissolves slowly in the mouth. As described by one patient, Actiq tastes like the most delicious candy you ever ate.

288.    Actiq is appropriately used only to treat breakthrough cancer pain that cannot be controlled by other medications. Breakthrough pain is a short-term flare of moderate-to-severe pain in patients with otherwise stable persistent pain. Actiq is a rapid-onset drug that takes effect within 10-15 minutes but lasts only a short time. It is also an extremely strong drug, considered at least 80 times more powerful than morphine. Fentanyl, a key ingredient in Actiq, has been linked to fatal respiratory complications in patients. Actiq is not safe in any dose for patients who are not opioid tolerant, that is, patients who have taken specific doses of opioids for a week or longer and whose systems have acclimated to the drugs.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

289.    In 1998, the FDA approved Actiq *ONLY* for the management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain. Because of Actiq's dangers, wider, off-label uses—as the FDA label makes clear—are not permitted:

> This product *must not* be used in opioid non-tolerant patients because life-threatening respiratory depression and death could occur at any dose in patients not on a chronic regimen of opioids. For this reason, ACTIQ is contraindicated in the management of acute or postoperative pain.

290.    Actiq and Fentora are intended for use only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain. Unlike other drugs, as to which off-label uses are permitted but cannot be promoted by the drug maker, Actiq and Fentora are so potent that the FDA bars off-label use for opioid naïve patients, as the labels make clear.

291.    Notwithstanding the drug's extreme potency and related dangers and the FDA's explicit limitations, Cephalon actively promoted Actiq for chronic non-cancer pain—an unapproved, off-label use. Cephalon marketed Actiq as appropriate for the treatment of various conditions including back pain, headaches, pain associated with sports-related injuries, and other conditions not associated with cancer for which it was not approved, appropriate, or safe.

292.    Actiq's initial sales counted in the tens of millions of dollars, corresponding to its limited patient population. Nevertheless, by 2005, Actiq sales reached $412 million, making it Cephalon's second highest selling drug. Because of Cephalon's deceptive, unlawful marketing, sales exceeded $500 million by 2006.

> (b)    October 1, 2006—Cephalon fraudulently marketed Actiq's successor drug, Fentora

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

293.    Actiq was set to lose its patent protection in September 2006. To replace the revenue stream that would be lost once generic competitors came to market, Cephalon purchased a new opioid drug, Fentora, from Cima Labs and, in August 2005, submitted a New Drug Application (NDA) to the FDA for approval. Like Actiq, Fentora is an extremely powerful and rapid-onset opioid. It is administered by placing a tablet in the mouth until it disintegrates and is absorbed by the mucous membrane that lines the inside of the mouth.

294.    On September 25, 2006, the FDA approved Fentora, like Actiq, only for the treatment of breakthrough cancer pain in cancer patients who were already tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain. Fentora's unusually strong and detailed black box warning label—the most serious medication warning required by the FDA—makes clear that, among other things:

> Fatal respiratory depression has occurred in patients treated with FENTORA, including following use in opioid non-tolerant patients and improper dosing. The substitution of FENTORA for any other fentanyl product may result in fatal overdose.
>
> Due to the risk of respiratory depression, FENTORA is contraindicated in the management of acute or postoperative pain including headache/migraine and in opioid non-tolerant patients.

295.    When Cephalon launched Fentora on October 1, 2006, it picked up the playbook it developed for Actiq and simply substituted in Fentora. Cephalon immediately shifted 100 general pain sales representatives from selling Actiq to selling Fentora to the very same physicians for uses that would necessarily and predictably be off-label. Cephalon's marketing of Actiq therefore primed the market for Fentora. Cephalon had trained numerous KOLs to lead promotional programs for Fentora, typically including off-label uses for the drug. Cephalon billed Fentora as a major advance that offered a significant upgrade in the treatment of breakthrough pain generally—not breakthrough cancer pain in particular—from Actiq. Cephalon

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

also developed a plan in 2007 to target elderly chronic pain patients, via a multi-city tour with stops at AARP events, YMCAs, and senior living facilities.

296.     On February 12, 2007, only four months after the launch, Cephalon CEO Frank Baldino told investors:

> We've been extremely pleased to retain a substantial portion, roughly 75% of the rapid onset opioid market. We executed our transition strategy and the results in our pain franchise have been better than we expected. With the successful launch of FENTORA and the progress in label expansion program, we are well positioned to grow our pain franchise for many years to come.

297.     On May 1, 2007, just seven months after Fentora's launch, Cephalon's then-Executive Vice President for Worldwide Operations, Bob Roche, bragged to financial analysts that Fentora's reach would exceed even Actiq's. He described the company's successful and aggressive launch of Fentora that was persuading physicians to prescribe Fentora for even broader uses. He identified two major opportunities—treating breakthrough cancer pain and:

> The other opportunity of course is the prospect for FENTORA outside of cancer pain, in indications such as breakthrough lower back pain and breakthrough neuropathic pain.

> .

> We believe that a huge opportunity still exists as physicians and patients recognize FENTORA as their first choice rapid onset opioid medication. Opioids are widely used in the treatment of non-cancer patients.

> .

> Of all the patients taking chronic opioids, 32% of them take that medication to treat back pain, and 30% of them are taking their opioids to treat neuropathic pain. In contrast, only 12% are taking them to treat cancer pain, 12%.

> We know from our own studies that breakthrough pain episodes experienced by these non-cancer sufferers respond very well to FENTORA. And for all these reasons, we are tremendously excited about the significant impact FENTORA can have on

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

patient health and wellbeing and the exciting growth potential that it has for Cephalon.

In summary, we have had a strong launch of FENTORA and continue to grow the product aggressively. Today, that growth is coming from the physicians and patient types that we have identified through our efforts in the field over the last seven years. In the future, with new and broader indications and a much bigger field force presence, the opportunity that FENTORA represents is enormous.

(c)     September 2007—Reports of death and serious side effects led the FDA to issue a public health warning for Fentora

298.   On September 10, 2007, Cephalon sent letters to doctors warning of deaths and other serious adverse events connected with the use of Fentora and indicating that these deaths occurred as a result of improper patient selection (*e.g.*, use in opioid non-tolerant patients), improper dosing, and/or improper product substitution.  The warning did not mention Cephalon's deliberate role in the improper patient selection.

299.   Two weeks later, the FDA issued its own Public Health Advisory. The FDA emphasized, once again, that Fentora should be prescribed only for approved conditions and that dose guidelines should be carefully followed. The FDA Advisory made clear that several Fentora-related deaths had occurred in patients who were prescribed the drug for off-label uses. The FDA Advisory warned that Fentora should not be used for any off-label conditions, including migraines, post-operative pain, or pain due to injury, and that it should be given only to patients who have developed opioid tolerance. The Advisory reiterated that because Fentora contains a much greater amount of fentanyl than other opiate painkillers, it is not a suitable substitute for other painkillers.

300.   Cephalon's off-label marketing continued notwithstanding the regulatory scrutiny. Cephalon's 2008 internal audit of its Sales & Marketing Compliance Programs concluded that

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

marketing and tactical documents, as written, might be construed to promote off-label uses. The same report acknowledged that Cephalon lacked a process to confirm that speakers' program participants were following Cephalon's written, formal policies prohibiting off-label promotion, and that non-compliant Cephalon Speaker Programs may be taking place.  Moreover, the report acknowledged that Cephalon's call universe may include inappropriate prescribers—prescribers who had nothing to do with cancer pain.

(d)      May 6, 2008—The FDA rejected Cephalon's
request for expanded approval of Fentora

301.    Cephalon filed a supplemental new drug application, (sNDA), asking the FDA to approve Fentora for the treatment of non-cancer breakthrough pain. Cephalon admitted that Fentora already had been heavily prescribed for non-cancer pain, but argued that such widespread use demonstrated why Fentora should be approved for these wider uses. Cephalon's application also conceded that to date, no medication has been systematically evaluated in clinical studies or approved by the FDA for the management of breakthrough pain in patients with chronic persistent non-cancer-related pain.

302.    In response to Cephalon's application, the FDA presented data showing that 95% of all Fentora use was for treatment of non-cancer pain. By a vote of 17-3, the relevant Advisory Committee—a panel of outside experts—voted against recommending approval of Cephalon's sNDA for Fentora, citing the potential harm from broader use. On September 15, 2008, the FDA denied Cephalon's application and, in light of Fentora's already off-label use, requested that Cephalon implement and demonstrate the effectiveness of proposed enhancements to Fentora's Risk Management Program. In December 2008, the FDA followed that up with a formal request directing Cephalon to submit a Risk Evaluation and Mitigation Strategy for Fentora.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

(e)     March 26, 2009—the FDA's Division of Drug
Marketing, Advertising and Communications
(DDMAC) warned Cephalon about its
misleading advertising of Fentora

303.    Undeterred by the rejection of its sNDA, Cephalon continued to use its general

pain sales force to promote Fentora off-label to pain specialists as an upgrade over Actiq for the

treatment of non-cancer breakthrough pain. Deceptively and especially dangerously, Cephalon

also continued to promote Fentora for use by all cancer patients suffering breakthrough cancer

pain, and not simply those who were opioid tolerant.

304.    On March 26, 2009, DDMAC issued a Warning Letter to Cephalon, telling

Cephalon that its promotional materials for Fentora amounted to deceptive, off-label promotion

of the drug. Specifically, the Warning Letter asserted that a sponsored link on Google and other

search engines for Fentora, which said learn about treating breakthrough pain in patients with

cancer, was improper because it misleadingly broadened the indication for Fentora by implying

that any patient with cancer who requires treatment for breakthrough pain is a candidate for

Fentora therapy when this is not the case.

305.    DDMAC emphasized that Fentora's label was limited to cancer patients with

breakthrough pain *who are already receiving and who are tolerant to around-the-clock opioid*

*therapy for their underlying persistent cancer pain.* DDMAC explained that the advertisement

was especially concerning given that Fentora **must not** be used in opioid non-tolerant patients

because life-threatening hypoventilation and death could occur at any dose in patients not on a

chronic regimen of opioids. DDMAC also warned Cephalon that based on a review of Cephalon-

sponsored links for Fentora on internet search engines, the company's advertisements were

misleading because they make representations and/or suggestions about the efficacy of Fentora,

but fail to communicate **any** risk information associated with the use of the drug.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

(f)     Cephalon continues to knowingly, deceptively,
and illegally promote Fentora for off-label uses

306.    Cephalon's own market research studies confirm that its Fentora promotions were not focused on the physicians who treat breakthrough cancer pain. Cephalon commissioned several market research studies to determine whether oncologists provided an adequate market potential for Fentora. These studies' central goal was to determine whether oncologists treat breakthrough cancer pain themselves, or whether they refer such patients to general pain specialists. The first study, completed in 2007, reported that 90% of oncologists diagnose and treat breakthrough cancer pain themselves, and do not refer their breakthrough cancer pain patients to pain specialists. The second study, completed in 2009, confirmed the results of the 2007 study, this time reporting that 88% of oncologists diagnose and treat breakthrough cancer pain themselves and rarely, if ever, refer those patients to general pain specialists.

307.    Cephalon was well aware that physicians were prescribing Fentora for off-label uses.

308.    In 2011, Cephalon wrote and copyrighted an article titled 2011 Special Report: An Integrated Risk Evaluation and Risk Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA®) and Oral Transmucosal Fentanyl Citrate (ACTIQ®) that was published in *Pain Medicine News*. The article promoted Cephalon's drugs for off-label uses by stating that the judicious use of opioids can facilitate effective and safe management of chronic pain and noted that Fentora has been shown to be effective in treatment of break through pain associated with multiple causes of pain, not just cancer.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

ii.     *Cephalon's Misrepresentation of the Risks Associated
with the Use of Opioids for the Long-Term Treatment
of Chronic Pain*

309.    Cephalon's conduct in marketing Actiq and Fentora for chronic non-cancer pain, despite their clear (and deadly) risks and unproved benefits, was an extension, and reaped the benefits, of Cephalon's generally deceptive promotion of opioids for chronic pain.

310.    There is no scientific evidence corroborating a link between chronic opioid therapy and increased functionality, and any suggestion of such a link is, in fact, false.

311.    As with the other Defendants, Cephalon deployed the made-up concept of pseudoaddiction to encourage prescribers to address addictive behavior very much possible— with more opioids.

312.    Working with FSMB, Cephalon also trained its speakers to turn doctors' fear of discipline on its head—doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with pain. Through this messaging, Cephalon aimed to normalize the prescribing of opioids for chronic pain and failed to acknowledge the serious risks of long-term opioid use and its inappropriateness as a front-line treatment for pain.

313.    Finally, Cephalon also developed a guidebook called *Opioid Medications and REMS:  A Patient's Guide*, which deceptively minimized the risks of addiction from the long-term use of opioids. Specifically, the guidebook claimed that patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids, which is dangerously false. Cephalon distributed the guidebook broadly, and it was available to and intended to reach prescribers in Missouri.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

314.    The misleading messages and materials Cephalon provided to its sales force and its speakers were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, without complete and accurate information about the risks, benefits, and alternatives. This deception was national in scope and included Missouri. Cephalon's nationwide messages would have reached Missouri prescribers in a number of ways. For example, they were delivered in Missouri by Cephalon's sales representatives in detailing visits and made available to Missouri patients and prescribers through websites and ads, including ads in prominent medical journals. They have also been delivered to Missouri prescribers by Cephalon's paid speakers, who were required by Cephalon policy to stay true to the company's nationwide messaging.

b.    Cephalon's Deceptive Third-Party Statements

315.    Like the other Defendants, Cephalon also relied on third parties to disseminate its messages through deceptive publications and presentations. By funding, developing and reviewing the content of, and distributing and facilitating the distribution of these messages, Cephalon exercised editorial control over them. Cephalon, in some instances, used its sales force to distribute directly certain publications by these Front Groups and KOLs, and making Cephalon responsible for their contents. Cephalon also deployed its KOLs as speakers for talks and CMEs to selected groups of prescribers.

316.    Cephalon's relationships with several such Front Groups and KOLs—and the misleading and deceptive publications and presentations those relationships generated—are described below.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

i.     *FSMB – Responsible Opioid Prescribing*

317.    In 2007, for example, Cephalon sponsored and distributed through its sales representatives FSMB's *Responsible Opioid Prescribing*, which was drafted by "Medical Writer X," whose work for Janssen. A consulting firm, Conrad & Associates LLC, frequently hired medical Writer X to write pro-opioid marketing pieces disguised as science. Medical Writer X's work was reviewed and approved by drug company representatives, and he felt compelled to draft pieces that he admits distorted the risks and benefits of chronic opioid therapy in order to meet the demands of his drug company sponsors.

318.    *Responsible Opioid Prescribing* was a signature piece of Medical Writer X's work and contained a number of deceptive statements. This publication claimed that because pain had a negative impact on a patient's ability to function, relieving pain—alone—would reverse that effect and improve function.  However, the truth is far more complicated; a number of problems, including addiction, can offset functional improvements made from increased pain relief.

319.    *Responsible Opioid Prescribing* also misrepresented the likelihood of addiction by mischaracterizing drug-seeking behavior as pseudoaddiction.  It explained that requesting drugs by name, engaging in demanding or manipulative behavior, seeing more than one doctor to obtain opioids, and hoarding were all signs of pseudoaddiction and are likely the effects of undertreated pain, rather than true addiction. There is no scientific evidence to support the concept of pseudoaddiction, and any suggestion that addictive behavior masquerades as pseudoaddiction is false.

320.    Cephalon spent $150,000 to purchase copies of *Responsible Opioid Prescribing* in bulk. It then used its sales force to distribute these copies to 10,000 prescribers and 5,000

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

pharmacists nationwide. These were available to and intended to reach prescribers and pharmacists in Missouri.

        ii.      *APF – Treatment Options:  A Guide for People Living with Pain*

321.    Cephalon also exercised considerable control over the Front Group APF, which published and disseminated many of the most egregious falsehoods regarding chronic opioid therapy. Their relationship, and several of the APF publications, is described in detail below.

322.    Documents indicate that Cephalon provided APF with substantial assistance in publishing deceptive information regarding the risks associated with the use of opioids for chronic pain. An April 3, 2008 Fentora Assessment Strategy Tactics Team Meeting presentation outlines Cephalon's strategy to prepare for a meeting at which the FDA Advisory Committee would consider expanding the indication of Fentora to include chronic, non-cancer pain. Cephalon prepared by reaching out to third-party organizations, KOLs, and patients to provide context and, where appropriate, encourage related activity.  First among the Front Groups listed was APF.

323.    Cephalon was among the drug companies that worked with APF to persuade the Institute of Medicine of the National Academies (IOM) on issues related to chronic opioid therapy. APF President Will Rowe circulated a document to Cephalon and other drug company personnel that contained key message points and suggested that they consider using this document in your communications with the members of the IOM Committee.  According to Rowe, recipients should consider this a working document that you can add to or subtract from. Rowe also advised that, if recipients have an ally on that Committee, they should consider sharing this document with that person.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

324.   Cephalon personnel responded enthusiastically, with Cephalon's Associate Director for Alliance Development stating her belief that the document *does a good job of bringing together many important ideas.*  Cephalon reviewed and directed changes to this document, with the Cephalon Associate Director thanking Rowe for *incorporating the points we had raised.*  The close collaboration between Cephalon and APF on this project demonstrates their agreement to work collaboratively to promote the use of opioids as an appropriate treatment for chronic pain.

325.   Cephalon's influence over APF's activities was so pervasive that APF's President, Will Rowe, even reached out to Defendants—including Cephalon—rather than his own staff to identify potential authors to draft an answer to an article critical of opioids that appeared in the *Archives of Internal Medicine* in 2011.

326.   Cephalon also sponsored APF's *Treatment Options:  A Guide for People Living with Pain*, starting in 2007. It is rife with misrepresentations regarding the risks, benefits, and superiority of opioids.

327.   For example, *Treatment Options* deceptively asserts that the long-term use of opioids to treat chronic pain could help patients function in their daily lives by stating that, when used properly, opioids give pain patients *a quality of life they deserve.*  There is no scientific evidence corroborating that statement, and such statements are, in fact, false because available data demonstrate that patients on chronic opioid therapy are *less likely* to participate in life activities like work.

328.   *Treatment Options* also claims that addiction is rare and is evident from patients' conduct in self-escalating their doses, seeking opioids from multiple doctors, or stealing the drugs. *Treatment Options* further minimizes the risk of addiction by claiming that it can be

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

avoided using screening tools, like opioid agreements, which can ensure that patients take the opioid as prescribed.  Nowhere does *Treatment Options* explain to patients and prescribers that neither opioid agreements nor any other screening tools have been scientifically validated to decrease the risks of addiction, and the publication's assurances to the contrary are false and deceptive.

329.   *Treatment Options* also promotes the use of opioids to treat chronic pain by painting a misleading picture of the risks of alternate treatments, most particularly NSAIDs. *Treatment Options* notes that NSAIDs can be dangerous at high doses, and attributes 10,000 to 20,000 deaths a year annually to NSAID overdose. According to *Treatment Options*, NSAIDs are different from opioids because opioids have no ceiling dose, which is beneficial since some patients need larger doses of painkillers than they are currently prescribed. These claims misleadingly suggest that opioids are safe even at high doses and omit important information regarding the risks of high-dose opioids.

330.   Additionally, *Treatment Options* warns that the risks associated with NSAID use increase if NSAIDs are taken for more than a period of months, but deceptively omits any similar warning about the risks associated with the long-term use of opioids. This presentation paints a misleading picture of the risks and benefits of opioids compared with alternate treatments.

331.   APF distributed 17,200 copies of *Treatment Options* in 2007 alone. It is currently available online and was intended to reach Missouri prescribers and pharmacists. At least one Missouri physician, Prescriber G., attended it.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

iii.      *Key Opinion Leaders and Misleading Science*

332.    Employing these tactics, Cephalon caused the term breakthrough pain—a term it seeded in the medical literature—to be used in articles published by practitioners and clinicians it supported. With funding from Cephalon, for example, Dr. Portenoy wrote an article that purported to expand the definition of breakthrough cancer pain to non-cancer indications, vastly expanding the marketing potential of Cephalon's Fentora. The article was published in the nationally circulated *Journal of Pain* in 2006 and helped drive a surge in Fentora prescriptions.

333.    The concept of breakthrough pain ultimately formed the sole basis for the central theme of promotional messages Cephalon cited to support the approval and marketing of Actiq and Fentora, rapid-acting opioids that begin to work very quickly but last only briefly. Neither of these drugs had a natural place in the treatment of chronic pain before Cephalon's marketing campaign changed medical practice. A recent literature survey of articles describing non-cancer breakthrough pain calls into question the validity of the concept, suggesting it was not a distinct pain condition but a hypothesis to justify greater dosing of opioids. In other words, Cephalon conjured the science of breakthrough pain in order to sell its drugs.

334.    As one scholar has pointed out, references to breakthrough pain in articles published on the MEDLINE bibliographic database spiked in 1998 and again in 2006. These spikes coincide with FDA's approval of Actiq and Fentora.

335.    Each of these doctors received some combination of research support, consulting fees, and honoraria from Cephalon, and Dr. Portenoy was a paid consultant for the company. All told, Cephalon has paid doctors more than $4.5 million for programs relating to its opioids since 2000.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

iv.    *Misleading Continuing Medical Education*

336.    Cephalon developed sophisticated plans for the deployment of its KOLs, broken down by sub-type and specialty, to reach targeted groups of prescribers through CMEs.

337.    Cephalon used the CME programs it sponsored to deceptively portray the risks related to the use of opioids to treat chronic non-cancer pain and promote the off-label use of Actiq and Fentora.

338.    In 2007 and 2008, Cephalon sponsored three CMEs that each positioned Actiq and Fentora, and only Actiq and Fentora, as rapid onset opioids that would provide effective analgesia within the time period during which breakthrough pain was at its peak intensity. Although the CMEs used only the generic names of the drugs, the description of the active ingredient and means of administration means that a physician attending the CME knew it referred only to Actiq or Fentora.

339.    The CMEs each taught attendees that there was no sound basis for the distinction between cancer and non-cancer breakthrough pain, and one instructed patients that Actiq and Fentora were commonly used in non-cancer patients, thus effectively endorsing this use. *Optimizing Opioid Treatment for Breakthrough Pain*, offered online by Medscape, LLC from September 28, 2007, through December 15, 2008, was prepared by KOL Dr. Lynn R. Webster and M. Beth Dove. It recommends prescribing a short-acting opioid (e.g., morphine, hydromorphone, oxycodone) when pain can be anticipated, or a rapid-onset opioid when it cannot. The only examples of rapid-onset opioids then on the market were oral transmucosal fentanyl citrate (*i.e.*, Actiq) or fentanyl effervescent buccal tablet (*i.e.*, Fentora):  Both are indicated for treatment of breakthrough pain in opioid-tolerant cancer patients *and are frequently prescribed to treat breakthrough pain in noncancer patients as well*. .

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

340.  *Optimizing Opioid Treatment for Breakthrough Pain* not only deceptively promoted Cephalon's drugs for off-label use, but also misleadingly portrayed the risks, benefits, and superiority of opioids for the treatment of chronic pain. For example, the CME misrepresented that Actiq and Fentora would help patients regain functionality by advising that they improve patients' quality of life and allow for more activities when taken in conjunction with long-acting opioids. The CME also minimized the risks associated with increased opioid doses by explaining that NSAIDs were less effective than opioids for the treatment of breakthrough pain because of their dose limitations, without disclosing the heightened risk of adverse events on high-dose opioids.

341.  Around the same time, Dr. Webster was receiving nearly $2 million in funding from Cephalon.

342.  Cephalon similarly used an educational grant to sponsor the CME *Breakthrough Pain: Improving Recognition and Management*, which was offered online between March 31, 2008, and March 31, 2009, by Medscape, LLC. The direct result of Cephalon's funding was a purportedly educational document that echoed Cephalon's marketing messages:  the CME deceptively omitted Actiq's and Fentora's tolerance limitations, cited examples of patients who experienced pain from accidents, not from cancer, and, like Cephalon's *Optimizing Opioid Treatment* CME, taught that Actiq and Fentora were the only products on the market that would take effect before the breakthrough pain episode subsided. This CME was available online and was intended to reach Missouri prescribers.

343.  Lastly, KOL Dr. Fine authored a CME, sponsored by Cephalon, titled *Opioid-Based Management of Persistent and Breakthrough Pain*, with KOLs Dr. Christine A. Miaskowski and Michael J. Brennan, M.D. Cephalon paid to have this CME published in a

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

supplement of Pain Medicine News in 2009. It instructed prescribers that clinically, broad classification of pain syndromes as either cancer- or non-cancer-related has limited utility, and recommended dispensing rapid onset opioids for episodes that occur spontaneously or unpredictably, including oral transmucosal fentanyl, *i.e.*, Actiq, and fentanyl buccal tablet, *i.e.*, Fentora, including in patients with chronic non-cancer pain. Dr. Miaskowski disclosed in 2009, in connection with the APS/AAPM Opioid Treatment Guidelines, that she served on Cephalon's speakers bureau. Dr. Fine also received funding from Cephalon for consulting services.

344.   *Opioid-Based Management of Persistent and Breakthrough Pain* was available to and was intended to reach Missouri prescribers. It was attended by at least two Missouri physicians, Prescriber O and Prescriber P.

345.   Cephalon's control over the content of these CMEs is apparent based on its advance knowledge of their content. A December 2005 Cephalon launch plan set forth key supporting messages to position Fentora for its product launch. Among them was the proposition that 15-minute onset of action addresses the unpredictable urgency of BTP.  Years later, the same marketing messages reappeared in the Cephalon-sponsored CMEs described above. Echoing the Cephalon launch plan, *Optimizing Opioid Treatment for Breakthrough Pain* stated that the unpredictability of BTP will strongly influence the choice of treatment and that Fentora delivers an onset of analgesia that is similar to Actiq at ≤ 15 minutes.  Similarly, *Opioid-Based Management of Persistent and Breakthrough Pain* defined breakthrough pain as unpredictable, over a table describing both cancer and non-cancer breakthrough pain.

346.   Cephalon tracked the effectiveness of its deceptive marketing through third parties, demonstrating that Cephalon not only planned for but also depended upon their activities as a key element of its marketing strategy. These programs were available to prescribers in

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Missouri and, given the uniform and nationwide character of Cephalon's marketing, featured the same deceptive messages described above.

### 3. Endo

347.    Endo promoted its opioids through the full array of marketing channels. The company deployed its sales representatives, paid physician speakers, journal supplements, and advertising in support of its branded opioids, principally Opana and Opana ER. Misleading claims about the purportedly lower abuse potential of Opana ER featured prominently in this campaign, but Endo also made many of the other deceptive statements and omissions described above. These included deceptive messages about functional improvement, addiction risk, pseudoaddiction, addiction screening tools, and the safety of alternatives to opioids.

348.    At the same time, Endo also relied on a cast of third-party partners to promote the safety, efficacy, and superiority of opioids generally, through a combination of CMEs, websites, patient education pamphlets, and other publications. These materials echoed the misrepresentations described above, and also made deceptive statements about withdrawal symptoms and the safety of opioids at higher doses.

349.    Based on the highly coordinated and uniform nature of Endo's marketing, and as confirmed by verbatim message data and interviews with a sales representative and prescribers, Endo conveyed these deceptive messages to Missouri prescribers. The materials that Endo generated in collaboration with third parties also were distributed or made available in Missouri. Endo distributed these messages, or facilitated their distribution, in Missouri with the intent that Missouri prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

a.   Endo's Deceptive Direct Marketing

350.   Like the other Defendants, Endo used deceptive direct marketing to increase the sales of its dangerous opioids. As set forth below, Endo conveyed these deceptive messages in training of its sales force and recruited speakers, who in turn conveyed them to physicians; in a misleading journal supplement; and in unbranded advertising.

i.   *Endo's Sales Force and Deceptive Sales Training*

351.   Endo's promotion of Opana ER relied heavily on in-person marketing, including to Missouri prescribers. Endo had an aggressive detailing program, with its sales representatives making nearly 72,000 visits to prescribers nationwide to detail Opana ER in the first quarter of 2010 alone. Between 2007 and 2013, Endo spent between $3 million and $10 million each quarter to promote opioids through its sales force.

352.   Endo's sales representatives, like those of the other Defendants, targeted physicians to deliver sales messages that were developed centrally and deployed uniformly across the country. These sales representatives were critical in transmitting Endo's marketing strategies and talking points to individual prescribers.

353.   Endo specifically directed its sales force to target physicians who would prescribe its drugs to treat chronic pain. For example, an Opana Brand Tactical Plan dated August 2007 aimed to increase Opana ER business from the Primary Care Physician community more than 45% by the end of that year. Indeed, Endo sought to develop strategies that would be most persuasive to primary care doctors—strategies that sought to influence the prescribing behavior of primary care physicians through the use of subject matter experts. A February 2011 Final Report on Opana ER Growth Trends, for example, predicted that Endo's planned use of Pain Specialists as local thought leaders should affect increased primary care adoption.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

354.    Endo trained its sales force to make a number of misrepresentations to physicians nationwide, including to physicians in Missouri. Endo's sales representatives were trained to represent to these prescribers that Opana ER would help patients regain function they had lost to chronic pain; that Endo opioids had a lower potential for abuse because they were designed to be crush resistant, even though the clinical significance of INTAC Technology or its impact on abuse/misuse has not been established for Opana ER; and that drug seeking behavior was a sign of undertreated pain rather than addiction.

355.    Endo knew that it's marketing reached physicians —repeatedly—because it tracked their exposure. Internal Endo documents dated August 23, 2006 demonstrate that the following percentages of physicians would view an Endo journal insert (or paid supplement) at least 3 times in an 8 month period:  86% of neurologists; 86% of rheumatologists; 85% of oncologists; 85% of anesthesiologists; 70% of targeted primary care physicians; and 76% of OB/Gyns.

356.    Endo was not only able to reach physicians through its marketing, but also successfully imparted its marketing messages. The company found its promotional materials tripled prescribers' ability to recall the sales message and doubled their willingness to prescribe Opana ER in the future. This was true of marketing that contained its deceptions.

357.    For example, according to internal Endo documents, up to 10% of physicians it detailed were able to recall without assistance the message that Opana ER had Minimal/less abuse/misuse potential than other drugs. The Endo message that prescribers retained was a plain misrepresentation: that use of Opana ER was unlikely to lead to abuse and addiction. Although Opana ER always has been classified under Schedule II as a drug with a high potential for abuse and consistent with the pattern of misrepresentations, the largest single perceived advantage of

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Opana ER, according to a survey of 187 physicians who reported familiarity with the drug, was perceived low abuse potential, cited by 15% of doctors as an advantage. Low abuse potential was among the deceptive messages that Missouri prescribers received, and retained, from Endo sales representatives.

358.     Endo's own internal documents, however, acknowledged the misleading nature of these statements, conceding, Opana ER has an abuse liability similar to other opioid analgesics as stated in the FDA-mandated box warning.  A September 2012 Opana ER Business Plan similarly stated that Endo needed a significant investment in clinical data – to support comparative effectiveness, scientific exchange, benefits and unmet need, while citing lack of head-to-head data as a barrier to greater share acquisition.

359.     Nevertheless, Endo knew that its marketing was extremely effective in turning physicians into prescribers. Nationally, the physicians Endo targeted for in-person marketing represented approximately 84% of all prescriptions for Opana ER in the first quarter of 2010. Endo also observed that the prescribers its sales representatives visited wrote nearly three times as many prescriptions per month for Opana ER as those physicians who were not targeted for Endo's marketing—7.4 prescriptions per month versus 2.5. The most heavily targeted prescribers wrote nearly 30 prescriptions per month. Internal Endo documents from May 2008 indicate that Endo expected that each of its sales representatives would generate 19.6 prescriptions per week by the end of 2008. As summarized by a February 2011 report on Opana ER growth trends, Endo's aggressive detailing is having an impact.

360.     More broadly, Endo's sales trainings and marketing plans demonstrate that its sales force was trained to provide prescribers with misleading information regarding the risks of opioids when used to treat chronic pain. Foremost among these messages were misleading claims

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

that the risks of addiction, diversion, and abuse associated with opioids—and Endo's products in particular—were low, and lower than other opioids.

(a)    Endo's Sales Force Deceptively Minimized
the Risks of Addiction Associated with
Chronic Opioid Therapy.

361.    By way of illustration, Endo's Opana ER INTAC Technology Extended-Release Sell Sheet Implementation Guide, which instructs Endo sales personnel how to effectively support key messages related to the marketing of Opana ER, states that it is an approved message for sales representatives to stress that Opana ER was designed to be crush resistant, even though this internal document conceded that the clinical significance of INTAC Technology or its impact on abuse/misuse has not been established for Opana ER.

362.    Other Endo documents acknowledged the limitations on Opana ER's INTAC technology, conceding that while Opana ER may be resistant to pulverization, it can still be ground and cut into small pieces by those looking to abuse the drug.

363.    Endo's claims about the crush-resistant design of Opana ER also made their way to the company's press releases. A January 2013 article in *Pain Medicine News*, based in part on an Endo press release, described Opana ER as crush-resistant.  This article was posted on the *Pain Medicine News* website, which was accessible to Missouri patients and prescribers.

364.    Endo could only have promoted the crush resistance of Opana ER in order to persuade doctors that there was less risk of abuse, misuse, and diversion of the drug. Endo claimed that it was less addictive than other drugs was the precise message that Missouri prescribers took from Endo's marketing.

365.    On May 10, 2013, however, the FDA warned Endo that there was no evidence that Opana ER's design would provide a reduction in oral, intranasal, or intravenous abuse and

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

that the post-marketing data Endo had submitted to the FDA are insufficient to support any conclusion about the overall or route-specific rates of abuse.  Even though it was rebuked by the FDA, Endo continued to market Opana ER as having been ***designed*** to be crush resistant, knowing that this would (falsely) imply that Opana actually ***was*** crush resistant and that this crush-resistant quality would make Opana ER less likely to be abused.

366.    Endo's sales training and the promotional materials distributed by its sales representatives also minimized the risk of addiction. For example, Endo circulated an education pamphlet with the Endo logo titled *Living with Someone with Chronic Pain*, which implied to persons providing care to chronic pain patients that addiction was not a substantial concern by stating that most health care providers who treat people with pain agree that most people do not develop an addiction problem.  This program was downloadable from Endo's website and accessible to Missouri area prescribers.

367.    Endo's sales training also misrepresented the risks of addiction associated with Endo's products by implying that Endo's prolonged absorption would make it less likely to lead to abuse. For example, a presentation titled Deliver the Difference for the Opana Brand in POA II sets out that one of the key messages for the Endo sales force was that Opana ER provides stable, steady-state plasma levels for true 12-hour dosing that lasts.  Endo's sales representatives used this messaging to imply to Missouri prescribers that Opana ER provided steady state pain relief, making Opana less likely to incite euphoria in patients and less likely to lead to addiction.

368.    Endo further instructed its sales force to promote the misleading concept of pseudoaddiction,—*i.e.*, that drug-seeking behavior was not cause for alarm, but merely a manifestation of undertreated pain. In a sales training document titled Understanding the Primary Care MD and their use of Opioids, Endo noted that the biggest concerns among primary care

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

physicians were prescription drug abuse (84.2%), addiction (74.9%), adverse effects (68%), tolerance (60.7%), and medication interaction (32%).  In response to these concerns, Endo instructed its sales representatives to ask whether their customers are confusing 'pseudo-addiction' with 'drug-seekers' and how confident they are that their health care providers know these differences (Tolerance, Dependence, Addiction, Pseudo-Addiction ).

        (b)       Endo's Sales Force Deceptively Implied that
                      Chronic Opioid Therapy Would Improve
                      Patients' Ability to Function.

369.    In addition to their deceptive messages regarding addiction, Endo's promotional materials and sales trainings also misleadingly claimed that patients using opioids for the long-term treatment of chronic pain would experience improvements in their daily function. In reality, long-term opioid use has not been shown to and does not improve patients' function, and, in fact, often is accompanied by serious side effects that degrade function. Endo's own internal documents acknowledged that claims about improved quality of life were unsubstantiated off label claims.

370.    Nevertheless, Endo distributed product advertisements that suggested that using Opana ER to treat chronic pain would allow patients to perform demanding tasks like work as a chef. One such advertisement states prominently on the front:  Janice is a 46-year-old chef with chronic low back pain. She needs a treatment option with true 12-hour dosing.  The advertisement does not mention the moderate to severe pain qualification in Opana ER's indication, except in the fine print. These advertisements were mailed to prescribers and distributed by Endo's sales force in detailing visits, which would have included Endo representatives' visits to Missouri prescribers.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

371.    Similarly, training materials for sales representatives from March 2009 ask whether it is true or false that the side effects of opioids prevent a person from functioning and can cause more suffering than the pain itself.  The materials indicate that this is false because the overall effect of treatment with opioids is very favorable in most cases.

372.    A sales training video dated March 8, 2012 that Endo produced and used to train its sales force makes the same types of claims. A patient named Jeffery explains in the video that he suffers from chronic pain and that chronic pain   reduces your functional level.  Jeffery claims that after taking Opana ER, he can go out and do things like attend his son's basketball game and there's no substitute for that.  This video was shown to Endo's sales force, which adopted its misleading messaging in its nationwide sales approach, including the approach it used in Missouri.

373.    Claims of improved functionality were central to Endo's marketing efforts for years. A 2012 Endo Business Plan lists ways to position Opana ER, and among them is the claim that Opana ER will help patients maintain normal functionality, sleep, and work/life/performance productivity and have a positive effect on social relationships.   Indeed, that business plan describes the Opana ER Vision as to make the Opana franchise (Opana ER, Opana, Opana Injection) the choice that maximizes improvement in functionality and freedom from the burden of moderate-to-severe pain.

        (c)     Endo's Sales Force Deceptively Presented the
                 Risks and Benefits of Opioids To Make Them
                 Appear Safer Than Other Analgesics

374.    Endo further misled patients and prescribers by downplaying the risks of opioids in comparison to other pain relievers. For example, it distributed in Missouri and elsewhere a presentation titled *Case Challenges in Pain Management*:  *Opioid Therapy for Chronic Pain*.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

This study held out as a representative example one patient who had taken NSAIDs for more than eight years and, as a result, developed a massive upper gastrointestinal bleed.   The presentation recommended treating this patient with opioids instead. By focusing on the adverse side effects of NSAIDs, while omitting discussion of serious side effects associated with opioids, this presentation misleadingly portrayed the comparative risks and benefits of these drugs.

375.    Endo distributed *Case Challenges in Pain Management*:  *Opioid Therapy for Chronic Pain* to 116,000 prescribers in 2007, including primary care physicians.

ii.    *Endo's Speakers Bureau Programs Deceptively Minimized the Risks of Addiction Associated with Chronic Opioid Therapy*

376.    In addition to its sales representatives' visits to doctors, Endo also used deceptive science and speaker programs to spread its deceptive messages.

377.    Endo leaned heavily on its speakers' bureau programs. In 2008 alone, Endo spent nearly $4 million to promote up to 1,000 speakers programs around the country. In 2012, at least 13 speakers programs devoted to Opana ER took place in Illinois, up from 8 in 2011. Endo contracted with a medical communications firm to operate its speakers bureau program, planning to hold a total of 500 fee-for-service  peer-to-peer promotional programs for Opana ER in just the second half of 2011, including dinners, lunches and breakfasts. These programs were attended by sales representatives, which reveal their true purpose as marketing, rather than educational, events.

378.    Endo's internal reporting stated that the return on investment turned positive 8-12 weeks after such programs. Endo measured that return on investment in numbers of prescriptions written by physicians who attended the events. One internal Endo document concluded: we looked at the data for the 2011 program and the results were absolutely clear:  physicians who

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

came into our speaker programs wrote more prescriptions for Opana ER after attending than they had before they participated. You can't argue with results like that.

379.     These speakers bureau presentations included the very same misrepresentations Endo disseminated through its sales representatives. A 2012 speaker slide deck for Opana ER—on which Endo's recruited speakers were trained and to which they were required to adhere to in their presentations—misrepresented that the drug had low abuse potential, in addition to suggesting that as many as one-quarter of the adult population could be candidates for opioid therapy.

380.     In addition, a 2013 training module directed speakers to instruct prescribers that OPANA ER with INTAC is the only oxymorphone designed to be crush resistant and advised that the only way for your patients to receive oxymorphone ER in a formulation designed to be crush resistant is to prescribe OPANA ER with INTAC.  This was a key point in distinguishing Opana ER from competitor drugs. Although Endo mentioned that generic versions of oxymorphone were available, it instructed speakers to stress that the generics are not designed to be crush resistant.  This was particularly deceptive given that Opana ER was not actually crush-resistant.

381.     In 2009, Endo wrote a talk titled *The Role of Opana ER in the Management of Chronic Pain*. The talk included a slide titled Use of Opioids is Recommended for Moderate to Severe Chronic Non-cancer Pain, which cited the AAPM/APS Guidelines—and, their accompanying misstatements regarding the likelihood of addiction (by claiming that addiction risks were manageable regardless of patients' past abuse histories) while omitting their disclaimer regarding the lack of supporting evidence in favor of that position. This dangerously misrepresented to doctors the force and utility of the 2009 Guidelines.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

382.    The misleading messages and materials Endo provided to its sales force and its speakers were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, irrespective of the risks, benefits, and alternatives. This deception was national in scope and included Missouri. Endo's nationwide messages would have reached Missouri prescribers in a number of ways. For example, they were carried into Missouri by Endo's sales representatives during detailing visits as well as made available to Missouri patients and prescribers through websites and ads. They also have been delivered to Missouri prescribers by Endo's paid speakers, who were required by Endo policy and by FDA regulations to stay true to Endo's nationwide messaging.

### iii.    *Endo's Misleading Journal Supplement*

383.    In 2007, Endo enlisted Prescribers to write a supplement available for CME credit in the *Journal of Family Practice* that Endo paid to have published. It was called *Pain Management Dilemmas in Primary Care:  Use of Opioids*, and it deceptively minimized the risk of addiction by emphasizing the effectiveness of screening tools. Specifically, it recommended screening patients using tools like the Opioid Risk Tool or the Screener and Opioid Assessment for Patients with Pain. It also falsely claimed that, through the use of tools like toxicology screens, pill counts, and a maximally structured approach, even patients at high risk of addiction could safely receive chronic opioid therapy. Endo distributed 96,000 copies of this CME nationwide, and it was available to and was intended to reach Missouri prescribers.

### iv.    *Endo's Deceptive Unbranded Advertising*

384.    Endo also used unbranded advertisements to advance its goals. By electing to focus on unbranded marketing, Endo was able to make claims about the benefits of its opioids

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

that the FDA would never allow in its branded materials. The chart below compares an Endo

unbranded statement with one of Endo's FDA-regulated, branded statements:

| **Living with Someone with Chronic Pain  (2009)** <br><br> **(Unbranded)** | **Opana ER Advertisement (2011/2012/2013)** <br><br> **(Branded)** |
|---|---|
| Patient education material created by Endo | Endo advertisement |
| Most health care providers who treat people with pain agree that **most people do not develop an addiction problem**. | Contains oxymorphone, an opioid agonist and Schedule II controlled substance with an abuse liability similar to other opioid agonists, legal or illicit. <br><br> All patients treated with opioids require careful monitoring for signs of abuse and addiction, since **use of opioid analgesic products carries the risk of addiction even under appropriate medical use**. |

b.    Endo's Deceptive Third-Party Statements

385.    Endo's efforts were not limited to directly making misrepresentations through its

marketing materials, its speakers, and its sales force. Endo believed that support for patient

advocacy and professional organizations would reinforce Endo's position as the pain

management company.

386.    Prior to, but in contemplation of, the 2006 launch of Opana ER, Endo developed a

Public Stakeholder Strategy.  Endo identified tier one advocates to assist in promoting the

approval and acceptance of its new extended release opioid. Endo also intended to enlist the

support of organizations that engage or have the potential to advocate for public policy that

would be favorable to Schedule II opioids from a sales perspective. Endo sought to develop its

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

relationships with these organizations through its funding. In 2008, Endo spent $1 million per year to attend conventions of these pro-opioid medical societies, including meetings of AAPM, APS, and the American Society of Pain Management Nursing (ASPMN).

387.    American Pain Foundation's (APF) ability to influence professional societies and other third parties is demonstrated by its approach in responding to a citizens' petition filed with the FDA by the Physicians for Responsible Opioid Prescribing (the PROP Petition). The PROP petition, filed by a group of prescribers who had become concerned with the rampant prescribing of opioids to treat chronic pain, asked the FDA to require dose and duration limitations on opioid use and to change the wording of the approved indication of various long-acting opioids to focus on the severity of the pain they are intended to treat.

388.    The PROP Petition set off a flurry of activity at Endo. It was a given that Endo would respond to the petition; the only question among Endo personnel was should we consider filing a direct response to this citizens' petition or do you think we are better served by working through our professional society affiliations?  One Endo employee responded: My sense is the societies are better placed to make a medical case than Endo.  Endo's Director of Medical Science agreed that a reply from an external source would be most impactful.  These communications reflected Endo's absolute confidence that the professional societies would support its position.

i.    *APF*

389.    One of the societies with which Endo worked most closely was APF. Endo provided substantial assistance to, and exercised editorial control, over the deceptive and misleading messages that APF conveyed through its National Initiative on Pain Control (NIPC). Endo was one of the APF's biggest financial supporters, and Endo provided more than half of

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

the $10 million APF received from opioid manufacturers during its lifespan. Endo spent $1.1 million on the NIPC program in 2008 alone, funding earmarked, in part, for the creation of CME materials, which were to be used over and over again.

390.    Endo's influence over APF's activities was so pervasive that APF President Will Rowe even reached out to Defendants—including Endo—rather than his own staff to identify potential authors to answer an article critical of opioids that appeared in the *Archives of Internal Medicine* in 2011. Personnel from Defendants Purdue, Endo, Janssen, and Cephalon worked with Rowe to formulate APF's response. The response suggested by Defendants was the one that APF ultimately published.

391.    Documents also indicate that Endo personnel were given advance notice of materials APF planned to publish on its website and provided an opportunity to comment on the content of those materials before they were published. For example, in early July of 2009, APF's Director of Strategic Development wrote to Endo personnel to give them advance notice of content that APF planned to be putting  up on the website but it's not up yet.  This Endo employee also reassured the sender that she <u>will not forward it to anyone at all</u> and promised that she would 'double delete it' from her inbox.  In response, APF's Director of Strategic Development replied internally with only four words:  And where's the money?

392.    Nowhere was Endo's relationship with APF closer than with its sponsorship of the NIPC. Before being taken over by APF, the NIPC was sponsored by Professional Postgraduate Services, but that company was determined to be a commercial interest by the ACCME and could no longer serve as a sponsor. In response, Endo reached out to APF. An August 2009 document titled A Proposal for the American Pain Foundation to Assume Sponsorship of the National Initiative on Pain Control, pointed out that for the past 9 years, the

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

NIPC has been supported by unrestricted annual grants from Endo Pharmaceuticals, Inc. According to this document, APF's sponsorship of the NIPC offers the APF a likely opportunity to generate new revenue, as Endo has earmarked substantial funding:  $1.2 million in net revenue for 2010 to continue the NIPC.  Further, sponsorship of the APF would provide numerous synergies to disseminate patient education materials, including handouts to attendees at all live events to encourage physicians to drive their patients to a trusted source for pain education—the APF website.

393.    A September 14, 2009 presentation to APF's board contained a materially similar discussion of NIPC sponsorship, emphasizing the financial benefit to APF from assuming the role of administering NIPC. The proposal offered a solution to continue the development and implementation of the NIPC initiative as non-certified  yet independent education to physicians and healthcare professionals in the primary care setting, while providing the APF with a dependable, ongoing source of grant revenue.  A number of benefits related to NIPC sponsorship were listed, but chief among them was a likely opportunity for APF to generate new revenue, as Endo has earmarked substantial funding: $1.2 million in net revenue for 2010 to continue the NIPC.

394.    Internal Endo scheduling documents indicate that NIPC module curriculum development, web posting, and live regional interactive workshops were Endo promotional tasks in 2010. Endo emails indicate that Endo personnel reviewed the content created by NIPC and provided feedback.

395.    Behind the scenes, Endo exercised substantial control over NIPC's work. Endo exerted its control over NIPC by funding NIPC and APF projects; developing, specifying, and reviewing content; and taking a substantial role in distribution of NIPC and APF materials,

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

which in effect determined which messages were actually delivered to prescribers and consumers. As described below, Endo projected that it would be able to reach tens of thousands of prescribers nationwide through the distribution of NIPC materials.

396.    From 2007 until at least 2011, Endo also meticulously tracked the distribution of NIPC materials, demonstrating Endo's commercial interest in and access to NIPC's reach. Endo knew exactly how many participants viewed NIPC webinars and workshops and visited its website, *Painknowledge.com*. Endo not only knew how many people viewed NIPC's content, but what their backgrounds were (*e.g.*, primary care physicians or neurologists). Endo's access to and detailed understanding of the composition of the audience at these events demonstrates how deeply Endo was involved in NIPC's activities. Moreover, Endo tracked the activities of NIPC— ostensibly a third party—just as it tracked its own commercial activity.

397.    Endo worked diligently to ensure that the NIPC materials it helped to develop would have the broadest possible distribution. Endo's 2008 to 2012 Opana Brand Tactical Plan indicates that it sought to reach 1,000 prescribers in 2008 through live NIPC events, and also to leverage live programs via enduring materials and web posting.  Endo also planned to disseminate NIPC's work by distributing two accredited newsletters to 60,000 doctors nationwide for continuing education credit and sponsoring a series of 18 NIPC regional case-based interactive workshops. Endo had earmarked more than one million dollars for NIPC activities in 2008 alone.

398.    In short, NIPC was a key piece of Endo's marketing strategy. Indeed, internal APF emails question whether it was worthwhile for APF to continue operating NIPC given that the NIPC's work was producing far more financial benefit for Endo than for APF. Specifically, after Endo approved a $244,337.40 grant request to APF to fund a series of NIPC eNewsletters,

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

APF personnel viewed it as great news, but cautioned that the more I think about this whole thing, Endo's making a lot of money on this with still pretty slender margins on APF's end. APF's commitment to NIPC's educational mission did not figure at all in APF's consideration of the value of its work, nor was Endo's motive or benefit in doubt.

(a)      Misleading Medical Education

399.    NIPC distributed a series of newsletter CMEs focused on key topics surrounding the use of opioid therapy and sponsored by Endo. These newsletters were edited by KOL Dr. Perry Fine and also listed several industry-backed KOLs, including Dr. Webster, as individual authors. Endo estimated that roughly 60,000 prescribers viewed each one, which were available to and would have included Missouri prescribers. Before-and-after surveys, summarized in the chart below, showed that prescriber comfort with prescribing opioids ranged from 27% to 62% before exposure to the CME, and from 76% to 92% afterwards:

| Topic | Comfort level *prior to reading the article* | Comfort level *after reading the article* |
|---|---|---|
| Patient Selection and Initiation of Opioid Therapy as a Component of Pain Treatment | 47% | 87% |
| Informed Consent and Management Plans to Optimize Opioid Therapy for Chronic Pain | 48% | 81% |
| Risk Stratification and Evaluation of High-Risk Behaviors for Chronic Opioid Therapy | 28% | 76% |
| Integration of Nonpharmacologic and Multidisciplinary Therapies Into the Opioid Treatment Plan | 42% | 85% |
| Addressing Patients' Concerns Associated With Chronic Pain Treatment and Opioid Use | 62% | 92% |
| Opioid Therapy in Patients With a History of Substance Use Disorders | 35% | 85% |
| Urine Drug Testing: An Underused Tool | 54% | 86% |
| Appropriate Documentation of Opioid Therapy: The Emergence of the 4As and Trust and Verify as the Paradigm | 44% | 86% |
| Opioid Rotation | 27% | 92% |
| Discontinuing Opioid Therapy: Developing and Implementing an "Exit Strategy" | 37% | 90% |

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

400.    Endo documents made clear that the persuasive power of NIPC speakers was directly proportional to their perceived objectivity. Accordingly, Endo personnel directed that, when giving Endo-sponsored talks, NIPC faculty would not appear to be Endo Speakers. Nevertheless, the two parties understood that Endo and NIPC shared a common mission to educate physicians and working through the APF  was a great way to work out  problems that could have been there without the APF's participation and support.

401.    The materials made available on and through NIPC included misrepresentations. For example, Endo worked with NIPC to sponsor a series of CMEs titled *Persistent Pain in the Older Patient* and *Persistent Pain in the Older Adult*. These CMEs misrepresented the prevalence of addiction by stating that opioids have possibly less potential for abuse in elderly patients than in younger patients, even though there is no evidence to support such an assertion. Moreover, whereas withdrawal symptoms are always a factor in discontinuing long-term opioid therapy, *Persistent Pain in the Older Adult* also misleadingly indicated that such symptoms can be avoided entirely by tapering the patient's does by 10-20% per day for ten days. *Persistent Pain in the Older Patient*, for its part, made misleading claims that opioid therapy has been shown to reduce pain and improve depressive symptoms and cognitive functioning.  NIPC webcast these CMEs from its own website, where they were available to and were intended to reach Missouri prescribers.

(b)    Painknowledge.com

402.    Working with NIPC enabled Endo to make a number of misleading statements through the NIPC's website, *Painknowledge.com*. Endo tracked visitors to *PainKnowledge.com* and used *Painknowledge.com* to broadcast notifications about additional NIPC programming that Endo helped to create.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

403.    APF made a grant request to Endo to create an online opioid tool-kit for NIPC and to promote NIPC's website, *Painknowledge.com*. In so doing, APF made clear that it planned to disseminate Defendants' misleading messaging. The grant request expressly indicated APF's intent to make misleading claims about functionality, noting:  Some of these people in chronic pain may be potential candidates for opioid analgesics, which can improve pain, function, and quality of life.  Endo provided $747,517 to fund the project.

404.    True to APF's word, *Painknowledge.com* misrepresented that opioid therapy for chronic pain would lead to improvements in patients' ability to function. Specifically, in 2009 the website instructed patients and prescribers that, with opioids, a patient's level of function should improve and that patients may find they are now able to participate in activities of daily living, such as work and hobbies, that they were not able to enjoy when their pain was worse.

405.    *Painknowledge.com* also deceptively minimized the risk of addiction by claiming that people who take opioids as prescribed usually do not become addicted.  *Painknowledge.com* did not stop there. It deceptively portrayed opioids as safe at high doses and also misleadingly omitted serious risks, including the risks of addiction and death, from its description of the risks associated with the use of opioids to treat chronic pain.

406.    Endo was the sole funder of *Painknowledge.com*, and it continued to provide that funding despite being aware of the website's misleading contents.

(c)    *Exit Wounds*

407.    Finally, Endo also sponsored APF's publication and distribution of *Exit Wounds*, a publication aimed at veterans that also contained a number of misleading statements about the risks, benefits, and superiority of opioids to treat chronic pain. "Medical Writer X," who did extensive work for Janssen, drafted *Exit Wounds*. Consulting firm Conrad & Associates LLC

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

was hired to write pro-opioid marketing pieces disguised as science and frequently hired medical Writer X. Medical Writer X's work was reviewed and approved by drug company representatives, and he felt compelled to draft pieces that he admits distorted the risks and benefits of chronic opioid therapy in order to meet the demands of his drug company sponsors.

408.    *Exit Wounds* is a textbook example of Medical Writer X's authorship on drug companies' behalf. The book misrepresented the functional benefits of opioids by stating that opioid medications "*increase* your level of functioning."

409.    *Exit Wounds* also misrepresented that the risk of addiction associated with the use of opioids to treat chronic pain was low. It claimed that "long experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications."

410.    Finally, *Exit Wounds* misrepresented the safety profile of using opioids to treat chronic pain by omitting key risks associated with their use. Specifically, it omitted warnings of the risk of interactions between opioids and benzodiazepines—a warning sufficiently important to be included on Endo's FDA-required labels. *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids—a particular risk for veterans.

411.    As outlined above, Endo exercised dominance over APF and the projects it undertook in an effort to promote the use of opioids to treat chronic pain. In addition, as outlined above, Medical Writer X's work was being reviewed and approved by drug company representatives, motivating him to draft pro-opioid propaganda masquerading as science. Combined, these factors gave Endo considerable influence over the work of Medical Writer X

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

and over APF. Further, by paying to distribute *Exit Wounds*, Endo endorsed and approved its contents.

ii.     *Other Front Groups:  FSMB, AAPM, and AGS*

412.    In addition to its involvement with APF, Endo worked closely with other third party Front Groups and KOLs to disseminate deceptive messages regarding the risks, benefits, and superiority of opioids for the treatment of chronic pain. As with certain APF publications, Endo in some instances used its sales force to directly distribute certain publications by these Front Groups and KOLs, making those publications labeling within the meaning of 21 C.F.R. § 1.3(a).

413.    In 2007, Endo sponsored FSMB's *Responsible Opioid Prescribing*, which deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain. *Responsible Opioid Prescribing* was drafted by "Medical Writer X."

414.    Endo spent $246,620 to help FSMB distribute *Responsible Opioid Prescribing*. Endo approved this book for distribution by its sales force. Based on the uniform and nationwide character of Endo's marketing campaign, and the fact that Endo purchased these copies specifically to distribute them, these copies were distributed to physicians nationwide, including physicians in Missouri.

415.    In December 2009, Endo also contracted with AGS to create a CME to promote the 2009 guidelines titled the *Pharmacological Management of Persistent Pain in Older Persons* with a $44,850 donation. These guidelines misleadingly claimed that the risks of addiction are exceedingly low in older patients with no current or past history of substance abuse, since the study supporting this assertion did not analyze addiction rates by age. They also stated, falsely, that all patients with moderate to severe pain  should be considered for opioid therapy (low

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

quality of evidence, strong recommendation) when in reality, opioid therapy was an appropriate treatment only for a subset of those patients, as Endo's FDA-mandated labels recognized.

416.   AGS's grant request to Endo made explicit reference to the CME Endo was funding. Endo thus knew full well what content it was paying to distribute, and was in a position to evaluate that content to ensure it was accurate, substantiated, and balanced before deciding whether to invest in it. After having sponsored it, Endo's internal documents indicate that Endo's pharmaceutical sales representatives discussed the AGS guidelines with doctors during individual sales visits.

417.   Endo also worked with AAPM, which it viewed internally as Industry Friendly, with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications.

418.   A talk written by Endo in 2009, approved by Endo's Medical Affairs Review Committee, and given by a Missouri-area KOL, titled *The Role of Opana ER in the Management of Chronic Pain,* includes a slide titled *Use of Opioids is Recommended for Moderate to Severe Chronic Noncancer Pain.* That slide cites the AAPM/APS Guidelines, which contain a number of misstatements while omitting their disclaimer regarding the lack of supporting evidence. This dangerously misrepresented to doctors the force and utility of the 2009 Guidelines. Furthermore, Endo's internal documents indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

iii.      *Key Opinion Leaders and Misleading Science*

419.   Endo also sought to promote opioids for the treatment of chronic pain through the use of key opinion leaders and biased, misleading science.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

420.   Endo's 2010 publication plan for Opana ER identified a corporate goal of making Opana ER the second leading branded product for the treatment of moderate-to-severe chronic pain (after OxyContin). Endo sought to achieve that goal by providing clinical evidence for the use of Opana ER in chronic low back pain and osteoarthritis, and succeeded in having articles on this topic published.

421.   In the years that followed, Endo sponsored articles, authored by an Endo consultant and Endo employees, which argued that the metabolic pathways utilized by Opana ER made it less likely than other opioids to result in drug interactions in elderly low back and osteoarthritis pain patients. In 2010, Endo directed its publication manager to reach out to a list of consultants conducting an ongoing Endo-funded study, to assess their willingness to respond to an article that Endo believed emphasized the risk of death from opioids, without  fair balance.

422.   Endo's reliance on flawed, biased research is also evident in its 2012 marketing materials and strategic plans.  A 2012 Opana ER slide deck for Endo's speakers bureaus—on which these recruited physician speakers were trained and to which they were required to adhere—misrepresented that the drug had low abuse potential and suggested that as many as one-quarter of the adult population could be candidates for opioid therapy. Although the FDA requires such speaker slide decks to reflect a fair balance of information on benefits and risks, Endo's slides reflected one-sided and deeply biased information. The presentation's 28 literature citations were largely to data on file with the company, posters, and research funded by or otherwise connected to Endo. Endo's speakers carried the information in these slides to audiences that were unaware of the skewed science on which the information rested.

423.   A 2012 Opana ER Strategic Platform Review suffered from similar defects. Only a small number of the endnote references in that document, which it cites to indicate no gap in

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

scientific evidence for particular claims, were to national-level journals. Many were published in lesser or dated journals, and written or directly financially supported by opioid manufacturers. Where the strategy document did cite independent, peer-reviewed research, it did so out of context. For example, it cited a 2008 review article on opioid efficacy for several claims, including that treatment of chronic pain reduces pain and improves functionality, but it ignores that article's overall focus on the lack of consistent effectiveness of opioids in reducing pain and improving functional status.

424.    Notwithstanding Endo's reliance upon dubious or cherry-picked science, in an Opana ER brand strategy plan it internally acknowledged the continuing need for a significant investment in clinical data to support comparative effectiveness. Endo also cited a lack of head-to-head data as a barrier to greater share acquisition and the lack of differentiation data as a challenge to addressing the  #1 Key Issue of product differentiation. Nor did this acknowledged lack of support stop Endo from directing its sales representatives to tell prescribers that its drugs were less likely to be abused or less addictive than other opioids.

425.    Endo also worked with various KOLs to disseminate various misleading statements about chronic opioid therapy. For example, Endo distributed a patient education pamphlet edited by KOL Dr. Russell Portenoy titled *Understanding your Pain: Taking Oral Opioid Analgesics*. This pamphlet deceptively minimized the risks of addiction by stating that addicts take opioids for other reasons than pain relief, such as unbearable emotional problems, implying that patients who are taking opioids for pain are not at risk of addiction.

426.    *Understanding your Pain:  Taking Oral Opioid Analgesics* also misleadingly omitted any description of the increased risks posed by higher doses of opioid medication.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Instead, in a Q&A format, the pamphlet asked if I take the opioid now, will it work later when I really need it? and responded that the dose can be increased  you won't 'run out' of pain relief.

427.    Dr. Portenoy received research support, consulting fees, and honoraria from Endo for editing *Understanding Your Pain* and other projects.

428.    Endo similarly distributed a book written by Dr. Lynn Webster titled *Avoiding Opioid Abuse While Managing Pain*, which stated that in the face of signs of aberrant behavior, increasing the dose in most cases  should be the clinician's first response.

429.    A slide from an Opana ER business plan contemplated distribution of the book as part of Endo's efforts to increase the breadth and depth of the OPANA ER prescriber base via targeted promotion and educational programs.  The slide indicates that the book would be particularly effective for the PCP audience and instructed sales representatives to deliver the book to participating health care professionals.  The slide, shown below, demonstrates Endo's express incorporation of this book by a KOL into its marketing strategy:



430.    Endo documents indicate that, around 2007, the company purchased at least 50,000 copies of the book for distribution. Internal Endo documents demonstrate that the book had been approved for distribution by Endo's sales force, and Endo had fewer than 8,000 copies

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

on hand in March of 2013. Based on the nationwide and uniform character of Endo's marketing, and the book's approval for distribution, this book was available to and was intended to reach Missouri prescribers.

### 4.   Janssen

431.   Janssen promoted its branded opioids, including Duragesic, Nucynta, and Nucynta ER, through its sales representatives and a particularly active speakers program. Deceptive messages regarding low addiction risk and low prevalence of withdrawal symptoms were a foundation of this marketing campaign. Janssen also conveyed other misrepresentations including that its opioids could safely be prescribed at higher doses and were safer than alternatives such as NSAIDs.

432.   Janssen supplemented these efforts with its own unbranded website, as well as third-party publications and a Front Group website, to promote opioids for the treatment of chronic pain. These materials likewise made deceptive claims about addiction risk, safety at higher doses, and the safety of alternative treatments. They also claimed that opioid treatment would result in functional improvement, and further masked the risk of addiction by promoting the concept of pseudoaddiction.

433.   Based on the highly coordinated and uniform nature of Janssen's marketing, and as confirmed by verbatim message data and interviews with prescribers, Janssen conveyed these deceptive messages to Missouri prescribers. The materials that Janssen generated in collaboration with third-parties also were distributed or made available in Missouri. Janssen distributed these messages, or facilitated their distribution, in Missouri with the intent that Missouri prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

a.   Janssen's Deceptive Direct Marketing

434.   Janssen joined the other Defendants in propagating deceptive branded marketing that falsely minimized the risks and overstated the benefits associated with the long-term use of opioids to treat chronic pain. Like the other Defendants, Janssen sales representatives visited targeted physicians to deliver sales messages that were developed centrally and deployed identically across the country. These sales representatives were critical in transmitting Janssen's marketing strategies and talking points to individual prescribers. In 2011, at the peak of its effort to promote Nucynta ER, Janssen spent more than $90 million on detailing.

435.   Janssen's designs to increase sales through deceptive marketing are apparent on the face of its marketing plans. For example, although Janssen knew that there was no credible scientific evidence establishing that addiction rates were low among patients who used opioids to treat chronic pain, its Nucynta Business Plans indicated that one of the drivers to sell more Nucynta among primary care physicians was the low perceived addiction and/or abuse potential associated with the drug. However, there is no evidence that Nucynta is any less addictive or prone to abuse than other opioids, or that the risk of addiction or abuse is low. Similarly, Janssen knew that there were severe symptoms associated with opioid withdrawal including, severe anxiety, nausea, vomiting, hallucinations, and delirium, but Janssen touted the ease with which patients could come off opioids.

i.   *Janssen's Deceptive Sales Training*

436.   Janssen's sales force was compensated based on the number of Nucynta prescriptions written in each sales representative's territory. Janssen encouraged these sales representatives to maximize sales of Nucynta and meet their sales targets by relying on the false and misleading statements.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

437.    For example, Janssen's sales force was trained to trivialize addiction risk. A June 2009 Nucynta training module warns that physicians are reluctant to prescribe controlled substances like Nuycnta because of their fear of addicting patients, but this reluctance is unfounded because the risks  are actually much smaller than commonly believed.  Janssen also encouraged its sales force to misrepresent the prevalence of withdrawal symptoms associated with Nucynta. A Janssen sales training PowerPoint titled Selling Nucynta ER and Nucynta indicates that the low incidence of opioid withdrawal symptoms is a core message for its sales force. The message was touted at Janssen's Pain District Hub Meetings, in which Janssen periodically gathered its sales force personnel to discuss sales strategy.

438.    This core message regarding a lack of withdrawal symptoms runs throughout Janssen's sales training materials. For example, Janssen's Licensed to Sell Facilitator's Guide instructs those conducting Janssen sales trainings to evaluate trainees, in part, on whether they remembered that withdrawal symptoms after abrupt cessation of treatment with NUCYNTA ER were mild or moderate in nature, occurring in 11.8% and 2% of patients, respectively and whether they were able to accurately convey this core message.  Janssen further claimed in 2008 that low incidence of opioid withdrawal symptoms was an advantage of the tapentadol molecule.

439.    Similarly, a Nucynta Clinical Studies Facilitator's Guide instructs individuals training Janssen's sales representatives to ask trainees to describe a key point—that 83% of patients reported no withdrawal symptoms after abruptly stopping treatment without initiating alternative therapy—as though he/she is discussing it with a physician.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

ii.       *Janssen's Deceptive Speakers Bureau Programs*

440.    Janssen did not stop at disseminating its misleading messages regarding chronic opioid therapy through its sales force. It also hired speakers to promote its drugs and trained them to make the very same misrepresentations made by its sales representatives.

441.    Janssen's speakers worked from slide decks—which they were required to present—reflecting the deceptive information about the risks, benefits, and superiority of opioids outlined above. For example, a March 2011 speaker's presentation titled *A New Perspective For Moderate to Severe Acute Pain Relief:  A Focus on the Balance of Efficacy and Tolerability* set out the following adverse events associated with use of Nucynta:  nausea, vomiting, constipation, diarrhea, dizziness, headache, anxiety, restlessness, insomnia, myalgia, and bone pain. It completely omitted the risks of misuse, abuse, addiction, hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, and other known, serious risks associated with chronic opioid therapy. The presentation also minimized the risks of withdrawal by stating, more than 82% of subjects treated with tapentadol IR reported no opioid withdrawal symptoms.

442.    An August 2011 speaker's presentation titled *New Perspectives in the Management of Moderate to Severe Chronic Pain* contained the same misleading discussion of the risks associated with chronic opioid therapy. It similarly minimized the risks of withdrawal by reporting that 86% of patients who stopped taking Nucynta ER abruptly without initiating alternative opioid therapy reported no withdrawal symptoms whatsoever. The same deceptive claims regarding risks of adverse events and withdrawal appeared in a July 2012 speaker's presentation titled *Powerful Pain Management:  Proven Across Multiple Acute and Chronic Pain Models*.

142

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

443.    These speakers' presentations were part of Janssen's nationwide marketing efforts. Upon information and belief, a number of these events were available to and were intended to reach Missouri prescribers.

iii.      *Janssen's Deceptive Unbranded Advertising*

444.    Janssen was aware that its branded advertisements and speakers programs would face regulatory scrutiny that would not apply to its unbranded materials, so Janssen also engaged in direct, unbranded marketing.

445.    One such unbranded project was Janssen's creation and maintenance of *Prescriberesponsibly.com* (last updated July 2, 2015), a website aimed at prescribers and patients that claims that concerns about opioid addiction are overstated.  A disclaimer at the bottom of the website states that the site is published by Janssen Pharmaceuticals, Inc., which is solely responsible for its content.   This website was available to and intended to reach Missouri prescribers and patients.

b.      Janssen's Deceptive Third-Party Statements

446.    Janssen's efforts were not limited to directly making misrepresentations through its sales force, speakers bureau, and website. To avoid regulatory constraints and give its efforts an appearance of independence and objectivity, Janssen obscured its involvement in certain of its marketing activities by collaborating with key patient advocacy organizations to release misleading information about opioids.

i.      *AAPM and AGS – Finding Relief:  Pain Management for Older Adults*

447.    Janssen worked with AAPM and AGS to create a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009). In doing so, Janssen contracted with a medical publishing firm, Conrad & Associates, LLC. The content was drafted by a writer,

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

"Medical Writer X", hired by Conrad & Associates and funded by Janssen. These materials were reviewed, in detail, by Janssen's medical-legal review team, which conducted detailed reviews and gave him editorial feedback on his drafts, which was adopted in the published version.

448.                          Medical Writer X understood, without being explicitly told, that since his work was funded and reviewed by Janssen, the materials he was writing should aim to promote the sale of more drugs by overcoming the reluctance to prescribe or use opioids to treat chronic pain. He knew that the publication was undertaken in connection with the launch of a new drug and was part of its promotional effort. Medical Writer X knew of the drug company sponsoring the publication, and he would go to the company's website to learn about the drug being promoted. He also knew that his clients—including Janssen—would be most satisfied with his work if he emphasized that:  (a) even when used long-term, opioids are safe and the risk of addiction is low; (b) opioids are effective for chronic pain; and (c) opioids are under-prescribed because doctors are hesitant, confused, or face other barriers. *Finding Relief* is rife with the deceptive content. *Finding Relief* misrepresents that opioids increase function by featuring a man playing golf on the cover and listing examples of expected functional improvement from opioids, like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs. The guide states as a fact that opioids may make it *easier* for people to live normally. The functional claims contained in *Finding Relief* are textbook examples of Defendants' use of third parties to disseminate messages the FDA would not allow them to say themselves. Compare, e.g.:

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

| **Branded Advertisement That Triggers an<br>FDA Warning Letter (2008)** |
|---|
| Improvement in Daily Activities Includes:<br><br>•   Walking on a flat surface<br><br>•   Standing or sitting<br><br>•   Climbing stairs<br><br>•   Getting in and out of bed or bath<br><br>•   Ability to perform domestic duties. |

with:

| **Seemingly Independent Publication:<br>"Finding Relief: Pain Management for Older Adults"<br>(Final Authority, Janssen 2009)**: |
|---|
| Your recovery will be measured by how well you reach functional goals such as<br><br>•   Sleeping without waking from pain<br><br>•   Walking more, or with less pain<br><br>•   Climbing stairs with less pain<br><br>•   Returning to work<br><br>•   Enjoying recreational activities<br><br>•   Having sex<br><br>•   Sleeping in your own bed |

449.  *Finding Relief* also trivialized the risks of addiction describing a myth that opioids are addictive, and asserting as fact that many studies show that opioids are *rarely* addictive when used properly for the management of chronic pain.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

450.    *Finding Relief* further misrepresented that opioids were safe at high doses by listing dose limitations as disadvantages of other pain medicines but omitting any discussion of risks from increased doses of opioids. The publication also falsely claimed that it is a myth that opioid doses have to be bigger over time.

451.    Finally, *Finding Relief* deceptively overstated the risks associated with alternative forms of treatment. It juxtaposes the advantages and disadvantages of NSAIDs on one page, with the myths/facts of opioids on the facing page. The disadvantages of NSAIDs are described as involving stomach upset or bleeding, kidney or liver damage if taken at high doses or for a long time, adverse reactions in people with asthma, and increased  risk of heart attack and stroke. Conversely, the only adverse effects of opioids listed by *Finding Relief* are upset stomach or sleepiness, which the brochure claims will go away, and constipation. The guide never mentions addiction, overdose, abuse, or other serious side effects of opioids.

452.    Janssen was not merely a passive sponsor of *Finding Relief*. Instead, Janssen exercised control over its content and provided substantial assistance to AGS and AAPM to distribute it. A Copy Review Approval Form dated October 22, 2008 indicates that key personnel from Janssen's Advertising & Promotion, Legal, Health Care Compliance, Medical Affairs, Medical Communications, and Regulatory Departments reviewed and approved *Finding Relief*. All six Janssen personnel approving the publication checked the box on the approval form indicating that *Finding Relief* was Approved With Changes.  After the publication was modified at the behest of Janssen personnel, Janssen paid to have its sales force distribute 50,000 copies of *Finding Relief* in Missouri and throughout the nation. Thus, *Finding Relief* is considered labeling for Janssen's opioids.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

453.    *Finding Relief's* author, Medical Writer X, later said it was clear, from his perch at the intersection of science and marketing, that the money paid by drug companies to the KOLs and professional and patient organizations with which he worked distorted the information provided to doctors and patients regarding opioids. The money behind these and many other educational efforts also, he believes, led to a widespread lack of skepticism on the part of leading physicians about the hazards of opioids. It also led these physicians to accept without adequate scrutiny published studies that, while being cited to support the safety of opioids, were, in fact, of such poor methodological quality that they would not normally be accepted as adequate scientific evidence.

ii.        *AGS – Misleading Medical Education*

454.    Janssen also worked with the AGS on another project—AGS's CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. These guidelines falsely claimed that the risks of addiction are exceedingly low in older patients with no current or past history of substance abuse when the study supporting this assertion did not analyze addiction rates by age. They also stated, falsely, that all patients with moderate to severe pain should be considered for opioid therapy (low quality of evidence, strong recommendation).  Based on Janssen's control over AGS's *Finding Relief*, Janssen also would have exercised control over this project as well.

iii.       *APF*

455.    Janssen also worked with APF to carry out its deceptive marketing campaign. Documents obtained from one of Janssen's public relations firms, Ketchum, indicate that Janssen and the firm enlisted APF as part of an effort to draft media materials and execute a launch plan for Janssen's drugs at an upcoming meeting of the AAPM. Janssen also drew on APF

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

publications to corroborate claims in its own marketing materials and its sales training. Janssen personnel participated in a March 2011 call with APF's Corporate Roundtable, in which they worked with APF and drug company personnel to develop strategies to promote chronic opioid therapy. In particular, APF personnel spoke with Janssen employees, who shared expertise from within their company for a public awareness campaign.

456.    Their joint work on the Corporate Roundtable demonstrates the close collaboration between Janssen and APF in promoting opioids for the treatment of chronic pain. APF President Will Rowe also reached out to Defendants—including Janssen—rather than his own staff to identify potential authors to draft an answer to an article critical of opioids that appeared in the *Archives of Internal Medicine* in 2011. Additional examples of APF's collaboration with Janssen are laid out below:

(a)      Let's Talk Pain

457.    Most prominent among these efforts was the *Let's Talk Pain* website. Janssen sponsored *Let's Talk Pain* in 2009, acting in conjunction with APF, American Academy of Pain Management, and American Society of Pain Management Nursing, whose participation in the website Janssen financed and orchestrated.

458.    Janssen exercised substantial control over the content of the *Let's Talk Pain* website. Janssen's internal communications always referred to *Let's Talk Pain* as promoting tapentadol, the molecule it sold as Nucynta and Nucynta ER. Janssen regarded *Let's Talk Pain* and another website—*Prescriberesponsibly.com*— as integral parts of Nucynta's launch:

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM



Janssen documents also reveal that Janssen personnel viewed APF and AAPM as coalition members in the fight to increase market share.

459.    To this end, Janssen and APF entered into a partnership to keep pain and the importance of responsible pain management top of mind among prescribers and patients. They agreed to work to reach target audiences that included patients, pain management physicians, primary care physicians, and KOLs. One of the roles Janssen assumed in the process was to review, provide counsel on, and approve materials.  Janssen did in fact review and approve material for the *Let's Talk Pain* website, as evidenced by the following edits by a Janssen executive to the transcript of a video that was to appear on the site:

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

2

edit out of video

Shaffer:  This is what has allowed me to continue to function.  It is what allowed me to have somewhat of a normal life, is the opioids. ~~But, and I do have a concern about the risk, but I also know that if I take them as directed by~~

3

~~my physician, and I let them know of any adverse reactions that I might feel~~

5

~~promptly, that I'm safe.~~

6

Anderson: ~~And that is true.~~  The job of the physician that's prescribing

The final version of the video on *Let's Talk Pain* omitted the stricken language above.

460.    This review and approval authority extended to the *Let's Talk Pain* website. Emails between Janssen personnel and a consultant indicate that, even though the *Let's Talk Pain* website was hosted by APF, Janssen had approval rights over its content. Moreover, emails describing Janssen's review and approval rights related to *Let's Talk Pain* indicate that this right extended to major changes and video additions.

461.    As a 2009 Janssen memo conceded, the *Let's Talk Pain Coalition* is sponsored by PriCara, a Division of Ortho-McNeil-Janssen Pharmaceuticals, Inc. and the Coalition and Pricara **maintain editorial control of all *Let's Talk Pain* materials and publications**.

462.    A 2011 Consulting Agreement between Janssen and one of APF's employees, relating to the dissemination of national survey data, demonstrates the near-total control Janssen was empowered to exercise over APF in connection with the *Let's Talk Pain* website, including in requiring APF to circulate and post Janssen's promotional content. The agreement required APF to participate in status calls between Janssen, APF, AAPM, ASPMN, and Ketchum as requested by Janssen and required APF to respond to requests to schedule status calls **within 48 hours** of the request. APF also was required to review and provide feedback to media materials,

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

including a press release, pitch email, a key messages document, and social media messages, **within one week** of receipt.

463.     The agreement further required APF to provide a summary of the survey results in APF's PAIN MONITOR e-newsletter, post a link to the survey results on APF's Facebook page, send out tweets related to the survey, serve as a spokesperson available for media interviews, share information with any media contacts with whom APF has existing relationships to promote the announcement of the national survey findings, identify at least two patient spokespersons to talk about the survey data, and include the survey results in any future APF materials, as appropriate.  Tellingly, any ideas made or conceived by APF in connection with or during the performance of the Agreement shall be the property of, and belong to, Janssen.

464.     Janssen also exercised its control over *Let's Talk Pain*. Janssen was able to update the *Let's Talk Pain* website to describe its corporate restructuring and Janssen personnel asserted their control over video additions by reviewing and editing the interview touting the functional benefits of opioids. Given its editorial control over the content of *Let's Talk Pain*, Janssen was at all times fully aware of—and fully involved in shaping—the website's content.

465.     *Let's Talk Pain* contained a number of the misrepresentations. For example, *Let's Talk Pain* misrepresented that the use of opioids for the treatment of chronic pain would lead patients to regain functionality. *Let's Talk Pain* featured an interview claiming that opioids were what allowed a patient to continue to function.  This video is still available today on YouTube.com and is accessible to Missouri prescribers and patients.

(b)     *Exit Wounds*

466.     Janssen also engaged in other promotional projects with and through APF. One such project was the publication and distribution of *Exit Wounds*, which deceptively portrayed

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

the risks, benefits, and superiority of opioids to treat chronic pain. "Medical Writer X" drafted *Exit Wounds*.  It is fully representative of his work on behalf of drug companies.

467.    Janssen gave APF substantial assistance in distributing *Exit Wounds* in Missouri and throughout the nation by providing grant money and other resources.

468.    APF mailed copies of *Exit Wounds* to the Wounded Heroes Foundation in Missouri. The Wounded Heroes Foundation is an organization designed to support the injured men and women who have served the United States in Iraq, Afghanistan and around the world. Unfortunately, by distributing *Exit Wounds* to its members, it distributed Defendants' deceptive statements about the appropriateness of opioid therapy to treat chronic pain.

### 5.    Purdue

469.    Purdue promoted its branded opioids—principally, Oxycontin, Butrans, and Hysingla—and opioids generally in a campaign that consistently mischaracterized the risk of addiction and made deceptive claims about functional improvement. Purdue did so through its sales force, branded advertisements, promotional materials, and speakers, as well as a host of materials produced by its third-party partners, most prominently APF. Purdue's sales representatives and advertising also misleadingly implied that OxyContin provides a full 12 hours of pain relief, and its allied Front Groups and KOLs conveyed the additional deceptive messages about opioids' safety at higher doses, the safety of alternative therapies, and the effectiveness of addiction screening tools.

470.    Dr. Richard Sackler, the former chairman and president of Purdue, was a chief architect and beneficiary of Purdue's deception. Because the Sackler family owns Purdue, a privately held company, and held a majority of the seats on its Board, Dr. Sackler had the authority to determine how opioids were marketed and sold.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

471.     Dr. Sackler directly controlled the aggressive marketing campaign championed by Purdue. Dr. Sackler knowingly and intentionally sent sales representatives to promote opioids to prescribers in Missouri thousands of times. Dr. Sackler knew and intended that the Purdue sales reps in Missouri would unfairly and deceptively promote opioid sales, including by: (1) pushing opioids for elderly patients, without disclosing the higher risks; (2) pushing opioids for patients who had never taken them before, without disclosing the higher risks; (3) pushing opioids as substitutes for safer medications, with improper comparative claims; (4) falsely assuring doctors and patients that reformulated OxyContin was safe; (5) pushing doctors and patients to use higher doses of opioids, without disclosing the higher risks; (6) pushing doctors and patients to use opioids for longer periods of time, without disclosing the higher risks; and (7) pushing opioid prescriptions by doctors that Purdue knew were writing dangerous prescriptions.

472.     Upon information and belief, Dr. Sackler instructed sales reps to place blame on individuals themselves for addiction issues after using OxyContin and to steer the narrative away from OxyContin's true addictive nature. Further, Dr. Sackler knew that many doctors held an important misconception that OxyContin was weaker than morphine, which led them to prescribe OxyContin far more often. In fact, OxyContin is far more potent than morphine. Rather that correct this misconception, Dr. Sackler instructed Purdue staff and sales reps to not disclose OxyContin's true potency in an effort to protect sales.

473.     Based on the highly coordinated and uniform nature of Purdue's marketing, and as confirmed by verbatim message data and interviews with prescribers, Purdue conveyed these deceptive messages to Missouri prescribers. The materials that Purdue generated in collaboration with third parties also were distributed or made available in Missouri. Purdue distributed these

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

messages, or facilitated their distribution, in Missouri with the intent that Missouri prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain.

a.   Purdue's Deceptive Direct Marketing

474.   Like the other Defendants, Purdue directly disseminated deceptive branded and unbranded marketing focused on minimizing the risks associated with the long-term use of opioids to treat chronic pain. Purdue directed these messages to prescribers and consumers through its sales force and branded advertisements.

475.   Purdue engaged in in-person marketing to doctors in Missouri and operated speakers bureau programs that included and targeted Missouri prescribers. Purdue had 250 sales representatives in 2007, of whom 150 were devoted to promoting sales of OxyContin full time. Like the other Defendants' detailers, Purdue sales representatives visited targeted physicians to deliver sales messages that were developed centrally and deployed, identically, across the country. These sales representatives were critical in delivering Purdue's marketing strategies and talking points to individual prescribers. Indeed, Endo's internal documents indicate that pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed the AAPM/APS Guidelines, which deceptively concluded that the risk of addiction is manageable for patients regardless of past abuse histories, with doctors during individual sales visits.

476.   Purdue's spending on detailing reached its nadir in 2006 and 2007, as the company faced civil and criminal charges for misbranding OxyContin. Since settling those charges in 2007, however, Purdue has sharply increased its quarterly spending on promotion through its sales force, from under $5 million in 2007 to more than $30 million by the end of 2014.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

477.     Purdue also marketed its drugs through branded advertisements, which relied on, among other deceptive tactics, misleading statements about the efficacy and onset of OxyContin. Purdue has marketed its drug as effective for 12 hours. Purdue knew, however, that these claims were misleading because, for many patients, the pain relief lasted for as little as eight hours, which led to end-of-dose failure and withdrawal symptoms and prompted doctors to prescribe or patients to take higher or more frequent doses of opioids, all of which increased the risk of abuse and addiction.

478.     For example, a Conversion and Titration Guide submitted to the FDA and distributed to physicians by Purdue, prominently referred to Q12h OxyContin Tablets, meaning that each tablet is intended to offer your patient every-twelve-hour dosing. Other marketing materials directed at physicians and disseminated across the country in 2006 touted that OxyContin's 12-hour AcroContin Delivery System is designed to deliver oxycodone over 12 hours, which offered patients life with Q12H relief.  Those same marketing materials included a timeline graphic with little white paper pill cups only at 8AM and, further down the line, at 8PM. They also proclaimed that OxyContin provides Consistent Plasma Levels Over 12 Hours and set forth charts demonstrating absorption measured on a logarithmic scale, which fraudulently made it appear levels of oxycodone in the bloodstream slowly taper over a 12 hour time period.

479.     Purdue advertisements that ran in 2005 and 2006 issues of the *Journal of Pain* depict a sample prescription for OxyContin with Q12h handwritten. Another advertisement Purdue ran in 2005 in the *Journal of Pain* touted OxyContin's Q12h dosing convenience and displayed two paper dosing cups, one labeled 8 am and one labeled 8 pm, implying that OxyContin is effective for the 12 hour period between 8 a.m. and 8 p.m. Similar ads appeared in the March 2005 *Clinical Journal of Pain*.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

480.    Further, to this day, Purdue includes prominent 12-hour dosing instructions in its branded advertising, such as in a 2012 Conversion and Titration Guide, which states:  Because each patient's treatment is personal / Individualize the dose / Q12h OxyContin Tablets.

481.    These statements; however, are misleading because they fail to make clear that a 12 hour dose does not equate to 12 hours of pain relief.  Nevertheless, Purdue's direct marketing materials have misleadingly claimed OxyContin offers 12 hour dosing convenience.

482.    As described below, these deceptive statements regarding the efficacy of OxyContin were also carried into Missouri by Purdue's detailers.

483.    Purdue's direct marketing materials also misrepresented that opioids would help patients regain functionality and make it easier for them to conduct everyday tasks like walking, working, and exercising.

484.    For example, in 2012, Purdue disseminated a mailer to doctors titled Pain vignettes.  These vignettes consisted of case studies describing patients with pain conditions that persisted over a span of several months. One such patient, Paul, is described to be a 54-year-old writer with osteoarthritis of the hands, and the vignettes imply that an OxyContin prescription will help him work. None of these ads, however, disclosed the truth—that there is no evidence that opioids improve patients' lives and ability to function (and there was substantial evidence to the contrary).

485.    Some of the greatest weapons in Purdue's arsenal, however, were unbranded materials it directly funded and authored. These were in addition to the unbranded materials, described below, that Purdue channeled through third parties.

486.    In 2011, Purdue published a prescriber and law enforcement education pamphlet titled *Providing Relief, Preventing Abuse*, which deceptively portrayed the signs—and therefore

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

the prevalence—of addiction. However, Purdue knew, that OxyContin was used non-medically by injection less than less than 17% of the time. Yet, *Providing Relief, Preventing Abuse* prominently listed side effects of injection like skin popping and track marks as Indications of Possible Drug Abuse—downplaying much more prevalent signs of addiction associated with OxyContin use, such as asking for early refills, and making it seem that addiction only occurs when opioids are taken illicitly.

487.    *Providing Relief, Preventing Abuse* also deceptively camouflaged the risk of addiction by falsely supporting the idea that drug-seeking behavior could, in fact, be a sign of pseudo addiction rather than addiction itself. Specifically, it noted that the concept of pseudo addiction had emerged in the literature to describe drug-seeking behaviors in patients who have pain that has not been effectively treated.  Nowhere in *Providing Relief, Preventing Abuse* did Purdue disclose the lack of scientific evidence justifying the concept of pseudo addiction, nor that it was coined by a Purdue vice president.

488.    *Providing Relief, Preventing Abuse* was available nationally and was intended to reach Missouri prescribers. As described below, the deceptive statements in *Providing Relief, Preventing Abuse* regarding addiction were the very same messages Purdue directed at Missouri prescribers through its sales force.

489.    Purdue also disseminated misrepresentations through two of its unbranded websites, *In the Face of Pain* and *Partners against Pain*.

490.    Consistent with Purdue's efforts to portray opioid treatment as essential for the proper treatment of chronic pain and label skepticism related to chronic opioid therapy as an inadequate understanding that leads to inadequate pain control, *In the Face of Pain* criticized policies that limited access to opioids as being at odds with best medical practices and

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

encouraged patients to be persistent in finding doctors who will treat their pain. This was meant to imply that patients should keep looking until they find a doctor willing to prescribe opioids.

491.    *In the Face of Pain* was available nationally and was intended to reach Missouri prescribers.

492.    Purdue also used its unbranded website, *Partners Against Pain,* to promote the same deceptive messages regarding risk of addiction and those delivered by its sales representatives. On this website, Purdue posted *Clinical Issues in Opioid Prescribing*, a pamphlet that was copyrighted in 2005. Purdue distributed a hard-copy version of this pamphlet at least as of November 2006. *Clinical Issues in Opioid Prescribing* claimed that illicit drug use and deception were not indicia of addiction, but rather indications that a patient's pain was undertreated. The publication indicated that pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated.  In other words, Purdue suggested that when faced with drug-seeking behavior from their patients, doctors should prescribe more opioids—turning evidence of addiction into an excuse to sell and prescribe even more drugs.

493.    Purdue's misleading messages and materials were part of a broader strategy to convince prescribers to use opioids to treat their patients' pain, irrespective of the risks, benefits, and alternatives. This deception was national in scope and included Missouri. Purdue's nationwide messages would have reached Missouri prescribers in a number of ways. For example, they were carried into Missouri by Purdue's sales representatives during detailing visits as well as made available to Missouri patients and prescribers through websites and ads, including ads in prominent medical journals. They would have also been delivered to Missouri

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

prescribers by Purdue's paid speakers, who were required by Purdue policy and by FDA regulations to stay true to Purdue's nationwide messaging.

b. <u>Purdue's Deceptive Third-Party Statements</u>

494.    Purdue's efforts were not limited to making misrepresentations through its own sales force and its own branded and unbranded marketing materials. As described above, Purdue knew that regulatory constraints restricted what it was able to say about its drugs through direct marketing. For this reason, like the other Defendants, Purdue enlisted the help of third parties to release misleading information about opioids. The most prominent of these was APF.

i.      *APF*

(a)     Purdue's Control of APF

495.    Purdue exercised considerable control over APF, which published and disseminated in many of the most blatant falsehoods regarding chronic opioid therapy. Their relationship, and several of the APF publications, is described in detail below.

496.    Purdue exercised its dominance over APF over many projects and years. Purdue was APF's second-biggest donor, with donations totaling $1.7 million. Purdue informed APF that the grant money reflected Purdue's effort to strategically align its investments in nonprofit organizations that share its business interests, making clear that Purdue's funding depended upon APF continuing to support Purdue's business interests. Indeed, Purdue personnel participated in a March 2011 call with APF's Corporate Roundtable, where they suggested that APF send ambassadors to talk about pain within companies and hospitals.  Thus, Purdue suggested what role APF could play that would complement its own marketing efforts. On that call, Purdue personnel also committed to provide APF with a list of industry state advocates who could help promote chronic opioid therapy, individuals and groups that, upon information and belief, APF reached out to. Purdue personnel remained in constant contact with their counterparts at APF.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

497.    This alignment of interests was expressed most forcefully in the fact that Purdue hired APF to provide consulting services on its marketing initiatives. Purdue and APF entered into a Master Consulting Services Agreement on September 14, 2011. That agreement gave Purdue substantial rights to control APF's work related to a specific promotional project. Moreover, based on the assignment of particular Purdue contacts for each project and APF's periodic reporting on their progress, the agreement enabled Purdue to be regularly aware of the misrepresentations APF was disseminating regarding the use of opioids to treat chronic pain in connection with that project. The agreement gave Purdue—but not APF—the right to end the project (and, thus, APF's funding) for any reason. Even for projects not produced during the terms of this Agreement, the Agreement demonstrates APF's lack of independence and willingness to harness itself to Purdue's control and commercial interests, which would have carried across all of APF's work.

498.    Purdue used this agreement to conduct work with APF on the *Partners against Pain* website. *Partners against Pain* is a Purdue-branded site, and Purdue holds the copyright. However, its ability to deploy APF on this project illustrates the degree of control Purdue exercised over APF. In 2011, it hired an APF employee to consult on the *Partners Against Pain* rollout, to orchestrate the media campaign associated with the launch of certain content on the website, and to make public appearances promoting the website along with a celebrity spokesperson. Purdue contemplated paying this consultant $7,500 in fees and expenses for 26 hours of work. Purdue would require this consultant to discuss and rehearse the delivery of Purdue's campaign messages and Purdue committed that message points will be provided to the Consultant in advance and discussed on a planned call.  At all times, decisions regarding the final content on the *Partners against Pain* website were at the sole discretion of Purdue.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

499.    APF also volunteered to supply a staff members (a medical doctor or a nurse practitioner) to assist Purdue as a consultant and spokesperson in connection with the launch of one of Purdue's opioid-related projects, *Understanding & Coping with Lower Back Pain*, which appeared on *Partners against Pain*. One of the consultants was APF's paid employee, Mickie Brown. The consultant's services would be provided in return for a $10,000 in consulting fees for APF and $1,500 in honoraria for the spokesperson. All documents used by the consultant in her media appearances would be reviewed and approved by individuals working for Purdue. Purdue initiated this project, and it was not until later that APF worried about how Purdue sees this program fitting in with our existing grant request.

500.    Given the financial and reputational incentives associated with assisting Purdue in this project and the direct contractual relationship and editorial oversight, APF personnel were acting under Purdue's control at all relevant times with respect to *Partners against Pain*.

501.    Purdue often asked APF to provide patient representatives for *Partners against Pain*, and APF fulfilled these requests. Moreover, APF staff and board members and Front Groups ACPA and AAPM, among others (such as Dr. Webster), appear on *Inthefaceofpain.com* as Voices of Hope—champions passionate about making a difference in the lives of people who live with pain and providing inspiration and encouragement to pain patients. APF also contracted with Purdue for a project on back pain where, among other things, it provided a patient representative who agreed to attend a Purdue-run media training session.

502.    According to an Assurance of Voluntary Compliance (AVC) entered into between the New York Attorney General and Purdue Pharma on August 19, 2015, *Inthefaceofpain.com* received 251,648 page views between March 2014 and March 2015. Except in one document linked to the website, *Inthefaceofpain.com* makes no mention of opioid abuse or addiction.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Purdue's copyright appears at the bottom of each page of the website, indicating its ownership and control of its content. There is no other indication that 11 of the individuals who provided testimonials on *Inthefaceofpain.com* received payments, according to the AVC, of $231,000 for their participation in speakers programs, advisory meetings and travel costs between 2008 and 2013. Therefore, the New York Attorney General found Purdue's failure to disclose its financial connections with these individuals had the potential to mislead consumers by failing to disclose the potential bias of these individuals.

503.    In 2011, APF and another third-party advocacy group, the Center for Practical Bioethics, were contemplating working together on a project. Having reviewed a draft document provided by the Center for Practical Bioethics, the APF employee cautioned that this effort will be in cooperation with the efforts of the PCF and acknowledged that I know you have reservations about the PCF and pharma involvement, but I do believe working with them and keeping the lines of communications open is important.  The Center for Practical Bioethics CEO responded by indicating some confusion about whom to speak with, asking is Burt Rosen the official leader and reflecting what other sources have confirmed.

504.    In 2007, the PCF Education Subgroup, consisting of drug companies Purdue and Alpharma, and Front Groups APF and ACPA (self-described as industry-funded groups), developed a plan to address a perceived lack of coordination among the industry and pro-opioid professional and patient organizations. PCF members agreed to develop simplified key messages to use for public education purposes. Their messages were reflected in programs like NIPC's *Let's Talk Pain* (put together by Endo and APF), and Purdue's *In the Face of Pain*.

505.    When the FDA required drug companies to fund CMEs related to opioid risks in connection with its 2009 REMS, Purdue, along with these Front Groups, worked through the

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

PCF to ensure that, although it was mandatory for drug companies to fund these CMEs, it would not be mandatory for prescribers to attend them. A survey was circulated among Defendants Endo, Janssen, and Purdue, which predicted that the rates of doctors who would prescribe opioids for chronic pain would fall by 13% if more than four hours of mandatory patient education were required in connection with the REMS. With a push from PCF, acting under Purdue's direction, they were not.

506.    APF showed its indebtedness to Purdue and its willingness to serve its corporate agenda by testifying on the company's behalf at a July 2007 hearing before the Senate Judiciary Committee evaluating the propriety and adequacy of the OxyContin criminal settlement.  Despite its ostensible role as a patient advocacy organization, APF was willing to overlook substantial evidence—resulting in the jailing of Purdue executives—that Purdue blatantly, and despite its clear knowledge to the contrary, told physicians and patients that OxyContin was rarely addictive and less addictive than other opioids. Like Purdue and despite the leadership of numerous medical doctors and researchers on its board, APF ignored the truth about opioids and parroted Purdue's deceptive messaging. Purdue testified on Purdue's behalf that addiction was a rare problem for chronic pain patients and asserted:  The scientific evidence suggests that addiction to opioids prescribed by legitimate chronic non-cancer pain patients without prior histories of substance abuse using the medication as directed is rare. Furthermore, no causal effect has been demonstrated between the marketing of OxyContin and the abuse and diversion of the drug. There was, and is, no scientific support for those statements.

507.    Recently the US Senate's committee on Homeland Security and Governmental Affairs issued a detailed report of the use by the above named defendants of third party groups. The report revealed the above named Defendants between 2012 and 2017 contributed nearly 9

million dollars to leading patient advocacy groups operating in the opioid area, with Doctors receiving more than 1.6 million from these same manufacturers. (See Exposing the Financial Ties between Opioid Manufacturers and Third Party Advocacy Groups-Minority Staff Report Homeland Security and Governmental Affairs Committee, Feb, 2017).

508.    APF President Will Rowe reached out to Defendants—including Purdue—rather than his own staff to identify potential authors to draft an answer to an article critical of opioids that appeared in the *Archives of Internal Medicine* in 2011.

509.    Purdue's control over APF shaped and was demonstrated by specific APF, pro-opioid publications. These publications had no basis in science and were driven (and can only be explained) by the commercial interest of pharmaceutical companies—Purdue chief among them.

(b)    *A Policymaker's Guide*

510.    Purdue provided significant funding to and was involved with APF in creating and disseminating *A Policymaker's Guide to Understanding Pain & Its Management*, which was originally published in 2011 and is available online to this day. *A Policymaker's Guide to Understanding Pain & Its Management* misrepresented that that there were studies showing that the use of opioids for the long-term treatment of chronic pain could improve patients' ability to function.

511.    Specifically, *A Policymaker's Guide to Understanding Pain & Its Management* claimed that multiple clinical studies demonstrated that opioids  are effective in improving daily function, psychological health and overall health-related quality of life for people with chronic pain and implied that these studies established that the use of opioids long-term led to functional improvement. The study cited in support of this claim specifically noted that there were no

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

studies demonstrating the safety of opioids long-term and noted that for functional outcomes, the other studied analgesics were significantly more effective than were opioids.

512.    The *Policymaker's Guide* also misrepresented the risk of addiction. It claimed that pain generally had been undertreated due to misconceptions about opioid addiction and that less than 1% of children treated with opioids become addicted.

513.    Moreover, the *Policymaker's Guide* attempted to distract doctors from their patients' drug-seeking behavior by labeling it as pseudo addiction, which, according to the guide, describes patient behaviors that may occur when pain is undertreated.  Like *Partners Against Pain*, *A Policymaker's Guide* noted that pseudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated.  The similarity between these messages regarding pseudo-addiction highlights the common, concerted effort behind Purdue's deceptive statements.

514.    The *Policymaker's Guide* further misrepresented the safety of increasing doses of opioids and deceptively minimized the risk of withdrawal. For example, the *Policymaker's Guide* claimed that symptoms of physical dependence on opioids in long-term patients can often be ameliorated by gradually decreasing the dose of medication during discontinuation while omitting the significant hardship that often accompanies cessation of use. Similarly, the *Policymaker's Guide* taught that even indefinite dose escalations are sometimes necessary to reach adequate levels of pain relief, but it completely omitted the safety risks associated with increased doses.

515.    Purdue provided substantial assistance toward the creation and dissemination of the *Policymaker's Guide*, which APF ultimately disseminated on behalf of Defendants, including Purdue. Purdue provided $26,000 in grant money to fund the development and dissemination of

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

its content. Purdue kept abreast of the content of the guide as it was being developed, and, based on the periodic reports APF provided to Purdue regarding its progress on the *Policymaker's Guide*, had editorial input into its contents.

516.    The *Policymaker's Guide* was posted online, and was available to and intended to reach Missouri prescribers and consumers. As described below, the deceptive statements in *Policymaker's Guide* regarding addiction and functionality were the very same messages Purdue directed at Missouri through its own sales force.

(c)    <em>Treatment Options: A Guide for People Living<br>with Pain</em>

517.    Purdue's partnership with APF did not end with the *Policymaker's Guide*. Purdue also substantially assisted APF by sponsoring *Treatment Options:  A Guide for People Living with Pain*, starting in 2007. Based on Purdue's control of other APF projects, Purdue also would have exercised control over *Treatment Options*.

518.    *Treatment Options* is rife with misrepresentations regarding the safety and efficacy of opioids. For example, *Treatment Options* misrepresented that the long-term use of opioids to treat chronic pain could help patients function in their daily lives by stating that, when used properly, opioids give pain patients a quality of life they deserve.

519.    *Treatment Options* claimed that addiction is rare and, when it does occur, involves unauthorized dose escalations, patients who receive opioids from multiple doctors, or theft, which paints a narrow and misleading portrait of opioid addiction.

520.    *Treatment Options* also promoted the use of opioids to treat long-term chronic pain by denigrating alternate treatments, most particularly NSAIDs. *Treatment Options* noted that NSAIDs can be dangerous at high doses and inflated the number of deaths associated with NSAID use, and distinguished opioids as having less risk. According to *Treatment Options*,

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

NSAIDs were different from opioids because opioids had no ceiling dose, which was beneficial since some patients need larger doses of painkillers than they are currently prescribed. *Treatment Options* warned that the risks associated with NSAID use increased if NSAIDs were taken for more than a period of months, but deceptively omitted any similar warning about the risks associated with the long-term use of opioids.

521.    *Treatment Options* was posted online and remains online today. It was available to and intended to reach Missouri prescribers and patients. As described below, the deceptive statements in *Treatment Options* regarding addiction and functionality echo the messages Purdue directed at Missouri through its own sales force.

(d)    *Exit Wounds*

522.    Purdue also engaged in other promotional projects with and through APF. One such project was the publication and distribution of *Exit Wounds*, which deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain.

523.    Purdue provided APF with substantial assistance in distributing *Exit Wounds* in Missouri and throughout the nation by providing grant money and other resources.

524.    APF mailed copies of *Exit Wounds* to the Wounded Heroes Foundation in Missouri.

ii.    *Purdue's Work with Other Third Party Front Groups and KOLs*

525.    Purdue also provided other third-party Front Groups with substantial assistance in issuing misleading statements regarding the risks, benefits, and superiority of opioids for the long-term treatment of chronic pain.

(a)    FSMB – Responsible Opioid Prescribing

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

526.    In 2007, Purdue sponsored FSMB's *Responsible Opioid Prescribing*, which deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain. *Responsible Opioid Prescribing* also was drafted by Medical Writer X.

527.    Purdue spent $150,000 to help FSMB distribute *Responsible Opioid Prescribing*. The book was distributed nationally, and was available to and intended to reach prescribers in Missouri.

(b)    *AGS – Pharmacological Management of
        Persistent Pain in Older Persons*

528.    Along with Janssen, Purdue worked with the AGS on a CME to promote the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. These guidelines falsely claimed that the risks of addiction are exceedingly low in older patients with no current or past history of substance abuse when the study supporting this assertion did not analyze addiction rates by age. They also stated, falsely, that all patients with moderate to severe pain should be considered for opioid therapy (low quality of evidence, strong recommendation).

529.    Controversy surrounding earlier versions of AGS guidelines had taught AGS that accepting money directly from drug companies to fund the guidelines' development could lead to allegations of bias and the appearance of conflict.  Accordingly, AGS endeavored to eliminate the root cause of that flack by turning down commercial support to produce the 2009 Guidelines. Having determined that its veneer of independence would be tarnished if it accepted drug company money to create the content, AGS decided to develop the guidelines itself and turn to the drug companies instead for funding to *distribute* the pro-drug company content once it had been created. As explained by AGS personnel, it was AGS's strategy that we will take commercial support to disseminate the 2009 Guidelines if such support is forthcoming.  AGS

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

knew that it would be difficult to find such support unless opioid makers viewed the report favorably.

530.    AGS sought and obtained grants from Endo and Purdue to distribute *Pharmacological Management of Persistent Pain in Older Persons*. As a result, the publication was distributed nationally, and was available to and was intended to reach Missouri prescribers. Indeed, internal documents of another Defendant, Endo, indicate that pharmaceutical sales representatives employed by Purdue discussed treatment guidelines that minimized the risk of addiction to opioids with doctors during individual sales visits.

(c)    *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*

531.    Purdue sponsored a 2012 CME program taught by Steven Stanos, a KOL-based KOL, called *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*. The presentation deceptively instructed doctors that, through the use of screening tools, more frequent refills, and other techniques, high-risk patients showing signs of addictive behavior could be treated with opioids. This CME was presented at various locations in the United States.

(d)    *Managing Patient's Opioid Use: Balancing the Need and Risk*

532.    Purdue also sponsored a 2011 CME taught by KOL Lynn Webster via webinar titled *Managing Patient's Opioid Use: Balancing the Need and Risk*. This presentation likewise deceptively instructed prescribers that screening tools, patient agreements, and urine tests prevented overuse of prescriptions and overdose deaths.  At the time, Dr. Webster was receiving significant funding from Purdue. Versions of Dr. Webster's Opioid Risk Tool appear on, or are

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

linked to, websites run by Purdue (and other Defendants).  The webinar was available to and was intended to reach Missouri prescribers.

(e)     *Path of the Patient, Managing Chronic Pain*
*in Younger Adults at Risk for Abuse*

533.    Purdue also sponsored a CME program entitled *Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse*. *Path of the Patient* is devoted entirely to treating chronic pain with opioids. Although the program purports to instruct a treating physician how to manage chronic pain in younger adults at risk for abuse, it does no such thing. This educational program, addressing treatment of a population known to be particularly susceptible to opioid addiction, presents none of the alternative treatment options available, but only discusses treatment of chronic pain with opioids.

534.    In a role-play in *Path of the Patient*, a patient who suffers from back pain tells his doctor that he is taking twice as many hydrocodone pills as directed. The doctor reports that the pharmacy called him because of the patient's early refills. The patient has a history of drug and alcohol abuse. Despite these facts, the narrator notes that, because of a condition known as pseudoaddiction, the doctor should not assume his patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or overindulges in unapproved escalating doses.  The doctor in the role-play treats this patient by prescribing a high-dose, long-acting opioid. This CME was available online and was intended to reach Missouri prescribers.

(f)     *Overview of Management Options*

535.    Purdue also sponsored a CME titled *Overview of Management Options* and issued by the American Medical Association in 2003, 2007, and 2013 (the latter of which is still available for CME credit). KOL Dr. Portenoy edited the CME, among others. It deceptively instructed physicians that NSAIDs and other drugs, but not opioids, are unsafe at high doses. In

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

fact, the data indicates that patients on high doses of opioids are more likely to experience adverse outcomes than patients on lower doses of the drugs. Dr. Portenoy received research support, consulting fees, and honoraria from Purdue (among others), and was a paid Purdue consultant. This CME was presented online in the United States and was available to Missouri prescribers.

iii.   *Purdue's Misleading Science*

536.   Purdue also misrepresented the risks associated with long-term opioid use by promoting scientific studies in a deceptive way. In 1998, Purdue funded two articles by Dr. Lawrence Robbins in Missouri, which showed that between 8% and 13% of the patients he studied became addicted to opioids—a troubling statistic for Purdue, whose market, and marketing, depended upon the claim that opioids were rarely addictive. Purdue had these articles placed in headache-specific journals, where they would be less likely to be encountered by pain specialists or general practitioners. The first of these articles has been cited a mere 16 times; the second does not even appear on Google scholar. Five years later, Purdue also funded a study of OxyContin in diabetic neuropathy patients, which was published in 2003. Notwithstanding that Purdue-funded studies, testing Purdue's own drugs, had previously indicated that addiction rates were between 8% and 13%, Purdue's 2003 article reached back to the 1980 Porter-Jick Letter to support its claim that OxyContin was not commonly addictive. This article was placed in a prominent pain journal and has been cited 487 times. While this article was drafted over a decade ago, it continues to be relied upon to further the misrepresentations that opioids are not addictive.

## VI.   WHY DEFENDANTS' MARKETING MESSAGES ARE MISLEADING AND UNFAIR.

537.   Defendants' marketing of opioids for long-term use to treat chronic pain, both directly and with and through third parties, included information that was false, misleading,

171

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

contrary to credible scientific evidence and their own labels, and lacked balance and substantiation. Their marketing materials omitted material information about the risks of opioids, and overstated their benefits. Moreover, Defendants inaccurately suggested that chronic opioid therapy was supported by evidence, and failed to disclose the lack of evidence in support of treating chronic pain with opioids.

538.    As described in greater detail, there are seven primary misleading and unfounded representations. Defendants and the third parties with which they teamed:

- misrepresented that opioids improve function;

- concealed the link between long-term use of opioids and addiction;

- misrepresented that addiction risk can be managed;

- masked the signs of addiction by calling them pseudoaddiction;

- falsely claimed withdrawal is easily managed;

- misrepresented or omitted the greater dangers from higher doses of opioids; and

- deceptively minimized the adverse effects of opioids and overstated the risks of NSAIDs.

539.    In addition to these misstatements, Purdue purveyed an eighth deception—that OxyContin provides a full 12 hours of pain relief.

540.    Exacerbating each of these misrepresentations and deceptions was the collective effort of Defendants and third parties to hide from the medical community the fact that there were no adequate and well-controlled studies of opioid use longer than 12 weeks.

### 1. Defendants and Their Third-Party Allies Misrepresented that Opioids Improve Function.

541.    Each of the following materials was created with the expectation that, by instructing patients and prescribers that opioids would improve patients' function and quality of

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

life, patients would demand opioids and doctors would prescribe them. These claims also encouraged doctors to continue opioid therapy in the belief that failure to improve pain, function, or quality of life could be overcome by increasing doses or prescribing supplemental short-acting opioids to take on an as-needed basis for breakthrough pain.

542.    However, not only is there no evidence of improvement in long-term functioning, a 2006 study-of-studies found that for functional outcomes  other analgesics were significantly more effective than were opioids.  Studies of the use of opioids in chronic conditions for which they are commonly prescribed, such as low back pain, corroborate this conclusion and have failed to demonstrate an improvement in patients' function. Instead, research consistently shows that long-term opioid therapy for patients who have lower back injuries does not cause patients to return to work or physical activity. Indeed, one Defendant's own internal marketing plans characterized functional improvement claims as aspirational.  Another acknowledged in 2012 that significant investment in clinical data was needed to establish opioids' effect on mitigating quality of life issues, like social isolation.

543.    The long-term use of opioids carries a host of serious side effects, including addiction, mental clouding and confusion, sleepiness, hyperalgesia, immune-system and hormonal dysfunction, that degrade, rather than improve, patients' ability to function. Defendants often omitted these adverse effects from their publications, as well as omitting certain risks of drug interactions.

544.    Yet each of the following statements by Defendants, which are further discussed, by Defendant, suggests that the long-term use of opioids improve patients' function and quality of life, and that scientific evidence supports this claim.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

545.    According to Dr. Andrew Kolodny, executive director of Physicians for Responsible Opioid Prescribing and chief medical officer of Phoenix House Foundation, fentanyl products are the most potent and dangerous opioids on the market.

546.    The dangers associated with Subsys are reflected by its extremely limited and specific indication, as it is approved solely for BTP in cancer patients already receiving opioids for persistent cancer-related pain.

547.    The following Defendants also developed and falsely marketed their products' improved function, to wit:

| Actavis | a. Documents from a 2010 sales training indicate that Actavis trained its sales force to instruct prescribers that *most* chronic benign pain patients do have ***markedly improved ability to function*** when maintained on chronic opioid therapy. |
| --- | --- |
| | b. Documents from a 2010 sales training indicate that Actavis trained its sales force that increasing and restoring function is an expected outcome of chronic Kadian therapy, including physical, social, vocational, and recreational function. |
| | c. Actavis distributed a product advertisement that claimed that use of Kadian to treat chronic pain would allow patients to return to work, relieve stress on your body and your mental health, and cause patients to enjoy their lives. The FDA warned Actavis such claims were misleading, writing: We are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug has in alleviating pain, taken together with any drug-related side effects patients may experience results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life. |
| | d. Actavis sales representatives told Missouri prescribers that prescribing Actavis's opioids would improve their patients' ability to function and improve their quality of life. |

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

| | |
|---|---|
| **Cephalon** | e.  Cephalon sponsored the FSMB's *Responsible Opioid Prescribing* (2007), which taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a long-term therapeutic treatment course.  Cephalon also spent $150,000 to purchase copies of the book in bulk and distributed the book through its pain sales force to 10,000 prescribers and 5,000 pharmacists.<br><br>f.  Cephalon sponsored the American Pain Foundation's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids when used properly give pain patients a quality of life we deserve.  The *Treatment Options* guide notes that non-steroidal anti-inflammatory drugs have greater risks with prolonged duration of use, but there was no similar warning for opioids. APF distributed 17,200 copies in one year alone, according to its 2007 annual report, and the publication is currently available online.<br><br>g.  Cephalon sponsored a CME written by key opinion leader Dr. Lynn Webster, titled *Optimizing Opioid Treatment for Breakthrough Pain*, which was offered online by Medscape, LLC from September 28, 2007, through December 15, 2008. The CME taught that Cephalon's Actiq and Fentora improve patients' quality of life and allow for more activities when taken in conjunction with long-acting opioids.<br><br>h.  Cephalon sales representatives told Missouri prescribers that opioids would increase patients' ability to function and improve their quality of life. |

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

| Endo | i. | Endo sponsored a website, painknowledge.com, through APF and NIPC, which claimed in 2009 that with opioids, your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse.  Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it. |
| | j. | A CME sponsored by Endo, titled *Persistent Pain in the Older Patient*, taught that chronic opioid therapy has been shown to reduce pain and improve depressive symptoms and cognitive functioning. |
| | k. | Endo distributed handouts to prescribers that claimed that use of Opana ER to treat chronic pain would allow patients to perform work as a chef. This flyer also emphasized Opana ER's indication without including equally prominent disclosure of the moderate to severe pain qualification. |
| | l. | Endo's sales force distributed FSMB's *Responsible Opioid Prescribing* (2007). This book taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a long-term therapeutic treatment course. |
| | m. | Endo provided grants to APF to distribute *Exit Wounds* to veterans, which taught that opioid medications *increase* your level of functioning. *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder. |
| | n. | Endo sales representatives told Missouri prescribers that opioids would increase patients' ability to function and improve their quality of life by helping them become more physically active and return to work. |

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

| | |
|---|---|
| **Janssen** | o.  Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and its sales force distributed. This guide features a man playing golf on the cover and lists examples of expected functional improvement from opioids, like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs. The guide states as a fact that opioids may make it *easier* for people to live normally . The myth/fact structure implies authoritative backing for the claim that does not exist. The targeting of older adults also ignored heightened opioid risks in this population.<br><br>p.  Janssen sponsored, developed, and approved content of a website, *Let's Talk Pain* in 2009, acting in conjunction with the APF, AAPM, and ASPMN, whose participation in *Let's Talk Pain* Janssen financed and orchestrated. This website featured an interview, which was edited by Janssen personnel, claiming that opioids were what allowed a patient to continue to function, inaccurately implying her experience would be representative. This video is still available today on youtube.com.<br><br>q.  Janssen provided grants to APF to distribute *Exit Wounds* to veterans, which taught that opioid medications *increase* your level of functioning . *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder.<br><br>r.  Janssen sales representatives told Missouri prescribers that opioids would increase patients' ability to function and improve their quality of life by helping them become more physically active and return to work. |

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

| Purdue | s. | Purdue ran a series of advertisements for OxyContin in 2012 in medical journals titled Pain vignettes, which were case studies featuring patients, each with pain conditions persisting over several months, recommending OxyContin for each. One such patient, Paul, is described to be a 54-year-old writer with osteoarthritis of the hands, and the vignettes imply that an OxyContin prescription will help him work more effectively. |
|---|---|---|
| | t. | Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which inaccurately claimed that multiple clinical studies have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients.  The sole reference for the functional improvement claim noted the absence of long-term studies and actually stated: For functional outcomes, the other analgesics were significantly more effective than were opioids.  The *Policymaker's Guide* is still available online. |
| | u. | Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids, when used properly, give pain patients a quality of life we deserve.  APF distributed 17,200 copies in one year alone, according to its 2007 annual report, and the guide currently is available online. |
| | v. | Purdue sponsored APF's *Exit Wounds* (2009), which taught veterans that opioid medications increase your level of functioning.  *Exit Wounds* also omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. Benzodiazepines are frequently prescribed to veterans diagnosed with post-traumatic stress disorder. |
| | w. | Purdue sponsored the FSMB's *Responsible Opioid Prescribing* (2007), which taught that relief of pain itself improved patients' function. *Responsible Opioid Prescribing* explicitly describes functional improvement as the goal of a long-term therapeutic treatment course.  Purdue also spent over $100,000 to support distribution of the book. |
| | x. | Purdue sales representatives told Missouri prescribers that opioids would increase patients' ability to function and improve their quality of life. |

**2.      Defendants and Their Third-Party Allies Concealed the Truth About the Risk of Addiction from Long-Term Opioid Use.**

548.    The fraudulent representation that opioids are rarely addictive is central to

Defendants' scheme. To reach chronic pain patients, Defendants, and the Front Groups and

KOLs that they directed, assisted, and collaborated with, had to overcome doctors' legitimate

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

fears that opioids would addict their patients. The risk of addiction is an extremely weighty risk—condemning patients to, among other things, dependence, compulsive use, haziness, a lifetime of battling relapse, and a dramatically heightened risk of serious injury or death. But for Defendants' campaign to convince doctors otherwise, finding benefits from opioid use for common chronic pain conditions sufficient to justify that risk would have, and previously had, posed a nearly insurmountable challenge.

549.    Through their well-funded, comprehensive marketing efforts, Defendants and their KOLs and Front Groups were able to change prescriber perceptions, despite the well-settled historical understanding and clear evidence that opioids taken long-term are often addictive. Defendants and their third-party partners:  (a) called it Pseudoaddiction maintained that the risk of addiction for patients who take opioids long-term was low; and (b) omitted the risk of addiction and abuse from the list of adverse outcomes associated with chronic opioid use, even though the frequency and magnitude of the risk—and Defendants' own labels—compelled disclosure.

550.    Further, in addition to falsely claiming opioids had low addiction risk or omitting disclosure of the risk of addiction altogether, Defendants employed language that conveyed to prescribers that the drugs had lower potential for abuse and addiction. Further, in addition to making outright misrepresentations about the risk of addiction, or failing to disclose that serious risk at all, Defendants used code words that conveyed to prescribers that their opioid was less prone to abuse and addiction. For instance, sales representatives for Mallinckrodt, Actavis, Endo, Janssen, and Purdue promoted their drugs as having steady-state properties with the intent and expectation that prescribers would understand this to mean that their drugs caused less of a rush or a feeling of euphoria, which can trigger abuse and addiction. Further, Endo actively promoted

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

its reformulated Opana ER on the basis that it was designed to be crush-resistant, suggesting both (a) that Endo had succeeded in making the drug harder to adulterate, and (b) that it was less addictive, in consequence. In fact, however, Endo knew that the clinical significance of INTAC Technology or its impact on abuse/misuse has not been established for Opana ER and that Opana ER could still be ground and cut into small pieces by those looking to abuse the drug. In the same vein, Janssen denied that Nucynta ER was an opioid and claimed that it was not addictive, and Purdue claimed that its opioids were not favored by addicts and did not produce a buzz, all of which falsely suggested that its opioids were less likely to be abused or addictive.

551.   Each of the following was created with the expectation that, by instructing patients and prescribers that addiction rates are low and that addiction is unlikely when opioids are prescribed for pain, doctors would prescribe opioids to more patients. For example, one publication sponsored exclusively by Purdue—APF's 2011 *A Policymaker's Guide to Understanding Pain & Its Management*—claimed that opioids are not prescribed often enough because of misconceptions about opioid addiction.

552.   Acting directly or with and through third parties, each of the Defendants claimed that the potential for addiction from its drugs was relatively small, or non-existent, even though there was no scientific evidence to support those claims, and the available research contradicted them. A recent literature survey in 2016 found that while ranges of problematic use of opioids ranged from <1% to 81%, abuse averages between 21% and 29% and addiction between 8% and 12%. These estimates are well in line with Purdue's own studies, showing that between 8% and 13% of OxyContin patients became addicted, but on which Purdue chose not to rely, citing instead the Porter-Jick letter, which primarily looked at hospitalized patients with acute post-surgical pain.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

553.    The FDA has found as well that 20% of opioid patients use two or more pharmacies, 26% obtain opioids from two or more prescribers, and 16.5% seek early refills—all potential red flags for abuse or addiction. The FDA in fact has ordered manufacturers of long-acting opioids to conduct one or more studies to provide quantitative estimates of the serious risks of misuse, abuse, addiction, overdose and death associated with long-term use of opioid analgesics for management of chronic pain, in recognition of the fact that it found high rates of addiction in the medical literature.

554.    Of course, the significant (and growing) incidence of abuse, misuse, and addiction to opioids also is powerful evidence that Defendants' statements regarding the low risk of addiction were and are untrue. This was well known to Defendants, who had access to sales data and reports, adverse event reports, federal abuse and addiction-related surveillance data, and other sources that demonstrated the widening epidemic of opioid abuse and addiction.

555.    Acting directly or through and with third parties, each of the Defendants claimed that the potential for addiction even from long-term use of its drugs was relatively small, or non-existent, even though that was false and there was no scientific evidence to support it. Defendants' conduct included:

| Actavis | a. | Documents from a 2010 sales training indicate that Actavis trained its sales force that long-acting opioids were less likely to produce addiction than short-acting opioids, although there is no evidence that either form of opioid is less addictive or that any opioids can be taken long-term without the risk of addiction. |
| | b. | Actavis caused a patient education brochure to be distributed in 2007 that claimed addiction is possible, but it is less likely if you have never had an addiction problem.  Although the term less likely is not defined, the overall presentation suggests the risk is so low as not to be a worry. |
| Cephalon | c. | Cephalon sponsored and facilitated the development of a guidebook, *Opioid Medications and REMS: A Patient's Guide*, which claims, among |

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

|  |  | other things, that patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids. |
|  | d. | Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft. |
| **Endo** | e. | Endo trained its sales force in 2012 that use of long-acting opioids resulted in increased patient compliance, without any supporting evidence. |
|  | f. | Endo's advertisements for the 2012 reformulation of Opana ER claimed it was *designed to be crush resistant*, in a way that conveyed that it was less likely to be abused. This claim was false; the FDA warned in a May 10, 2013 letter that there was no evidence Endo's design would provide a reduction in oral, intranasal or intravenous abuse and Endo's post-marketing data submitted are insufficient to support any conclusion about the overall or route-specific rates of abuse.  Further, Endo instructed its sales representatives to repeat this claim about design, with the intention of conveying Opana ER was less subject to abuse. |
|  | g. | Endo sponsored a website, painknowledge.com, through APF and NIPC, which claimed in 2009 that: people who take opioids as prescribed usually do not become addicted.   Although the term usually is not defined, the overall presentation suggests the risk is so low as not to be a worry. The language also implies that as long as a prescription is given, opioid use will not become problematic. Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it. |
|  | h. | Endo sponsored a website, PainAction.com, which stated Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them. |
|  | i. | Endo sponsored CMEs published by APF's NIPC, of which Endo was the sole funder, titled *Persistent Pain in the Older Adult* and *Persistent Pain in the Older Patient*. These CMEs claimed that opioids used by elderly patients present possibly less potential for abuse than in younger patients, which lacks evidentiary support and deceptively minimizes the risk of addiction for elderly patients. |
|  | j. | Endo distributed an education pamphlet with the Endo logo titled *Living with Someone with Chronic Pain*, which inaccurately minimized the risk of addiction:  Most health care providers who treat people with pain agree that most people do not develop an addiction problem. |
|  | k. | Endo distributed a patient education pamphlet edited by key opinion leader Dr. Russell Portenoy titled *Understanding Your Pain: Taking Oral* |

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

|  |  | *Opioid Analgesics*. It claimed that addicts take opioids for other reasons than pain relief, such as unbearable emotional problems. This implies that pain patients prescribed opioids will not become addicted, which is unsupported and untrue. |
|--|--|--|
|  | l. | Endo contracted with AGS to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. These guidelines falsely claim that the risks of addiction are exceedingly low in older patients with no current or past history of substance abuse. None of the references in the guidelines corroborates the claim that elderly patients are less likely to become addicted to opioids, and there is no such evidence. Endo was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion. |
|  | m. | Endo provided grants to APF to distribute *Exit Wounds* (2009) to veterans, which taught that long experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications. Although the term very unlikely is not defined, the overall presentation suggests that the risk is so low as not to be a worry. |
| **Janssen** | n. | Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and which its sales force distributed. This guide described a myth that opioids are addictive, and asserts as fact that many studies show that opioids are *rarely* addictive when used properly for the management of chronic pain. Although the term rarely is not defined, the overall presentation suggests the risk is so low as not to be a worry. The language also implies that as long as a prescription is given, opioid use is not a problem. |
|  | o. | Janssen contracted with AGS to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. These guidelines falsely claim that the risks of addiction are exceedingly low in older patients with no current or past history of substance abuse. The study supporting this assertion does not analyze addiction rates by age and, as already noted, addiction remains a significant risk for elderly patients. Janssen was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion. |
|  | p. | Janssen provided grants to APF to distribute *Exit Wounds* (2009) to veterans, which taught that long experience with opioids shows that |

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

|  |  | people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications.  Although the term very unlikely is not defined, the overall presentation suggests the risk is so low as not to be a worry. |
|  | q. | Janssen ran a website, *Prescriberesponsibly.com* (last modified July 2, 2015), which claims that concerns about opioid addiction are overstated. |
|  | r. | A June 2009 Nucynta Training module warns Janssen's sales force that physicians are reluctant to prescribe controlled substances like Nucynta, but this reluctance is unfounded because the risks  are much smaller than commonly believed. |
| **Purdue** | s. | Purdue published a prescriber and law enforcement education pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which under the heading, Indications of Possible Drug Abuse, shows pictures of the stigmata of injecting or snorting opioids—skin popping, track marks, and perforated nasal septa. In fact, opioid addicts who resort to these extremes are uncommon; the far more typical reality is patients who become dependent and addicted through oral use. Thus, these misrepresentations wrongly reassure doctors that as long as they do not observe those signs, they need not worry that their patients are abusing or addicted to opioids. |
|  | t. | Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which inaccurately claimed that less than 1% of children prescribed opioids will become addicted. This publication is still available online. This publication also asserted that pain is undertreated due to misconceptions about opioid addiction. |
|  | u. | Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which asserted that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft. |
|  | v. | A Purdue-funded study with a Purdue co-author claimed that evidence that the risk of psychological dependence or addiction is low in the absence of a history of substance abuse.  The study relied only on the 1980 Porter-Jick letter to the editor concerning a chart review of hospitalized patients, not patients taking Purdue's long-acting, take-home opioid. Although the term low is not defined, the overall presentation suggests the risk is so low as not to be a worry. |
|  | w. | Purdue contracted with AGS to produce a CME promoting the 2009 guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. These guidelines falsely claim that the risks of addiction are exceedingly low in older patients with no current or past history of substance abuse.  None of the references in the guidelines corroborates the |

|  | claim that elderly patients are less likely to become addicted to opioids and the claim is, in fact, untrue. Purdue was aware of the AGS guidelines' content when it agreed to provide this funding, and AGS drafted the guidelines with the expectation it would seek drug company funding to promote them after their completion. |
|  | x.    Purdue sponsored APF's *Exit Wounds* (2009), which counseled veterans that long experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications.  Although the term very unlikely is not defined, the overall presentation suggests it is so low as not to be a worry. |

556.    In addition to denying or minimizing the risk of addiction and abuse generally, and as laid out in, Defendants also falsely claimed that their particular drugs were safer, less addictive, and less likely to be abused or diverted than their competitors' or predecessor drugs. In making these claims, Defendants said or implied that because their drug had a steady-state and did not produce peaks and valleys, which cause drug-seeking behavior—either to obtain the high or avoid the low—it was less likely to be abused or addicting. Endo also asserted in particular that, because a reformulation of Opana ER was (or was designed to be) abuse-deterrent or tamper-resistant, patients were less likely to become addicted to them. Defendants had no evidence to support any of these claims, which, by FDA regulation, must be based on head-to-head trials; the claims also were false and misleading in that they misrepresented the risks of both the particular drug and opioids as a class.

557.    Further, rather than honestly disclose the risk of addiction, Defendants, and the third parties they directed and assisted and whose materials they distributed, attempted to portray those who were concerned about addiction as unfairly denying treatment to needy patients. To increase pressure on doctors to prescribe chronic opioid therapy, Defendants turned the tables; it was doctors who fail to treat their patients' chronic pains with opioids—not doctors who cause their patients to become addicted to opioids—who are failing their patients (and subject to

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

discipline). Defendants and their third-party allies claimed that purportedly overblown worries about addiction cause pain to be under-treated and opioids to be over-regulated and under-prescribed. This mantra of under-treated pain and under-used drugs reinforced Defendants' messages that the risks of addiction and abuse were not significant and were overblown.

558.   For example, Janssen's website, *Let's Talk Pain*, warns in a video posted online strict regulatory control has made many physicians reluctant to prescribe opioids. The unfortunate casualty in all of this is the patient, who is often undertreated and forced to suffer in silence.  The program goes on to say:  Because of the potential for abusive and/or addictive behavior, many healthcare professionals have been reluctant to prescribe opioids for their patients  . This prescribing environment is one of many barriers that may contribute to the under treatment of pain, a serious problem in the United States.

559.   In the same vein, a Purdue website called *In the Face of Pain* complains, under the heading of Protecting Access, that, through at least mid-2013, policy governing the prescribing of opioids was at odds with best medical practices by unduly restricting the amounts that can be prescribed and dispensed; restricting access to patients with pain who also have a history of substance abuse; and requiring special government-issued prescription forms only for the medications that are capable of relieving pain that is severe.  This unsupported and untrue rhetoric aims to portray doctors who do not prescribe opioids as uncaring, converting their desire to relieve patients' suffering into a mandate to prescribe opioids.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

### 3. Defendants and Their Third-Party Allies Misrepresented that Addiction Risk Can Be Avoided or Managed.

560. Defendants each continue to maintain to this day that most patients safely can take opioids long-term for chronic pain without becoming addicted. Presumably to explain why doctors encounter so many patients addicted to opioids, Defendants and their third-party allies have come to admit that some patients could become addicted, but that doctors can avoid or manage that risk by using screening tools or questionnaires. These tools, they say, identify those with higher addiction risks (stemming from personal or family histories of substance abuse, mental illness, or abuse) so that doctors can more closely monitor patients at greater risk of addiction.

561. There are three fundamental flaws in these assurances that doctors can identify and manage the risk of addiction. First, there is no reliable scientific evidence that screening works to accurately predict risk or reduce rates of addiction. Second, there is no reliable scientific evidence that high-risk or addicted patients can take opioids long-term without triggering addiction, even with enhanced monitoring and precautions. Third, there is no reliable scientific evidence that patients without these red flags are necessarily free of addiction risk.

562. Addiction is difficult to predict on a patient-by-patient basis, and there are no reliable, validated tools to do so. A recent Evidence Report by the Agency for Healthcare Research and Quality (AHRQ), which systematically reviewed the current evidence on long-term opioid therapy for chronic pain identified no study that had evaluated the effectiveness of risk mitigation strategies, such as use of risk assessment instruments, opioid management plans, patient education, urine drug screening, prescription drug monitoring program data, monitoring instruments, more frequent monitoring intervals, pill counts, or abuse-deterrent formulations on outcomes related to overdose, addiction, abuse or misuse.  Furthermore, attempts to treat high-

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

risk patients, such as those who have a documented predisposition to substance abuse, by resorting to patient contracts, more frequent refills, or urine drug screening are not proven to work in the real world, if busy doctors even in fact attempt them.

563.   Most disturbingly, despite the widespread use of screening tools, patients with past substance use disorders—which every tool rates as a risk factor—receive, on average, higher doses of opioids.

564.   As described below, each Defendant claimed that the risk of addiction could be avoided or managed, claims that are deceptive and without scientific support:

| Actavis | a. | Documents from a 2010 sales training indicate that Actavis trained its sales force that prescribers can use risk screening tools to limit the development of addiction. |
|---|---|---|
| Cephalon | b. | Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioid agreements between doctors and patients can ensure that you take the opioid as prescribed. |
| Endo | c. | Endo paid for a 2007 supplement available for continuing education credit in the *Journal of Family Practice* and written by a Missouri-based doctor who later became a member of Endo's speakers bureau. This publication, titled *Pain Management Dilemmas in Primary Care: Use of Opioids*, recommended screening patients using tools like the Opioid Risk Tool or the Screener and Opioid Assessment for Patients with Pain, and advised that patients at high risk of addiction could safely (*e.g.*, without becoming addicted) receive chronic opioid therapy using a maximally structured approach involving toxicology screens and pill counts. |

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

| Purdue | d. Purdue's unbranded website, *In the Face of Pain* (inthefaceofpain.com) states that policies that restrict access to patients with pain who also have a history of substance abuse and requiring special government-issued prescription forms for the only medications that are capable of relieving pain that is severe are at odds with best medical practices. |
|---|---|
| | e. Purdue sponsored a 2012 CME program taught by a Missouri-based KOL titled *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*. This presentation recommended that use of screening tools, more frequent refills, and switching opioids could treat a high-risk patient showing signs of potentially addictive behavior. |
| | f. Purdue sponsored a 2011 webinar taught by Dr. Lynn Webster, titled *Managing Patient's Opioid Use: Balancing the Need and Risk*. This publication taught prescribers that screening tools, urine tests, and patient agreements have the effect of preventing overuse of prescriptions and overdose deaths. |

**4.    Defendants and their Third-Party Allies Created Confusion By Promoting the Misleading Term Pseudoaddiction.**

565.    Defendants and their third-party allies developed and disseminated each of the following misrepresentations with the intent and expectation that, by instructing patients and prescribers that signs of addiction are actually the product of untreated pain, doctors would prescribe opioids to more patients and would continue to prescribe, and patients to use, opioids despite signs that the patient was addicted. The concept of pseudoaddiction was coined by Dr. David Haddox, who went to work for Purdue, and popularized by Dr. Russell Portenoy, who consulted for Cephalon, Endo, Janssen, and Purdue. Much of the same language appears in other Defendant Mallinckrodt's treatment of this issue, highlighting the contrast between undertreated pain and true addiction, as if patients could not experience both. As KOL Dr. Lynn Webster wrote: Pseudoaddiction obviously became too much of an excuse to give patients more medication . It led us down a path that caused harm. It is already something we are debunking as a concept.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

566.    Each of the publications and statements below, falsely states or suggests that the concept of pseudoaddiction is substantiated by scientific evidence and accurately describes the condition of patients who only need, and should be treated with, more opioids:

| | |
|---|---|
| **Actavis** | a. Documents from a 2010 sales training indicate that Actavis trained its sales force to instruct physicians that aberrant behaviors like self-escalation of doses constituted pseudoaddiction. |
| **Cephalon** | b. Cephalon sponsored FSMB's *Responsible Opioid Prescribing* (2007), which taught that behaviors such as requesting drugs by name, demanding or manipulative behavior, seeing more than one doctor to obtain opioids, and hoarding are all signs of pseudoaddiction. Cephalon also spent $150,000 to purchase copies of the book in bulk and distributed it through its pain sales force to 10,000 prescribers and 5,000 pharmacists. |
| **Endo** | c. Endo distributed copies of a book by KOL Dr. Lynn Webster entitled *Avoiding Opioid Abuse While Managing Pain* (2007). Endo's internal planning documents describe the purpose of distributing this book as to increase the breadth and depth of the Opana ER prescriber base.  The book claims that when faced with signs of aberrant behavior, the doctor should regard it as pseudoaddiction and thus, increasing the dose *in most cases should be the clinician's first response.* |
| | d. Endo spent $246,620 to buy copies of FSMB's *Responsible Opioid Prescribing* (2007), which was distributed by Endo's sales force. This book asserted that behaviors such as requesting drugs by name, demanding or manipulative behavior, seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction. |
| **Janssen** | e. Janssen's website, *Let's Talk Pain*, stated from 2009 through 2011 that pseudoaddiction  refers to patient behaviors that may occur when *pain is under-treated* and pseudoaddiction is *different from true addiction* because such behaviors can be resolved with effective pain management. |
| **Purdue** | f. Purdue published a prescriber and law enforcement education pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which described pseudoaddiction as a concept that emerged in the literature to describe the inaccurate interpretation of drug-seeking behaviors in patients who have pain that has not been effectively treated. |
| | g. Purdue distributed to physicians at least as of November 2006, and posted on its unbranded website, *Partners Against Pain*, a pamphlet copyrighted 2005 and titled *Clinical Issues in Opioid Prescribing*. This pamphlet |

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

included a list of conduct including illicit drug use and deception it defined as indicative of pseudoaddiction or untreated pain. It also states: Pseudoaddiction is a term which has been used to describe patient behaviors that may occur when *pain is undertreated* . Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief. Pseudoaddiction can be *distinguished from true addiction* in that the behaviors resolve when the pain is effectively treated.

h. Purdue sponsored FSMB's *Responsible Opioid Prescribing* (2007), which taught that behaviors such as requesting drugs by name, demanding or manipulative behavior, seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction. Purdue also spent over $100,000 to support distribution of the book.

i. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which states:  Pseudo-addiction describes patient behaviors that may occur when *pain is undertreated* . Pseudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated.

### 5. Defendants and their Third-Party Allies Claimed Withdrawal is Simply Managed.

567. Defendants and their third-party allies promoted the false and misleading messages below with the intent and expectation that, by concealing the difficulty of withdrawing from opioids, prescribers and patients would be more likely to start chronic opioid therapy and would fail to recognize the actual risk of addiction.

568. In an effort to underplay the risk and impact of addiction, Defendants and their third-party allies frequently claim that while patients become physically dependent on opioids, physical dependence can be addressed by gradually tapering patients' doses to avoid the adverse effects of withdrawal. They fail to disclose the extremely difficult and painful effects that patients can experience when they are removed from opioids—effects that also make it less likely that patients will be able to stop using the drugs.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

569.    In reality, withdrawal is prevalent in patients after more than a few weeks of therapy, and common symptoms of withdrawal include:  severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, and pain. Some symptoms may persist for months, or even years, after a complete withdrawal from opioids, depending on how long opioids were used. Withdrawal symptoms trigger a feedback loop that drives patients to seek opioids, contributing to addiction.

570.    Each of the publications and statements below falsely states or suggests that withdrawal from opioids was not a problem and they should not be hesitant about prescribing or using opioids:

| Actavis | a. Documents from a 2010 sales training indicate that Actavis trained its sales force that discontinuing opioid therapy can be handled simply and that it can be done at home. Actavis's sales representative training claimed opioid withdrawal would take only a week, even in addicted patients. |
|---|---|
| Endo | b. A CME sponsored by Endo, titled *Persistent Pain in the Older Adult*, taught that withdrawal symptoms can be avoided entirely by tapering the dose by 10-20% per day for ten days. |

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

| Janssen | c. | A Janssen PowerPoint presentation used for training its sales representatives titled Selling Nucynta ER indicates that the low incidence of withdrawal symptoms is a core message for its sales force. This message is repeated in numerous Janssen training materials between 2009 and 2011. The studies supporting this claim did not describe withdrawal symptoms in patients taking Nucynta ER beyond 90 days or at high doses and would therefore not be representative of withdrawal symptoms in the chronic pain population. Patients on opioid therapy long-term and at high doses will have a harder time discontinuing the drugs and are more likely to experience withdrawal symptoms. In addition, in claiming a low rate of withdrawal symptoms, Janssen relied upon a study that only began tracking withdrawal symptoms in patients two to four days after discontinuing opioid use, when Janssen knew or should have known that these symptoms peak earlier than that for most patients. Relying on data after that initial window painted a misleading picture of the likelihood and severity of withdrawal associated with chronic opioid therapy. Janssen also knew or should have  known that the patients involved in the study were not on the drug long enough to develop rates of withdrawal symptoms comparable to rates of withdrawal suffered by patients who use opioids for chronic pain—the use for which Janssen promoted Nucynta ER. |
|  | d. | Janssen sales representatives told Missouri prescribers that patients on Janssen's drugs were less susceptible to withdrawal than those on other opioids. |
| Purdue | e. | Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught Symptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation, but did not disclose the significant hardships that often accompany cessation of use. |

### 6.    Defendants and Their Third-Party Allies Misrepresented that Increased Doses Pose No Significant Additional Risks.

571.    Each of the following misrepresentations was created with the intent and expectation that, by misrepresenting and failing to disclose the known risks from high dose opioids, prescribers and patients would be more likely to continue to prescribe and use opioids, even when they were not effective in reducing patients' pain, and not to discontinue opioids even when tolerance required them to reach even higher doses.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

572.    Defendants and their third-party allies claimed that patients and prescribers could increase doses of opioids indefinitely without added risk, even when pain was not decreasing or when doses had reached levels that were frighteningly high, suggesting that patients would eventually reach a stable, effective dose. Each of Defendants' claims also omitted warnings of increased adverse effects that occur at higher doses, and misleadingly suggested that there was no greater risk to higher dose opioid therapy.

573.    These claims are false. Patients receiving high doses of opioids as part of long-term opioid therapy are three to nine times more likely to suffer overdose from opioid-related causes than those on low doses. As compared to available alternative pain remedies, scholars have suggested that tolerance to the respiratory depressive effects of opioids develops at a slower rate than tolerance to analgesic effects. Accordingly, the practice of continuously escalating doses to match pain tolerance can, in fact, lead to overdose even where opioids are taken as recommended. The FDA has itself acknowledged that available data suggest a relationship between increased doses and the risk of adverse effects. Moreover, it is harder for patients to terminate use of higher-dose opioids without severe withdrawal effects, which contributes to a cycle of continued use, even when the drugs provide no pain relief and are causing harm—the signs of addiction.

574.    Each of the following claims suggests that high-dose opioid therapy is safe:

| Actavis | a.  Documents from a 2010 sales training indicate that Actavis trained its sales force that individualization of opioid therapy depended on increasing doses until patient reports adequate analgesia and to set dose levels on the basis of patient need, not on a predetermined maximal dose.   Actavis further counseled its sales representatives that the reasons some physicians had for not increasing doses indefinitely were simply a matter of physician comfort level, which could be overcome or used as a tool to induce them to switch to Actavis's opioid, Kadian. |
|---|---|

| | |
|---|---|
| **Cephalon** | b. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients need a larger dose of their opioid, regardless of the dose currently prescribed.<br><br>c. Cephalon sponsored a CME written by KOL Dr. Lynn Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, which was offered online by Medscape, LLC from September 28, 2007 through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids that include aspirin and acetaminophen are less effective to treat breakthrough pain because of dose limitations. |
| **Endo** | d. Endo sponsored a website, painknowledge.com, through APF and NIPC, which claimed in 2009 that opioids may be increased until you are on the right dose of medication for your pain, and once that occurs, further dose increases would not occur. Endo funded the site, which was a part of Endo's marketing plan, and tracked visitors to it.<br><br>e. Endo distributed a patient education pamphlet edited by KOL Dr. Russell Portenoy titled *Understanding Your Pain: Taking Oral Opioid Analgesics*. In Q&A format, it asked: If I take the opioid now, will it work later when I really need it?  The response was:  The dose can be increased  . You won't 'run out' of pain relief. |
| **Janssen** | f. Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and its sales force distributed. This guide listed dose limitations as disadvantages of other pain medicines but omitted any discussion of risks of increased doses from opioids. The publication also falsely claimed that it is a myth that opioid doses have to be bigger over time. |
| **Purdue** | g. Purdue's *In the Face of Pain* website, along with initiatives of APF, promoted the notion that if a patient's doctor does not prescribe them what—in their view—is a sufficient dose of opioids, they should find another doctor who will. In so doing, Purdue exerted undue, unfair, and improper influence over prescribers who face pressure to accede to the resulting demands.<br><br>h. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dose escalations are sometimes necessary, even indefinitely high ones, which suggested that high dose opioids are safe and appropriate and did not disclose the risks from high dose opioids. This publication is still available online.<br><br>i. Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids have no ceiling dose |

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

|   | and are therefore the most appropriate treatment for severe pain. The guide also claimed that some patients need a larger dose of the drug, regardless of the dose currently prescribed. This language fails to disclose heightened risks at elevated doses. |
|---|---|
|   | j.  Purdue sponsored a CME issued by the American Medical Association in 2003, 2007, 2010, and 2013. The CME, *Overview of Management Options*, was edited by KOL Dr. Russell Portenoy, among others, and taught that other drugs, but not opioids, are unsafe at high doses. The 2013 version is still available for CME credit. |
|   | k.  Purdue sales representatives told Missouri prescribers that opioids were just as effective for treating patients long-term and omitted any discussion that increased tolerance would require increasing, and increasingly dangerous, doses. |

**7.      Defendants and Their Third-Party Allies Deceptively Omitted or Minimized Adverse Effects of Opioids and Overstated the Risks of Alternative Forms of Pain Treatment.**

575.    Each of the following misrepresentations was created with the intent and expectation that, by omitting the known, serious risks of chronic opioid therapy, including the risks of addiction, abuse, overdose, and death, and emphasizing or exaggerating risks of competing products, prescribers and patients would be more likely to choose opioids. Defendants and their third-party allies routinely ignored the risks of chronic opioid therapy. These include (beyond the risks associated with misuse, abuse, and addiction):  hyperalgesia, a known serious risk associated with chronic opioid analgesic therapy in which the patient becomes more sensitive to certain painful stimuli over time; hormonal dysfunction; decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly; neonatal abstinence syndrome (when an infant exposed to opioids prenatally withdraws from the drugs after birth); and potentially fatal interactions with alcohol or benzodiazapines, which are used to treat post-traumatic stress disorder and anxiety (disorders frequently coexisting with chronic pain conditions).

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

576.    Despite these serious risks, Defendants asserted or implied that opioids were appropriate first-line treatments and safer than alternative treatments, including NSAIDs such as ibuprofen (Advil, Motrin) or naproxen (Aleve). While NSAIDs can pose significant gastrointestinal, renal, and cardiac risks, particularly for elderly patients, Defendants' exaggerated descriptions of those risks were deceptive in themselves, and also made their omissions regarding the risks of opioids all the more striking and misleading. Defendants and their third-party allies described over-the-counter NSAIDs as life threatening and falsely asserted that they were responsible for 10,000-20,000 deaths annually (more than opioids), when the real number is closer to 3,200. This description of NSAIDs starkly contrasted with their representation of opioids, for which the listed risks were nausea, constipation, and sleepiness (but not addiction, overdose, or death). Compared with NSAIDs, opioids are responsible for roughly four times as many fatalities annually. In addition, as published March 6, 2018 in JAMA, the first randomized controlled clinical trial demonstrated that opioids are no more effective in treating pain over a 12 month period than NSAIDs.

577.    As with the preceding misrepresentations, Defendants' false and misleading claims regarding the comparative risks of NSAIDs and opioids had the effect of shifting the balance of opioids' risks and purported benefits. While opioid prescriptions have exploded over the past two decades, the use of NSAIDs has declined during that same time.

578.    Each of the following reflects Defendants' deceptive claims and omissions about the risks of opioids, including in comparison to NSAIDs:

| Actavis | a. Documents from a 2010 sales training indicate that Actavis trained its sales force that the ability to escalate doses during long-term opioid therapy, without hitting a dose ceiling, made opioid use safer than other forms of therapy that had defined maximum doses, such as acetaminophen or NSAIDs. |
|---|---|

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

| | |
|---|---|
| | b. Actavis also trained physician-speakers that maintenance therapy with opioids can be safer than long-term use of other analgesics, including NSAIDs, in older persons. |
| **Cephalon** | c. Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids differ from NSAIDs in that they have no ceiling dose and are therefore the most appropriate treatment for severe pain. The publication attributed 10,000 to 20,000 deaths annually to NSAID overdose. *Treatment Options* also warned that risks of NSAIDs increase if taken for more than a period of months, with no corresponding warning about opioids. |
| **Endo** | d. Endo distributed a case study to prescribers titled *Case Challenges in Pain Management:  Opioid Therapy for Chronic Pain*. The study cites an example, meant to be representative, of a patient with a massive upper gastrointestinal bleed believed to be related to his protracted use of NSAIDs (over eight years), and recommends treating with opioids instead.<br><br>e. Endo sponsored a website, painknowledge.com, through APF and NIPC, which contained a flyer called *Pain: Opioid Therapy*.  This publication included a list of adverse effects from opioids that omitted significant adverse effects like hyperalgesia, immune and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death. Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it.<br><br>f. Endo provided grants to APF to distribute *Exit Wounds* (2009), which omitted warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids. |
| **Janssen** | g. Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which its personnel reviewed and approved and its sales force distributed. This publication described the advantages and disadvantages of NSAIDs on one page, and the myths/facts of opioids on the facing page. The disadvantages of NSAIDs are described as involving stomach upset or bleeding, kidney or liver damage if taken at high doses or for a long time, adverse reactions in people with asthma, and can increase the risk of heart attack and stroke.  The only adverse effects of opioids listed are upset stomach or sleepiness, which the brochure claims will go away, and constipation.<br><br>h. Janssen sponsored APF's *Exit Wounds* (2009), which omits warnings of the risk of interactions between opioids and benzodiazepines. Janssen's label for |

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

|  | Dur.agesic, however, states that use with benzoidazepines may cause respiratory depression, low blood pressure, and profound sedation or potentially result in coma. *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids. |
|---|---|
| **Purdue** | i. Purdue sponsored APF's *Exit Wounds* (2009), which omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. APF distributed copies of *Exit Wounds* to a non-profit in Missouri. *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids. <br><br> j. Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which advised patients that opioids differ from NSAIDs in that they have no ceiling dose and are therefore the most appropriate treatment for severe pain. The publication attributes 10,000 to 20,000 deaths annually to NSAID overdose. *Treatment Options* also warned that risks of NSAIDs increase if taken for more than a period of months, with no corresponding warning about opioids. <br><br> k. Purdue sponsored a CME issued by the American Medical Association in 2003, 2007, 2010, and 2013, and the 2013 version is still available for CME credit. The CME, *Overview of Management Options*, was edited by KOL Dr. Russell Portenoy, among others, and taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses. |

**8.    Purdue Misleadingly Promoted OxyContin as Providing 12 Hours of Pain Relief.**

579.    In addition to making the deceptive statements above, Purdue also dangerously misled doctors and patients about OxyContin's duration and onset of action.

580.    Purdue promotes OxyContin as an extended-release opioid, but the oxycodone does not enter the body on a linear rate. OxyContin works by releasing a greater proportion of oxycodone into the body upon administration, and the release gradually tapers, as illustrated in the following chart, which was, upon information and belief, adapted from Purdue's own sales materials:

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM



## OxyContin PI Figure, Linear y-axis

Figure 1

The reduced release of the drug over time means that the oxycodone no longer provides the same level of pain relief; as a result, in many patients, OxyContin does not last for the 12 hours for which Purdue promotes it—a fact that Purdue has known at all times relevant to this action.

581.    OxyContin tablets provide an initial absorption of approximately 40% of the active medicine. This has a two-fold effect. First, the initial rush of nearly half of the powerful opioid—OxyContin is roughly twice as powerful as morphine—triggers a powerful psychological response. OxyContin thus behaves more like an immediate release opioid, which Purdue itself once claimed was more addicting in its original 1995 drug label. Second, the initial burst of oxycodone means that there is less of the drug at the end of the dosing period, which results in the drug not lasting for full 12 hours and precipitates withdrawal symptoms in patients,

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

a phenomenon known as end of dose failure. The combination of fast onset and end-of-dose failure makes OxyContin particularly addictive, even compared with other opioids.

582.    Purdue nevertheless has falsely promoted OxyContin as if it were effective for a full 12 hours. Its advertising in 2000 included claims that OxyContin provides Consistent Plasma Levels Over 12 Hours.  That claim was accompanied by a chart depicting plasma levels on a logarithmic scale, which minimized the rate of end-of-dose failure by depicting 10 mg in a way that it appeared to be half of 100 mg in the table's y-axis. That chart, shown below, depicts the same information as the chart above but does so in a way that makes the absorption rate appear more consistent:



583.    More recently, other Purdue advertisements also emphasized Q12h (meaning twice-daily) dosing. These include an advertisement in the February 2005 *Journal of Pain* and 2006 *Clinical Journal of Pain* featuring an OxyContin logo with two pill cups, reinforcing the

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

twice-a-day message. Other advertisements that ran in the 2005 and 2006 issues of the *Journal of Pain* depict a sample prescription for OxyContin, with Q12h handwritten for emphasis.

584.    The information that OxyContin did not provide pain relief for a full 12 hours was known to Purdue, and Purdue's competitors, but was not disclosed to general practitioners. Purdue's knowledge of some pain specialists' tendency to prescribe OxyContin three times per day instead of two (which would have compensated for end-of-dose failure) was set out in Purdue's internal documents as early as 1999 and is apparent from MEDWATCH Adverse Event reports for OxyContin.

## VII.    THE RESULT OF DEFENDANTS' DECEPTIVE SCHEME

585.    Through their direct promotional efforts, along with those of the third-party Front Groups and KOLs they assisted and controlled, and whose seemingly objective materials they distributed, Defendants accomplished exactly what they set out to do:  change the institutional and public perception of the risk-benefit assessments and standard of care for treating patients with chronic pain. As a result, Missouri doctors began prescribing opioids long-term to treat chronic pain—something most would never have considered prior to Defendants' campaign.

586.    But for the misleading information disseminated by Defendants, doctors would not, in most instances, have prescribed opioids as medically necessary or reasonably required to address chronic pain. As outlined below, the impact of Defendants' deceptive marketing on doctors' prescribing and patients' use of opioids is evidenced by:  (a) the increase in opioid prescribing nationally in concert with Defendants' marketing; (b) the City's own increased spending on opioids resulting from Defendants' promotional spending; and (C) the consequences of opioid over prescription—including addiction, overdose, and death—that have been visited on

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Missouri and its residents, as confirmed by interviews with victims and addiction treatment programs.

## VIII.  THE PHARMACY DEFENDANTS' UNLAWFUL DISTRIBUTION OF FAILURE TO MONITOR AND REFUSING TO FILL OPIOID PRESCRIPTIONS.

587.    Defendants Walgreens, Express Scripts, Wal-Mart, Target, and CVS (collectively Pharmacy Defendants) owe a duty under both federal law (21 U.S.C. § 823, 21 CFR 1301.74) and Missouri law (20 CSR 2220 – 5.030; 2220 – 5.050; and 2220-5.060), to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids originating from Plaintiff County as well as those orders which the Pharmacy Defendants knew or should have known were likely to be diverted into Plaintiff County.

588.    Pharmacy Defendants similarly had industry-specific knowledge of the particular risks and harms from filling prescriptions for non-medical purposes and the resulting widespread opioid abuse.

589.    The DEA has provided extensive guidance to pharmacists concerning their duties to the public, as have state pharmacy boards, and national industry associations. The guidance teaches pharmacists how to identify red flags, which indicate that there may be a problem with the legitimacy of a prescription presented by a patient. The guidance also tells pharmacists how to resolve the red flags and what to do if the red flags are unresolvable.

590.    For instance, the industry guidance tells pharmacists how to recognize: (a) stolen prescription pads; (b) prescription pads printed using a legitimate doctor's name, but with a different call back number that is answered by an accomplice of the drug-seeker; (c) prescriptions written using fictitious patient names and addresses; and (d) other similar red flags.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

591.    Pharmacy Defendants, through their words or actions set forth in news reports and other public documents, have acknowledged these risks and assured the public that issues affecting public health and safety are their highest priority.

592.    In 2015, CVS publicly stated that, the abuse of controlled substance pain medication is a nationwide epidemic that is exacting a devastating toll upon individuals, families and communities. Pharmacists have a legal obligation under state and federal law to determine whether a controlled substance was issued for a legitimate purpose and to decline to fill prescriptions they have reason to believe were issued for a non-legitimate purpose.

593.    Similarly, in 2016, Walgreens issues a press release captioned "Walgreens Leads Fights against Prescription Drug Abuse with New Programs to Help Curb Misuse of Medications and the Rise in Overdose Death."

594.    Despite knowing and even warning of these risks, Pharmacy Defendants recklessly or negligently permitted diversion to occur. In failing to take adequate measures to prevent substantial opioid-related injuries to the nation, Pharmacy Defendants have breached their duties under the reasonable care standard of Missouri common law (including violating a voluntarily-undertaken duty to the public which they have assumed by their own words and actions), professional duties under the relevant standards of professional practice, and requirements established by Missouri and federal laws and regulations.

595.    Pharmacy Defendants were on notice of their ongoing negligence or reckless misconduct towards the nation in part because of their history of being penalized for violating their duties in other jurisdictions.

596.    CVS has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States Department of Justice (DOJ). It nonetheless

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

treated these fines as the cost of doing business and has allowed its pharmacies to continue (a) dispensing prescription opioids in quantities significantly higher than any plausible medical need would require, and (b) violating their recordkeeping and dispensing obligations under the FCSA.

597.    As recently as February 2016, CVS paid $8 million to settle allegations by the DEA and DOJ that its stores and pharmacists had been violating their duties under the FCSA and filling prescriptions with no legitimate medical purpose. CVS has resolved similar allegation by settling with Florida ($22 million), Oklahoma ($11 million), Massachusetts and New Hampshire ($3.5 million), Texas ($1.9 million), and Rhode Island ($450,000).

598.    These cases included evidence that CVS filled prescriptions that were clearly forged. For example, in 2016, CVS settled with the United States to resolve allegations stemming from two DEA investigations that revealed that over 50 CVS stores in Massachusetts and New Hampshire had filled patently forged prescriptions for addictive painkillers more than 500 times between 2011 and 2014. The DEA estimated the street value of the diverted drugs to be over $1 million. One forger successfully filled 131 prescriptions for hydrocodone at eight CVS stores. One of those stores filled 29 prescriptions for the forger over the course of just six months, an inordinate amount under the circumstances. At a different store, the same individual filled 28 prescriptions that she forged for herself and three other alleged patients, even though the prescriptions were identical in every aspect other than the patient name. Additionally, 107 of the forged prescriptions bore the Massachusetts address of a dentist who had closed her Massachusetts practice and moved to Maine, something that should have been easily discovered by CVS pharmacists by checking the DEA website or calling the phone number on the prescriptions. Upon information and belief, CVS has undertook the same actions and conduct in Missouri, including Plaintiff County, violating state and federal law

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

599.    CVS also settled allegations by the DEA and DOJ that its stores and pharmacists had been violating their duty under the FCSA and filling prescriptions with no legitimate medical purpose. As part of the settlement, CVS acknowledged that from 2008 to 2012, some of its stores in Maryland dispensed controlled substances, including prescription opioids, in a manner that was not fully consistent with the FCSA and relevant regulations, including failing to comply with a pharmacist's responsibility to ensure that these prescriptions were issued for a legitimate medical purpose. CVS paid $8 million to settle these claims.

600.    CVS also has settled allegations by the DOJ that some of its stores in Connecticut failed to maintain records in accordance with the FCSA. On over 6,000 occasions, CVS stores in Connecticut failed to keep appropriate records of prescriptions and purchase invoices. CVS settled these allegations for $600,000. Upon information and belief, CVS committed the same type of acts in St. Louis City and in Plaintiff County, thereby violating state and federal law. Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the FCSA by filling prescriptions signed by prescribers with invalid DEA registration numbers of non-prescribing practitioners, or substituted false DEA registration numbers in company computer systems, on paper prescriptions, and even in the information that the pharmacy reported to the State of Oklahoma's Prescription Drug Monitoring Program.

601.    In 2015, CVS acquired Target Corporation's pharmacy and clinic business for $1.9 billion. CVS therefore owns Target's approximately 1,672 pharmacies, including those located within St. Louis City and Plaintiff County.

602.    Walgreens agreed to the largest settlement in DEA history - $80 million – to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the FCSA, including negligently allowing controlled substances such as oxycodone

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

and other prescription painkillers to be diverted for abuse and illegal black market sales. As part of the settlement, Walgreens agreed to enhance its training and compliance programs, and to cease compensating its pharmacists based on the volume of prescriptions filled. The settlement resolved investigations into and allegations of FCSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions or prescription opioids into illicit channels.

603.    Walgreens' Florida operations at issue in this settlement highlight its egregious conduct regarding diversion of prescription opioids. Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011 – more than ten times the average amount. They increased their orders over time, in some cases as much as 600% in the span of just two years, including, for example, supplying a town of 3,000 residents with 285,800 orders of oxycodone in a one-month period. Yet Walgreens' corporate officers not only turned a blind eye, but also facilitated the opioid boom in Florida by providing Walgreens' pharmacists with incentives through a bonus program that compensated them based on the number of prescription filled at the pharmacy. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance, underscoring Walgreens' attitude that profit outweighed compliance with the FCSA or the health of communities.   Upon information and belief, Defendant Walgreens committed the same type of actions in the state of Missouri.

604.    Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000). The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

across the state failed to monitor the prescription opioid use of some Medicaid patients who were considered high-risk. Such patients are supposed to obtain all prescriptions from only one pharmacy, and that pharmacy is required to track the patient's pattern of prescription use. Some of the state's 160 Walgreens accepted cash for controlled substances from patients in MassHealth (the state's combined program for Medicaid and Children's Health Insurance Program), rather than seeking approval from the agency. In some cases, MassHealth had rejected the prescription; other times, MassHealth was never billed. In response, Walgreens simply agreed to update its policies and procedures and train its staff to ensure that pharmacists properly monitor and do not accept cash payments from patients deemed high-risk. Upon information and belief, Walgreens committed the same type of acts in Missouri.

605.    Walgreens has also not properly monitored and detected their inventory of opioids located in Plaintiff County and have failed to adequately keep safe their inventories of opioids from theft, improper transfer and for allowing their opioid inventories to illegally flow into Plaintiff's communities thereby diverting these schedule II narcotics to the illegal street trade, in violation of both state law  (20 CSR 2220-5.030; 2220-5.50; and 2220-5.060) and federal law (21 USC §823, 21 CFR 1301.74).

606.    Despite their extensive understanding of the risks and harms of prescription opioid diversion set forth above, Pharmacy Defendants continue to fail to fulfill their obligations to prevent prescription opioid diversion.

607.    Pharmacy Defendants have engaged in a consistent, nationwide pattern and practice of illegally distributing prescription opioids. That pattern and practice has also affected Missouri and its citizens.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

608.    On information and belief, Pharmacy Defendants regularly filled opioid prescriptions in circumstances where red flags were present.

609.    On information and belief, Pharmacy Defendants regularly filled opioid prescriptions that would have been deemed questionable or suspicious by a reasonably prudent pharmacy.

610.    On information and belief, Pharmacy Defendants have not adequately trained or supervised their employees at the point of sale to investigate or report suspicious or invalid opioid prescriptions, or protect against corruption or theft by employees or others.

611.    On information and belief, Pharmacy Defendants utilized monetary compensation programs for certain employees that are based, in part, on the number of prescriptions filled and dispensed. This type of compensation creates economic disincentives within the companies to change their practices. For example, these have been reports of chain store supervisory personnel directing pharmacists to fill prescriptions regardless of red flags presented.

612.    The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

613.    Each Pharmacy Defendants repeatedly and purposefully breached its duties under state and federal law. Such breaches are direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes into Plaintiff County.

614.    The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in Plaintiff County. This diversion and the epidemic are direct causes of harms for which Plaintiff seeks to recover here.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

615.    The opioid epidemic in Missouri, including inter alia in Plaintiff County, remains an immediate hazard to public health and safety.

616.    The opioid epidemic in Plaintiff County is a continuous public nuisance and remains unabated.

617.    The Pharmacy Defendants' intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

618.    The Pharmacy Defendants and the Manufacturer Defendants acted pursuant to an agreement explicit or implied, in conspiracy and/or in concert of action with each other to illicitly promote and distribute opioids.

## IX.    THE DISTRIBUTOR DEFENDANTS HAVE A DUTY UNDER FEDERAL AND STATE LAW TO GUARD AGAINST AND REPORT, UNLAWFUL DIVERSION AND TO REPORT AND PREVENT SUSPICIOUS ORDERS.

619.    Opioids are a controlled substance under Missouri law. *See* Mo. Rev. Stat. § 195.010 (26)(a).

620.    As wholesale drug distributors, Defendants Cardinal, McKesson, and AmerisourceBergen (collectively Distributor Defendants) were required under Missouri law to obtain a license as a wholesaler of controlled substances from the state board of pharmacy. Mo. CSR 20 CSR 2220-5.020, 5.030, and 5.050. Each Distributor Defendant is licensed by the Missouri Board of Pharmacy and is a registrant or licensee as a wholesale distributor in the chain of distribution of Schedule II controlled substances and assumed a duty to comply with all security requirements imposed under the regulations adopted by the Missouri Board of Pharmacy.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

621.    Each Distributor Defendant was further required to register with the DEA, pursuant to the federal Controlled Substance Act.  See 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100.  Each Distributor Defendant is a registrant as a wholesale distributor in the chain of distribution of Schedule II controlled substances with a duty to comply with all security requirements imposed under that statutory scheme. Those requirements are adopted and incorporated into Missouri law. Mo. CSR 2220-5.020.

622.    Each Defendant has an affirmative duty under federal and Missouri law to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs. Federal law requires that Distributors of Schedule II drugs, including opioids, must maintain effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels.  21 U.S.C. §§823(b)(1).  Missouri incorporates these requirements through Missouri's Pharmacy Board Regulations, which mandate that wholesale drug distributors shall operate in compliance with applicable federal, state, and local laws and regulations.  20 CSR 52220-5.030 (m) 5 and 7.

623.    The Missouri State Board of Pharmacy requires that wholesale drugs and pharmacy distributors shall establish, maintain and adhere to written policies and procedures, which shall be followed for the receipt, security, storage, inventory and distribution of prescription drugs, including policies and procedures for identifying, recording and reporting losses or thefts and for correction all errors and inaccuracies in inventories.  *See* Mo. CSR 2220-5.20.

624.    A procedure for the mandatory reporting to the board and any other federal or state agency of all shortages or prescription drugs.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

625.   Missouri law similarly imposes a non-delegable duty upon wholesale drug distributors to design and operate a system to disclose to the registrant suspicious orders of controlled substances. *See* Mo. CSR 2220-5030 (m) 5-7. The registrant distributor shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. 21 C.F.R. § 1301.74(b).

626.   Suspicious orders include orders of an unusual size, orders of unusual frequency or orders deviating substantially from a normal pattern. *See* 21 C.F.R. §1306. These criteria are disjunctive and are not all-inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a wholesale distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the wholesale distributor's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the wholesale distributor's customer base and the patterns throughout the relevant segment of the wholesale distributor industry.

627.   In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels.

628.   These prescription drugs are regulated for the purpose of providing a closed system intended to reduce the widespread diversion of these drugs out of legitimate channels into

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.

629.    Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance. Statutes and regulations define each participant's role and responsibilities.

630.    As the DEA advised the Distributor Defendants in a letter to them dated September 27, 2006, wholesale distributors are one of the key components of the distribution chain. If the closed system is to function properly … distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as … the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people.

631.    The Distributor Defendants have admitted that they are responsible for reporting suspicious orders.

632.    The DEA sent a letter to each of the Distributor Defendants on September 27, 2006, warning that it would use its authority to revoke and suspend registrations when appropriate. The letter expressly states that a distributor, in addition to reporting suspicious orders, has a statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels. The letter also instructs distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. The DEA warns, even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

633.    The Distributor Defendants admit that they have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription drugs, but undertake such efforts as responsible members of society.

634.    The Distributor Defendants knew they were required to monitor, detect, and halt suspicious orders. Industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are at the center of a sophisticated supply chain and therefore are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers.  The guidelines set forth recommended steps in the due diligence process, and note in particular: If an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest.

635.    Each of the Distributor Defendants sold prescription opioids, including hydrocodone and/or oxycodone, to retailers in Plaintiff County and/or to retailers from which Defendants knew prescription opioids were likely to be diverted to Plaintiff County.

636.    Each Distributor Defendant owes a duty to monitor and detect suspicious orders of prescription opioids.

637.    Each Distributor Defendant owes a duty under federal and state law to investigate and refuse suspicious orders of prescription opioids.

638.    Each Distributor Defendant owes a duty under federal and state law to prevent the diversion of prescription opioids into illicit markets in the State and Plaintiff County.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

639.    The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes and subsequent plague of opioid addiction.

640.    The foreseeable harm resulting from the diversion of prescription opioids for nonmedical purposes is abuse, addiction, morbidity and mortality in Plaintiff County and the damages caused thereby.

   **1.     The Distributor Defendants Breached Their Duties.**

641.    Because distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled substances. If a distributor deviate from these checks and balances, the closed system collapses.

642.    The sheer volume of prescription opioids distributed to pharmacies in the Plaintiff County, and/or to pharmacies from which the Distributor Defendants knew the opioids were likely to be diverted into Plaintiff County, is excessive for the medical need of the county and facially suspicious. Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.

643.    The Distributor Defendants failed to report suspicious orders originating from Plaintiff County, or which the Distributor Defendants knew were likely to be diverted to Plaintiff County, to the federal and state authorities, including the DEA and/or the state Board of Pharmacy.

644.    The Distributor Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency in

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Plaintiff County, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to Plaintiff County.

645.    The Distributor Defendants breached their duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates originating from Plaintiff County, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to Plaintiff County.

646.    The Distributor Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels.

647.    The Distributor Defendants breached their duty to design and operate a system to disclose to the registrant suspicious orders of controlled substances and failed to inform the authorities including the DEA of suspicious orders when discovered, in violation of their duties under federal and state law.

648.    The Distributor Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific and industrial channels.

649.    The Distributor Defendants' violations of public safety statutes constitute prima facie evidence of negligence under Missouri law.

650.    The Distributor Defendants acted with actual malice in breaching their duties, i.e., they have acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

651.    The unlawful conduct by the Distributor Defendants is purposeful and intentional. The Distributor-Pharmacy Defendants refuse to abide by the duties imposed by federal and state

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

law, which are required to legally acquire and maintain a license to distribute prescription opiates.

652.    The Distributor Defendants' repeated shipments of suspicious orders, over an extended period of time, in violation of public safety statutes, and without reporting the suspicious orders to the relevant authorities demonstrates wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others and justifies an award of punitive damages.

653.    Rather than abide by their non-delegable duties under public safety laws, the Distributor Defendants, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to halt prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a sharp drop in enforcement actions and the passage of the Ensuring Patient Access and Effective Drug Enforcement Act which, ironically, raised the burden for the DEA to revoke a distributor's license from imminent harm to immediate harm and provided the industry the right to cure any violations of law before a suspension order can be issued.

654.    In addition to taking actions to limit regulatory prosecutions and suspensions, the Distributor-Pharmacy Defendants undertook to fraudulently convince the public that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, the Distributor-Pharmacy Defendants attempted to assure the public they were working to curb the opioid epidemic.

655.    For example, a Cardinal Health executive claimed that it uses advanced analytics to monitor its supply chain, and represented that it was being as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Given the sales volumes and the company's history of violations, this executive was either not telling the truth, or, if Cardinal Health had such a system, it ignored the results. Defendant McKesson publicly stated that it has a  best-in-class controlled substance monitoring program to help identify suspicious orders, and claimed it is deeply passionate about curbing the opioid epidemic in our country. Again, given McKesson's historical conduct, this statement is either false, or the company ignored outputs of the monitoring program.

656.    By misleading the public about the effectiveness of their controlled substance monitoring programs, the Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts. Plaintiff did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence. Meanwhile, the opioid epidemic rages unabated throughout the country, Missouri, and in Plaintiff County.

657.    The epidemic still rages because the fines and suspensions imposed by the DEA did not change the conduct of the industry. The distributors, including the Distributor Defendants, pay fines as a cost of doing business in an industry that generates billions of dollars in annual revenue. They hold multiple DEA registration numbers and when one facility is suspended, they simply ship from another facility.

658.    The wrongful actions and omissions of the Distributor Defendants which have caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiff's racketeering allegations below.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

659.    The Distributor-Pharmacy Defendants have abandoned their duties imposed under federal and state law, taken advantage of a lack of DEA law enforcement, and abused the privilege of distributing controlled substances in the State and Plaintiff County.

## X.    PHARMACY BENEFIT MANAGER DEFENDANTS FAILED TO REPORT SUSPICIOUS ORDERS.

660.    Defendants Express Scripts, CVS, United Health Group, Optum, Inc., and OptumRx (collectively PBMs and/or PBM Defendants) acted as the gatekeepers of prescription drugs including opioids. PBMs negotiate with drug manufacturers to offer preferred drug formulary placement for the manufacturers' drugs. PBMs establish reimbursement rates for the drugs dispensed. PBMs earn revenue from at least the following sources: fees from health plans and insurers, fees related to formulary creation and drug placement from drug manufacturers administrative fees from drug manufacturers, rebates and other incentives such as volume target bonuses negotiated with drug manufacturers, and fees from maintaining pharmacy networks.

### 1.    Express Scripts

661.    In 2012, Express Scripts, Inc. acquired its rival, Medco Health Solutions, Inc., in a $29.1 billion deal. As a result of the merger, Express Scripts Holding Company was formed and became the largest PBM in the nation, filling a combined 1.4 billion prescriptions for employers and insurers. Express Scripts, Inc. and Express Scripts Holding Company are hereinafter collectively referred to as "Express Scripts."

662.    According to the Pharmacy Benefit Management Institute, in 2015, Express Scripts was the top ranking PBM nationwide with 26% of the industry market share.

663.    Express Scripts derives substantial revenue managing pharmacy benefits in Missouri through several means, including, but not limited to, providing services to companies in

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

managing their employees prescription benefit program. Upon information and belief this is the primary method by which Express Scripts profits from-- the management and control of opioid traffic and the subsequent reimbursement by Medicaid and Medicare.

664.    While Express Scripts publicly asserts that efforts to curb opioid abuse and misuse remain its highest priorities, Express Scripts' 2018 standard formulary awards OxyContin, one of the most highly addictive opioids, preferred alternative status over less addictive opioids in the Long-Acting Opioid Analgesics drug class.

665.    At all times relevant hereto, Express Scripts offered pharmacy benefit management services, including mail order pharmacy services, nationwide and maintained a national formulary or formularies that are used nationwide, including in Missouri. At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Missouri, including St. Louis City and Plaintiff County.

**2.    CVS**

666.    CVS Health describes itself in a September 3, 2014 press release as a pharmacy innovation company helping people on their path to better health. Through our 7,700 retail pharmacies, 900 walk-in medical clinics, a leading pharmacy benefits manager with nearly 65 million plan members, and expanding specialty pharmacy services, we enable people business and communities to manager health in more affordable, effective ways. This unique integrated model increased access to care, delivers better health outcomes and lowers overall health care costs.  In 2016, CVS reported an operating income of $10 billion.

667.    In the above-referenced September 3, 2014 press release, CVS Health announced its change of name from CVS Caremark Corporation to CVS Health. CVS Health explained that it was changing its name to reflect its broader health care commitment and its expertise in

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

driving the innovations needed to shape the future of health.  CVS Health explained that the newly-named company included its pharmacy benefit management business, which is known as CVS/Caremark.  In that same press release, CHS Health touted, for our patients and customers, **_health is everything_** and…_we are advising on prescriptions_ and helping manage chronic and specialty conditions.'

668.    According to the Pharmacy Benefit Management Institute, CVS Health (Caremark) was the second highest-ranking PBM in 2015 with twenty-five percent (25%) of the industry market share.

669.    At all times relevant hereto, CVS Health and Caremark offered pharmacy benefit management services nationwide and maintained a national formulary or formularies that are used nationwide. At all times relevant hereto, those formularies included opioids, including those at issue in this case. At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Missouri.

670.    At all times relevant hereto, CVS Health, though Caremark, derives substantial revenue providing pharmacy benefits in Missouri though several different companies and entities.

### 3.    UnitedHealth Group and Optum

671.    UnitedHealth serves approximately 115 million individuals throughout the United States. For 2016, UnitedHealth reported an operating income of $12.9 billion. Optum, Inc. is a health services company managing the subsidiaries that administer UnitedHealth's pharmacy benefits, including OptumRx, Inc. Upon information and belief, Optum, Inc. is a subsidiary of UnitedHealth. OptumRx operates as a subsidiary of Optum, Inc. OptumRx operates as the PBM for UnitedHealth.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

672.    According to the Pharmacy Benefit Management Institute, OptumRx (UnitedHealth) was the third highest-ranking PBM in 2015 with 22% of the industry market share.

673.    In one case, OptumRx suggested that a member taking Butrans consider switching to a lower cost alternative, such as OxyContin or extended-release morphine, according to a letter provided by the member. Mr. Wiggin, the UnitedHealth spokesman, said the company's rules and preferred drug list are designed to ensure members have access to drugs they need for acute situations, such as post-surgical care or serious injury, or ongoing cancer treatment and end of life care, as well as for long-term use after alternatives are tried.

674.    Upon information and belief, UnitedHealth and its subsidiaries place morphine on its lowest-cost drug coverage tier with no prior permission required, while in many cases excluding Butrans. And it places Lyrica, a non-opioid, brand-name drug that treats nerve pain, on its most expensive tier, requiring patients to try other drugs first.

675.    At all times relevant hereto, OptumRx derives substantial revenue providing pharmacy benefits in Missouri through several different means, and based upon information and believe Optum administered these plans through Missouri corporations, business, and municipal entities based in the Plaintiff County's communities.

676.    At all times relevant hereto, OptumRx offered pharmacy benefit management services nationwide and maintained a national formulary or formularies that are used nationwide. At all times relevant hereto, those formularies included opioids, including those at issue in this case. At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Missouri.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

677.    The PBM Defendants reimbursed the opioids at issue. Without the PBM Defendant reimbursement for the opioids at issue herein, the opioids would not have entered the marketplace and the entire scheme would have failed.

### 4.    PBM Defendants Guaranteed that Opioids were Regularly Prescribed and Flooded the Market.

678.    PBMs are brokers between payers (representing patients), drug manufacturers, and retailers and they influence which drug products are used most frequently and set prices for pharmacies.

679.    PBMs named in this Petition manage the prescription drug benefits for nearly 95% of the population. They control what drugs virtually all health insurance providers for over 260 million people cover. PBMs made almost $260 billion last year. In 2015 they covered most of the 4 billion retail prescriptions that were covered in the United States. They are key participants and play a crucial role in the administration and reimbursement of prescription drugs.

680.    PBM influence is notable especially considering the lack of competition in the PBM space. Market concentration is an important indicator of a company's ability to earn extraordinary returns, and several segments in the United States pharmaceutical distribution system are highly concentrated.

681.    With this kind of monopolistic structure, the top three PBMs have the almost exclusive control over the dissemination of opioids. In concert with drug manufacturers who provide them with assorted complicated payments as incentives, PBMs choose which drugs appear on their formularies, thus determining which drugs will be reimbursed. No drug will leave a pharmacy if it is not paid for. Thus, PBMs control which drugs are dispensed and which drugs enter communities.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

682.    Every PBM Defendants' formulary is influenced by its financial arrangements with drug manufacturers.

683.    For example, notwithstanding its express assurance to its customers that it agrees to act as a fiduciary in good faith, with candor and due diligence in connection with the performance of its PBM contract and any negotiations related thereto, OptumRx then proceeds to define its formulary as follows:

> A list of prescription drugs administered by PBM that has been evaluated by the PBM for inclusion on its formulary ('Formulary')…The drugs included on the PBM's formulary may be modified by PBM, with prior approval by client, from time-to-time as a result of factors including, but not limited to, medical appropriateness, *manufacturer rebate arrangements* and patent expirations.

684.    Notably, OptumRx does not explain how manufacturer rebate arrangements impact its formulary design.

685.    Express Scripts likewise is paid by drug manufacturers based on formulary design:

> Express Scripts contracts for its own account with pharmaceutical manufacturers to obtain rebates attributable to the utilization of certain prescription products by individuals who receive benefits from clients for whom we provide PBM services. *Rebate amounts vary based on the volume of utilization as well as the benefit design and formulary position applicable to utilization of a product.* Express Scripts often pays all or a portion of the rebates it receives to a client based on the client's PBM services agreement. Express Scripts retains the financial benefit of the use of any funds held until payment is made to a client. In connection with our maintenance and operation of the systems and other infrastructure necessary for managing and administering the rebate process, *Express Scripts also receives administrative fees* from pharmaceutical manufacturers participating in the rebate program discussed above. *The services provided to participating manufacturers include* making certain drug utilization data available, as allowed by law, for purposes of verifying and evaluating the rebate payments. The administrative fees paid to Express Scripts by manufacturers for participating in the rebate program do not exceed 3.5% of the AWP of the rebated products.

686.    It is notable that Express Scripts does not commit to share all of the rebates it receives from drug manufacturers with its clients, nor does it commit to share any of the

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

administrative fees. Nor does it explain all of the services for which it receives the administrative fees. Nor does it explain how any of these payments actually influence its formulary design. Also noteworthy is that Express Scripts pegs its administrative fees to Average Wholesale Price (AWP), which is a reported price higher than any Express Scripts customer pays for any drug.

687.    Express Scripts' standard contract language contemplates that it will derive even further revenue from drug manufacturers in other vaguely described arrangements, none of which are shared with its customers:

> If any, Express Scripts and Express Scripts's wholly-owned subsidiaries derive margin from fees and revenue in one or more of the ways as further described herein Express Scripts and Express Scripts's wholly-owned subsidiaries act on their own behalf, and not for the benefit of or as agents for its customers. *Express Scripts and* Express Scripts's *wholly-owned subsidiaries retain all proprietary rights and beneficial interest in such fees and revenues* described in the Financial Disclosure and, accordingly, *customer acknowledges that neither it, any Member, nor the Plan, has a right to receive, or possess any beneficial interest in, any such fees or revenues*.

688.    A standard Caremark PBM contract reflects similar perverse incentives. It explains that Manufacturer means a pharmaceutical company that has contracted with Caremark (or its affiliate or agent) *to offer discounts for pharmaceutical products in connection with Caremark's Formulary Services*.

689.    And, Manufacturer Payments include revenues received by Caremark:

> from each of the following sources: 1) payments received in accordance with agreements with pharmaceutical manufacturers for formulary placement and, if applicable, drug utilization ; 2) rebates, regardless of how categorized; 3) market share incentives; 4) commissions; 5) any fees received for the sale of utilization data to a pharmaceutical manufacturer; 6) educational grants; 7) administrative management fees; and 8) all compensation from manufacturers including rebates paid by a manufacturer as a result of product inflation caps and/or guarantees negotiated by the Service Provider.

690.    Caremark's standard PBM contract further explains:

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

that in lieu of billing Member County a 'per Claim' fee for Services, Caremark shall retain 100% of the Rebates as reasonable compensation for the Services. Customer and Member County understand and agree that neither they nor any Participant will share in the Rebate monies collected from Manufacturers by Caremark.

691.    Caremark also explains that it will encourage the use of its Preferred Drugs (those where is has the most lucrative arrangement with a drug manufacturer) over non-Preferred drugs. Its standard contract language states that Caremark will encourage the use of Preferred Drugs by:

(i) identifying appropriate opportunities for converting a prescription from a non-Preferred Drug to a Preferred Drug, and (ii) contacting the Participant and the prescriber to request that the prescription be changed to the Preferred Drug. A Preferred Drug is one on the Performance Drug List, which has been developed by Caremark as a clinically appropriate and *economically advantageous subset of the Caremark Formulary*, as revised by Caremark from time to time.

692.    People with chronic pain thus are at the mercy of PBMs and their self-serving formularies. Yet PBMs make it more difficult to get pain medication that is less addictive while making it easier to get opioids, because opioids are generally cheaper than non-opioid alternatives and opioid manufacturers have provided rich incentives, as described above. According to a study by the New York Times and ProPublica of 35.7 million people on Medicare prescription drug plans, in the second quarter of 2017 only one-third of them had access to pain medication less addictive than opioids.

693.    Even when they were asked to limit accessibility to opioids, PBMs refused. The seeds of the opioid epidemic were sown with early over prescription of OxyContin. In 2001, when officials in the West Virginia state employee health plan tried to get Purdue, which manufactured OxyContin, to require pre-authorization, Purdue refused. Using the financial quid pro quo it had with the state's PBM, it paid Merci Medco (now Express Scripts) to prevent insurers from limiting access to the drug.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

694.    PBMs are driving patients to opioids, away from abuse-deterrent form (ADF) and less addictive forms of opiates through formulary and pricing strategies.

695.    Not only do PBMs place roadblocks in the way of limiting excessive opioid prescriptions, they also make it more difficult to obtain Abuse Deterrent Formula (ADF) opioids. These pills are more difficult to physically alter (crushing to snort or dissolving to inject) and therefore are less prone to abuse. The three major PBMs carry at most 3 of the 10 FDA approved ADF opioids, which CVS Caremark, which has nearly 90 million members, carries none. A study by Tufts CSSD found that ninety-six percent (96%) of all prescription opioids were non-ADF in 2015.

696.    This denial was endorsed by the Institute for Clinical and Economic Review, a private organization funded in part by some of the largest health plans and PBMs, that claimed that ADF opioids provided neither financial nor societal benefits, even though they were given data showing that ADF OxyContin could prevent 4,300 cases of abuse and save $300 million over a five-year period.

> ICER ignored research that demonstrated abuse deterrent Oxy reduced abuse by 20% and reduced the average daily dose of OxyContin from 80 mg to 60 mg. Perhaps even more important, it reduced sharing and selling of the drug for getting high (diversion) by nearly 90 percent. The diversion of generic painkillers is responsible for as many as 63 percent of fatal prescription drug overdoses. ICER consciously decided to ignore the human cost of this deadly behavior.

> What the ICER report ignores entirely is that one of the factors driving abuse and addiction is the inappropriate use of generic opioids for conditions that have non-opioid, on-label options. Fifty-two percent of patients diagnosed with fibromyalgia and 42 percent of patients with diabetic peripheral neuropathy.

697.    What is inconceivable is that PBMs, while making it easy to obtain generic highly addictive opioids, make it *harder* to obtain *treatment*. The NY Times/ProPublica study found that insurers have erected more hurdles to approving addiction treatments than for the addictive

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

substances themselves. Only after being subject to much public pressure and congressional investigations did some insurers remove the barriers to addiction treatment.

698.    A 2008 study by the Mayo Clinic found that patients who were weaned off opioids and followed a non-drug treatment experienced less pain than when they were on opioids and had improved functioning. Some plans cover these costs but others do not.

699.    The efforts to artificially increase the number of opioid prescriptions, implanted by PBMs, directly and predictably caused a corresponding increase in opioid abuse. In a 2016 report, the CDC explained that opioid pain reliever prescribing has quadrupled since 1999 and *has increased in parallel with opioid* overdoses. Many abusers start with legitimate prescriptions. For these reasons, the CDC concluded that efforts to rein the prescribing of opioids for chronic pain are critical to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity.  The PBMs' role in increasing prescriptions played an enormous role in the current opioid epidemic.

700.    There are steps the PBMs could take. They could make it easier to access other non-opioid drugs in the current opioid epidemic. They could require doctors to start treating pain first with non-opioid pain medications as recommended by the CDC and turn to opioids as a last resort. They could cover alternative, non-medication treatments for pain. They could make addiction treatment more accessible. They could make their pricing more transparent so everyone could see if they were being improperly influenced by manufacturers to make choices for financial, not medical reasons. No single actor is to blame for this epidemic, but PBMs play a unique role in controlling which pain medications reach the marketplace – and which do not – through their self-serving formulary design.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

## XI.   DEFENDANTS' UNLAWFUL FAILURE TO PREVENT DIVERSION AND MONITOR, REPORT, AND PREVENT SUSPICIOUS ORDERS.

701.   The same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescription opioids that were incumbent upon the Distributor and Pharmacy Defendants were also legally required of the Manufacturer Defendants under state and federal law.

702.   Like the Distributor Defendants, the Manufacturer Defendants were required to register with the DEA to manufacture schedule II controlled substances, like prescription opioids. A requirement of such registration is the: maintenance of effective controls against diversion of particular controlled substances and any controlled substance in schedule I or II compounded therefrom into other than legitimate medical, scientific, research, or industrial channels, by limiting the importation and bulk manufacture of such controlled substances to a number of establishments which can produce an adequate and uninterrupted  supply  of  these substances    under    adequately   competitive conditions for legitimate medical, scientific, research, and industrial purposes.

703.   Additionally, under Missouri and federal law as registrants, the Manufacturer Defendants were also required to monitor, report, and prevent suspicious orders of controlled substances: The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. Like the Distributor Defendants, the Manufacture Defendants breached these duties.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

704.    The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion. The Manufacturer Defendants engaged in the practice of paying chargebacks to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product.  Thus, the Manufacturer Defendants knew – as the Distributor Defendants knew – the volume, frequency, and pattern of opioid orders being placed and filled. The Manufacturer Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

705.    Federal statutes and regulations are clear: like opioid distributors, opioid manufacturers are required to design and operate a system to disclose  suspicious orders of controlled substances and to maintain  effective controls against diversion.

706.    The Department of Justice has recently confirmed the suspicious order obligations clearly imposed by federal law upon opioid manufacturers, fining Mallinckrodt $35 million for failure to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements. In the press release accompanying the Mallinckrodt settlement, the Department of Justice stated: Mallinckrodt did not meet its obligations to detect and notify DEA of suspicious orders of controlled substances such as oxycodone, the abuse of which is part of the current opioid epidemic. These suspicious order monitoring requirements exist to prevent excessive sales of controlled substances, like oxycodone, Mallinckrodt's actions and omissions formed a link in the chain of supply that resulted in millions of oxycodone pills being sold on the

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

street…Manufacturers and distributors have a crucial responsibility to ensure that controlled substances do not get into the wrong hands. In April 2017, Mallinckrodt agreed to pay a $35 million fine as part of a guilty plea. Among the allegations resolved by the settlement, the government alleged Mallinckrodt failed to design and implement an effective system to detect and report 'suspicious orders' for controlled substances – orders that are unusual in their frequency, size, or other patterns  and Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders.

707.    The Memorandum of Agreement entered into by Mallinckrodt (2017 Mallinckrodt MOA) avers as a registrant under the CSA, Mallinckrodt had a responsibility to maintain effective controls against diversion, including a requirement that it review and monitor these sales and report suspicious orders to DEA. One of two Mallinckrodt opioid manufacturing plants is located in the City of St. Louis.

708.    Mallinckrodt agreed that its system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007. Mallinckrodt further agreed that it recognizes the importance of the prevention of diversion of the controlled substances they manufacture information to identify suspicious orders of any Mallinckrodt product. Further, Mallinckrodt agrees  to  notify  Missouri Board Pharmacy and the DEA of any diversion and/or suspicious circumstances involving any Mallinckrodt controlled substances that Mallinckrodt discovers.

709.    Mallinckrodt acknowledged that as part of their business model Mallinckrodt collects transaction information, referred to as chargeback data, from their direct customers

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

(distributors). The transaction information contains data relating to the direct customer sales of controlled substances to downstream registrants.  Mallinckrodt agreed that, from this data, it would report to the DEA when Mallinckrodt concludes that the chargeback data or other information indicates that a downstream registrant poses a risk of diversion.

710.    The same duties imposed by Missouri law on Mallinckrodt are imposed upon all Distributor Defendants.

711.    The same business practices utilized by Mallinckrodt regarding charge backs and receipt and review of data from opioid distributors regarding orders of opioids were utilized industry-wide among opioid manufacturers and distributors, including, upon information and belief, the other Distributor Defendants.

712.    Plaintiff seeks economic damages from the Defendants to pay for the cost to permanently eliminate the hazards to public health and safety and abate the temporary public nuisance.

713.    To eliminate the hazard to public health and safety, and abate the public nuisance, a  multifaceted, collaborative public health and law enforcement approach is  urgently needed.

714.    A comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective opioid addiction treatment while safely meeting the needs of patients experiencing pain.

715.    These community-based problems require community-based solutions that have been limited by budgetary constraints at the state and Federal levels.

716.    Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of opiates, Defendants should be required to take responsibility for the financial burdens their conduct has inflicted upon Plaintiff and Plaintiff's community.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

## XII.   PHYSICIAN DEFENDANTS AND IMPACT OF PILL MILLS.

717.   A pill mill is an operation in which a doctor, clinic or pharmacy prescribes and/or dispenses narcotics without a legitimate medical purpose. Upon information and belief, Dr. Williams operates a pill mill in St. Louis City at her business and practice, Delmar Primary Care Associates, and Dr. Padda operates a pill mill in St. Louis City at his businesses and practice, Interventional Center for Pain Management, P.C. d/b/a Padda Institute Center for Interventional Pain Management and Comprehensive Pain Associates, LLC. In cases like Dr. Williams's and Dr. Padda's, these doctors use their prescription pads to flood communities with illegal narcotics.

718.   Upon information and belief, Dr. Williams, through her business and practice at Delmar Primary Care Associates, charged patients cash per prescription, regardless of whether a particular patient had health coverage.

719.   Upon information and belief, Dr. Williams, through her business and practice at Delmar Primary Care Associates, did minimal examinations of patients prior to prescribing highly addictive opioids.

720.   Upon information and belief, Dr. Williams, through her business and practice at Delmar Primary Care Associates, advised patients to pay for opioid prescriptions with cash in order to avoid insurance and regulatory oversight.

721.   Upon information and belief, the DEA is aware of Dr. Williams's prescribing history.

722.   Dr. Williams owns and operates an internal medicine and pain management practice under the name Delmar Primary Care Associates in St. Louis City.

723.   Upon information and belief, Dr. Padda, through his business and practice at Interventional Center for Pain Management, P.C. d/b/a Padda Institute Center for Interventional

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Pain Management and Comprehensive Pain Associates, LLC, charged patients cash per prescription, regardless of whether a particular patient had health coverage.

724.    Upon information and belief, Dr. Padda, through his businesses and practice at Interventional Center for Pain Management, P.C. d/b/a Padda Institute Center for Interventional Pain Management and Comprehensive Pain Associates, LLC, did minimal examinations of patients prior to prescribing highly addictive opioids.

725.    Upon information and belief, Dr. Padda, through his business and practice at Interventional Center for Pain Management, P.C. d/b/a Padda Institute Center for Interventional Pain Management and Comprehensive Pain Associates, LLC, advised patients to pay for opioid prescriptions with cash in order to avoid insurance and regulatory oversight.

726.    Upon information and belief, the DEA is aware of Dr. Padda's prescribing history.

727.    Dr. Padda owns and operates a pain management practice and associated businesses under the names Interventional Center for Pain Management, P.C. d/b/a Padda Institute Center for Interventional Pain Management and Comprehensive Pain Associates, LLC in St. Louis City.

## CAUSES OF ACTION

### COUNT I
### PUBLIC NUISANCE

728.    Plaintiff repeats and reiterates the allegations previously set forth herein.

729.    Plaintiff brings an action under Missouri's common law, which provides that County in Missouri have the power to suppress all nuisances, which are, or may be, injurious to the health and welfare of the inhabitants as well as to recover costs associated with the nuisance.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

730.   Each Defendant has caused actual harm in Plaintiff County because of the products manufactured, sold, distributed, prescribed, and marketed through deceptive practices causing a nuisance, hereinafter referred to as the opioid epidemic, which were reported to have killed at least 908 people in Missouri in 2016 alone, including individuals in each of the Plaintiff County.

731.   Additionally, or in the alternative, Defendants engaged in an agreement and conspiracy to illicitly market and sell opioids in Missouri and/or not report illegal diversions of opioids within the Plaintiff County. Defendants are jointly and severally liable for the public nuisance. Some of this evidence is set forth *intra* regarding the funding of organizations like the American Pain Association, funded by Defendants to mislead doctors and the public about the safety and efficacy of opioids.

732.   Plaintiff specifically alleges that the Defendants acted in concert of action with one another pursuant to an agreement with a common intent and purpose with such actions directly contributing to the damages of Plaintiff. Plaintiff further alleges that each Defendant is jointly and severally liable for the public nuisance.

733.   Defendants are jointly and severally liable for the public nuisance in Plaintiff County because their conduct has caused an offense against the public order, threatens the economies of Plaintiff County, and violates the public's right to life and health.

734.   Defendants, acting in concert and/or in conspiracy with one another, intentionally, unlawfully, and/or recklessly manufactured, marketed, distributed and sold prescription opioids which Defendants knew, or reasonably should have known, would be improperly diverted, causing widespread distribution of prescription opioids in and/or to Plaintiff County, resulting in: addiction and abuse, an elevated level of crime, death and injuries to the residents of Plaintiff

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

County at the expense of Plaintiff County, a higher level of fear, discomfort and inconvenience within Plaintiff County, and direct and indirect costs to Plaintiff County.

735.    Defendants have unlawfully and/or intentionally caused and permitted dangerous drugs under their control to be diverted in a way to injure individuals in Plaintiff County at the expense of Plaintiff County.

736.    Defendants have unlawfully and/or intentionally distributed opioids or caused opioids to be distributed without maintaining effective controls against diversion, which is illegal. Defendants' failures to maintain effective controls against diversion include Defendants' failure to effectively monitor for suspicious orders, report suspicious orders, and/or stop shipment of suspicious orders, which has created an opioid epidemic throughout Missouri and, specifically, within Plaintiff County.

737.    Defendants acted with reckless indifference to human life, including individuals within Plaintiff County, resulting in the extensive damages incurred by Plaintiff and justifying an award of punitive damages.

738.    As a direct and proximate result of Defendants' conduct, individuals within Plaintiff County suffered from physical and mental injuries, including death, at the considerable expense of Plaintiff County. The full extent of the destruction caused by the misrepresentations of these drugs has not yet been quantified because the loss of human life, resources devoted to administering and trying to save those lives, and costs for the dealing with the problem in Plaintiff County is far reaching. As a direct and proximate result from the aforesaid conduct of defendants, Plaintiff has sustained, and will sustain, significant costs to address and attempt to abate the nuisance including, but not limited to:

   a. costs for providing medical care and other treatments, including medical examiners to determine the cause of overdoses and deaths;

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

b.  costs for public safety, including law enforcement, paramedics, jail space, drug task forces, over time hours, and various costs related to combating the illegal diversion of opioids, fentanyl, as well as heroin trafficking;

c.  costs for treatment including counseling and drug rehabilitation services;

d.  costs for caring for children out of the care of their parent(s) who are addicted to opioids, heroin, and/or fentanyl, including, but not limited to, providing foster care, attorneys for parents, and costs of the parenting programs for returning children to biological parents;

e.  juvenile delinquency costs for juveniles addicted to opioids who have engaged in criminal behavior as a result of their addition to opioids, heroin, and/or fentanyl;

f.  drug court costs;

g.  costs for Drug Education programs for children;

h.  increased workers' compensation costs and health insurance for Plaintiff's employees; and

i.  costs in the future to attempt to abate the epidemic/nuisance as well as other damages to be specified in discovery.

WHEREFORE, Plaintiff prays for a judgment against Defendants jointly and severally for:

A.     A fair and just amount of damages in excess of $25,000;
B.     A fair and just amount for future damages for abatement;
C.     For their costs herein incurred; and
D.     Such other and further relief that may be just and proper.

## COUNT II
## NEGLIGENCE PER SE – ILLEGAL DIVERSION

739.   Plaintiff repeats and reiterates the allegations previously set forth herein.

740.   At all times mentioned herein Defendants were under a duty to exercise due care in the manufacturing and distribution of their opioids.

741.   Both Missouri and federal law mandate that the Defendants implement effective controls and procedures in their supply chains to guard against theft, diversion, and the abuse of

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

prescription opioids. Defendants failed to adequately design and operate a system to detect, halt, and/or report suspicious orders of prescription opioids. *See* MO. 20 CSR 2220-5.060; *see also* U.S.C. §§ 801 et seq).

742.   Defendants negligently disseminated massive quantities of prescription opioids into Plaintiff County. Defendants' conduct, actions, and failure to act moved once legal prescription drugs to unlawful channels of distribution or use.

743.   As a result of their failure, Plaintiff County has been inundated with an illegal opioid market, which in turn created substantial addiction problems leading to numerous deaths and other injuries, the costs of which Plaintiff County bore resulting in significant economic damages.

744.   Defendants negligently distributed enormous quantities of opioids into the illegal drug market, especially acting as a supplier to illegal drug dealers and permitting opioids to be illegally trafficked and sold in Plaintiff County.

745.   Defendants' actions were a substantial factor in making opioids widely available and widely used by individuals within Plaintiff County. Defendants' actions were a substantial factor in doctors and patients inaccurately assessing the risks and benefits of opioids for chronic pain. Without Defendants' actions, opioid use would not have been so widespread and the enormous public health hazard of opioid abuse and addiction that exists could have been averted.

746.   Defendants knowingly, intentionally, recklessly, and/or negligently provided massive quantities of prescription opioids to physicians who they knew, or should have known, wrote suspicious prescriptions and/or prescriptions for known abusers of prescription opioids.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

747.    Defendants knowingly, intentionally, recklessly, and/or negligently disseminated prescription opioids without effective controls and procedures to guard against theft, diversion, and/or abuse of prescription opioids.

748.    Defendants also knowingly enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including pill mills, and known drug dealers.

749.    Defendants' nuisance-causing activities include, but are not limited to, failing to implement effective controls and procedures in their supply chains to guard against theft, diversion, and misuse of prescription opioids, as well as failing to adequately design and operate a system to detect, halt, and/or report suspicious orders of prescription opioids.

750.    Defendants also knowingly and intentionally enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including pill mills, and known drug dealers.

751.    Defendants knowingly and intentionally chose to include opioids on their formularies and approve prescription lists that were more addictive to users because they generated greater profits. This failure led directly to the increased likelihood of addiction. PBM Defendants further knowingly and intentionally chose to include opioids that were easier to misuse. For example, by crushing them into powder and mixing them with liquid in order to inject said opioids instead of choosing Abuse Deterrent Formulations (ADFs) on their formularies, which tend to be more expensive and cost prohibitive for PBM Defendants. This choice directly led to the ease with which the pills could be misused.

752.    Defendants knowingly and intentionally made it more expensive and/or more difficult to obtain knowingly efficacious non-opioid medications for pain, leading directly to the increased sale and use of opioids.

753.    Defendants knowingly and intentionally chose not to include certain medications that would prevent overdoses or made them more difficult or expensive to obtain. Defendants chose not to cover, or provide less coverage for, drug treatment.

754.    Defendants knowingly and intentionally created formularies to ensure that an excessive number of pills were made available to users for use and abuse. This diversion in the secondary criminal market and the increase in Plaintiff County of addicts because of this diversion has placed unnecessary and excessive demands on the medical, public safety, juvenile, courts and financial resources of Plaintiff County.

755.    Defendants acted with reckless indifference to human life, including individuals within Plaintiff County, resulting in the extensive damages incurred by Plaintiff and justifying an award of punitive damages.

756.    As a direct and proximate result of Defendants' conduct, individuals within Plaintiff County suffered from physical and mental injuries, including death, at the considerable expense of Plaintiff County. The full extent of the destruction caused by the misrepresentations of these drugs has not yet been quantified because the loss of human life, resources devoted to administering and trying to save those lives, and costs for the dealing with the problem in Plaintiff County is far reaching. As a direct and proximate result from the aforesaid conduct of defendants, Plaintiff has sustained, and will sustain, significant costs to address and attempt to abate the nuisance including, but not limited to:

  a.  costs for providing medical care and other treatments, including medical examiners to determine the cause of overdoses and deaths;

  b.  costs for public safety, including law enforcement, paramedics, jail space, drug task forces, over time hours, and various costs related to combating the illegal diversion of opioids, fentanyl, as well as heroin trafficking;

  c.  costs for treatment including counseling and drug rehabilitation services;

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

d.  costs for caring for children out of the care of their parent(s) who are addicted to opioids, heroin, and/or fentanyl, including, but not limited to, providing foster care, attorneys for parents, and costs of the parenting programs for returning children to biological parents;

e.  juvenile delinquency costs for juveniles addicted to opioids who have engaged in criminal behavior as a result of their addition to opioids, heroin, and/or fentanyl;

f.  drug court costs;

g.  costs for Drug Education programs for children;

h.  increased workers' compensation costs and health insurance for Plaintiff's employees; and

i.  costs in the future to attempt to abate the epidemic/nuisance as well as other damages to be specified in discovery.

WHEREFORE, Plaintiff prays for a judgment against Defendants jointly and severally for:

A.  A fair and just amount of damages in excess of $25,000;
B.  A fair and just amount for future damages for abatement;
C.  For their costs herein incurred; and
D.  Such other and further relief that may be just and proper.

## COUNT III
## NEGLIGENCE

757.  Plaintiff repeats and reiterates the allegations previously set forth herein

758.  At all times mentioned herein, Defendants were under a duty to exercise reasonable care in advertising, marketing, promotion, and labeling of their opioid products to ensure that the use of their products did not result in avoidable injuries.

759.  At all times mentioned herein, Defendants were under a duty to exercise reasonable care in advertising, marketing, promotion, and labeling of their opioid products.

760.  Defendants were under a duty to exercise reasonable care in monitoring, reviewing, tracking, filling, and dispensing opioid products.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

761.    Plaintiff County's damages are the direct result of Defendants' breach of their duties under Missouri and federal law. Defendants, working in concert with one another,:

a.    carelessly and negligently researching, manufacturing, selling, merchandising, advertising, promoting, labeling, analyzing, testing, distributing, and marketing their opioid products;

b.    failing to fully disclose the results of the testing and other information in its possession regarding the possibility opioids were addictive and subjecting a user to withdrawal symptoms;

c.    knew that withdrawal was not easily managed and failed to instruct this;

d.    knew that OxyContin was in fact not a 12 hour relief pain pill, and that instructing doctors to up the dosage to reach 12 hours increased the likelihood that a patient would become addicted to the drug, thereby increasing the dangers from higher doses of opioids;

e.    that opioids had adverse effects and failing to warn that opioids do not increase function, and in fact leads to lesser function in the patient; and

762.    Upon information and belief, the conduct by Defendants caused or contributed to cause Plaintiff County's damages. Defendants knew, or should have known, that opioids would have a devastating impact on Plaintiff County and that the failure to report diversions and over prescription would result in the ongoing opioid epidemic facing Plaintiff County.

763.    Defendants acted with reckless indifference to human life, including individuals within Plaintiff County, resulting in the extensive damages incurred by Plaintiff and justifying an award of punitive damages.

764.    As a direct and proximate result of Defendants' conduct, individuals within Plaintiff County suffered from physical and mental injuries, including death, at the considerable expense of Plaintiff County. The full extent of the destruction caused by the misrepresentations of these drugs has not yet been quantified because the loss of human life, resources devoted to administering and trying to save those lives, and costs for the dealing with the problem in

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Plaintiff County is far reaching. As a direct and proximate result from the aforesaid conduct of defendants, Plaintiff has sustained, and will sustain, significant costs to address and attempt to abate the nuisance including, but not limited to:

    a.  costs for providing medical care and other treatments, including medical examiners to determine the cause of overdoses and deaths;

    b.  costs for public safety, including law enforcement, paramedics, jail space, drug task forces, over time hours, and various costs related to combating the illegal diversion of opioids, fentanyl, as well as heroin trafficking;

    c.  costs for treatment including counseling and drug rehabilitation services;

    d.  costs for caring for children out of the care of their parent(s) who are addicted to opioids, heroin, and/or fentanyl, including, but not limited to, providing foster care, attorneys for parents, and costs of the parenting programs for returning children to biological parents;

    e.  juvenile delinquency costs for juveniles addicted to opioids who have engaged in criminal behavior as a result of their addition to opioids, heroin, and/or fentanyl;

    f.  drug court costs;

    g.  costs for Drug Education programs for children;

    h.  increased workers' compensation costs and health insurance for Plaintiff's employees; and

    i.  costs in the future to attempt to abate the epidemic/nuisance as well as other damages to be specified in discovery.

WHEREFORE, Plaintiff prays for a judgment against Defendants jointly and severally for:

    A.    A fair and just amount of damages in excess of $25,000;
    B.    A fair and just amount for future damages for abatement;
    C.    For their costs herein incurred; and
    D.    Such other and further relief that may be just and proper.

**COUNT IV**
**FRAUD IN THE OMISSION**

765.    Plaintiff repeats and reiterates the allegations previously set forth herein.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

766.    Defendants, having undertaken the development, manufacturing, marketing, dispensing, distribution, monitoring, reporting, and promotion of their various opioid products as described herein, owed a duty to provide accurate and complete information regarding these products.

767.    Through the use of front groups, KOLS, and advertising to treating and prescribing physicians, Defendants omitted material facts about the lack of evidence regarding the safety and efficacy for opioid use in treating chronic pain.

768.    Defendants, acting in concert and/or in a conspiracy with each other, deceptively misrepresented the true nature of their opioid products with a mutual intent and purpose to deceive individuals and prescribing physicians about the safety and efficacy of opioids. These deceptive omissions caused or contributed to case damages incurred by Plaintiff County.

769.    Defendants marketed, advertised, and distributed, through the use of KOLS and organizations which they funded, the following omissions materially relied upon by individuals and prescribing physicians:

    a.    omitted that in the use of opioids that sustained exposure would deteriorate the patients function, knowing that long term use would lead to less function;

    b.    concealed the link between long term use and addiction;

    c.    concealed the fact that there were no studies showing that opioids were a safe and effective treatment for chronic pain;

    d.    omitted that withdrawal symptoms for a patient were harsh, debilitating and a problem for most users, and the Defendants never advised of such;

    e.    omitted that opioid use could lead to addiction and possibly death; and

    f.    Purdue specifically omitted to physicians and the public that OxyContin was not a 12 hour pain relief pill, and in fact lasted at most 6 -8 hours, but omitted to tell physicians and patients.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

770.    Plaintiff County has had to expend funds for health, public safety, juvenile care, juvenile delinquency, medical examiner costs, including but not limited to autopsies, drug treatment and education as a direct result from Defendants' misconduct.

771.    Defendants acted with reckless indifference to human life, including individuals within Plaintiff County, resulting in the extensive damages incurred by Plaintiff and justifying an award of punitive damages.

772.    Defendants' conduct in illegally distributing and/or selling prescription opioids or conduct allowing opioids to be distributed and/or sold illegally is ongoing and continues to harm Plaintiff County and continues to create an ongoing public nuisance.

773.    Defendants' conduct in marketing, distributing, selling, and filling prescription opioids which Defendants know, or reasonably should know, will be diverted for non- legitimate use and thereby cause significant injury and death to individuals in Plaintiff County at the expense of Plaintiff. Further, the prevalence and widespread availability of diverted opioids creates a climate of fear throughout Plaintiff County, which Plaintiff must combat through enhanced law enforcement measures at significant expense to Plaintiff. Defendants' conduct has made it increasingly easy for individuals to divert opioids thereby seriously harming the public health and safety of Plaintiff County and resulting in significant costs to Plaintiff, including but not limited to: law enforcement, police equipment, and funding for treatment of opioid addicts, including the cost of Narcan.

774.    Defendants' actions are substantial and unreasonable. Defendants have caused, and continue to cause, significant harm to Plaintiff County. The staggering rates of opioid and heroin use resulting from the Defendants' misconduct have caused significant harms to Plaintiff County, including but not limited to:

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

a.      high rates of use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths;

b.      children have fallen victim to the opioid epidemic with easy access to prescription opioids made opioids a recreational drug of choice among teenagers;

c.      infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

d.      residents of Plaintiff County who have never taken opioids have suffered from public nuisance arising from Defendants' abdication of their gate-keeper duties and fraudulent promotions. Many residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids;

e.      the opioid epidemic has increased healthcare costs;

f.      employers have lost the value of productive and healthy employees;

g.      Defendants' conduct created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse and injury in violation of its statutes under state and federal law;

h.      Defendants' fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them. More prescription opioids sold by Defendants led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result;

i.      the diversion of opioids into the secondary, criminal market and the increased number of individuals who abuse or are addicted to opioids increased the demands on healthcare services and law enforcement;

j.      the significant and unreasonable interference with the public rights caused by Defendants' conduct taxed the human, medical, public health, law enforcement, and financial resources of the Plaintiff County; and

k.      Defendants' interference with the public rights caused by Defendants' conduct taxed the human, medical, public health, law enforcement, and financial resources of the Plaintiff County.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

775.    Defendants acted with reckless indifference to human life, including individuals within Plaintiff County, resulting in the extensive damages incurred by Plaintiff and justifying an award of punitive damages.

776.    As a direct and proximate result of Defendants' conduct, individuals within Plaintiff County suffered from physical and mental injuries, including death, at the considerable expense of Plaintiff County. The full extent of the destruction caused by the misrepresentations of these drugs has not yet been quantified because the loss of human life, resources devoted to administering and trying to save those lives, and costs for the dealing with the problem in Plaintiff County is far reaching. As a direct and proximate result from the aforesaid conduct of defendants, Plaintiff has sustained, and will sustain, significant costs to address and attempt to abate the nuisance including, but not limited to:

   a.   costs for providing medical care and other treatments, including medical examiners to determine the cause of overdoses and deaths;

   b.   costs for public safety, including law enforcement, paramedics, jail space, drug task forces, over time hours, and various costs related to combating the illegal diversion of opioids, fentanyl, as well as heroin trafficking;

   c.   costs for treatment including counseling and drug rehabilitation services;

   d.   costs for caring for children out of the care of their parent(s) who are addicted to opioids, heroin, and/or fentanyl, including, but not limited to, providing foster care, attorneys for parents, and costs of the parenting programs for returning children to biological parents;

   e.   juvenile delinquency costs for juveniles addicted to opioids who have engaged in criminal behavior as a result of their addition to opioids, heroin, and/or fentanyl;

   f.   drug court costs;

   g.   costs for Drug Education programs for children;

   h.   increased workers' compensation costs and health insurance for Plaintiff's employees; and

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

i.   costs in the future to attempt to abate the epidemic/nuisance as well as other damages to be specified in discovery.

WHEREFORE, Plaintiff prays for a judgment against Defendants jointly and severally for:

A.   A fair and just amount of damages in excess of $25,000;
B.   A fair and just amount for future damages for abatement;
C.   For their costs herein incurred; and
D.   Such other and further relief that may be just and proper.

## COUNT V
## FRAUD

777.   Plaintiff repeats and reiterates the allegations previously set forth herein.

778.   At all times relevant hereto, Defendants acted in concert of action with their deceptions and misrepresentations executed with a common intent and purpose to deceive individuals and physicians, including those within Plaintiff County. Defendants' deceptive conduct caused, or contributed to cause, Plaintiff's damages.

779.   Defendants marketed, advertised, and distributed, through the use of KOLS and organizations which they funded, the following material omissions relied upon by individuals and prescribing physicians:

a.   misrepresented that opioids improve function;

b.   concealed the link between long term use of opioids and addiction;

c.   misrepresented that addiction can be managed;

d.   falsely claimed that withdrawal can easily be managed;

e.   misrepresented the dangers of higher doses of opioids;

f.   downplayed the use of NSAIDs and other therapies while downplaying the use of opioids; and

g.   falsely claimed that OxyContin was a 12 hour pain relief pill.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

780.    Defendants, as the manufacturers, marketers, distributers, and promoters of opioids, owed a duty to provide accurate and complete information regarding their opioids.

781.    Defendants' promotional, marketing, and distribution plan, developed in a concert with one another, had the goal of increasing market share of all opioids. Defendants cultivated an image that opioids were the proper use for chronic pain and that opioids were safe, non-addictive, and would not interfere with daily life. Defendants worked together in concert to fund, direct, and guide KOL's and false front groups to tout the false benefits of opioids and downplay harsh side effects, chiefly addiction and death. Individuals and physicians in Plaintiff County reasonably relied on Defendants' false and misleading statements concerning the nature of opioids and their use, leading to a significant nuisance and threat to the public health and safety in Plaintiff County.

782.    Defendants acted with reckless indifference to human life, including individuals within Plaintiff County, resulting in the extensive damages incurred by Plaintiff and justifying an award of punitive damages.

783.    As a direct and proximate result of Defendants' conduct, individuals within Plaintiff County suffered from physical and mental injuries, including death, at the considerable expense of Plaintiff County. The full extent of the destruction caused by the misrepresentations of these drugs has not yet been quantified because the loss of human life, resources devoted to administering and trying to save those lives, and costs for the dealing with the problem in Plaintiff County is far reaching. As a direct and proximate result from the aforesaid conduct of defendants, Plaintiff has sustained, and will sustain, significant costs to address and attempt to abate the nuisance including, but not limited to:

    a.   costs for providing medical care and other treatments, including medical examiners to determine the cause of overdoses and deaths;

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

b.  costs for public safety, including law enforcement, paramedics, jail space, drug task forces, over time hours, and various costs related to combating the illegal diversion of opioids, fentanyl, as well as heroin trafficking;

c.  costs for treatment including counseling and drug rehabilitation services;

d.  costs for caring for children out of the care of their parent(s) who are addicted to opioids, heroin, and/or fentanyl, including, but not limited to, providing foster care, attorneys for parents, and costs of the parenting programs for returning children to biological parents;

e.  juvenile delinquency costs for juveniles addicted to opioids who have engaged in criminal behavior as a result of their addition to opioids, heroin, and/or fentanyl;

f.  drug court costs;

g.  costs for Drug Education programs for children;

h.  increased workers' compensation costs and health insurance for Plaintiff's employees; and

i.  costs in the future to attempt to abate the epidemic/nuisance as well as other damages to be specified in discovery.

WHEREFORE, Plaintiff prays for a judgment against Defendants jointly and severally for:

A.  A fair and just amount of damages in excess of $25,000;
B.  A fair and just amount for future damages for abatement;
C.  For their costs herein incurred; and
D.  Such other and further relief that may be just and proper.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

784.  Plaintiff repeats and reiterates the allegations previously set forth herein.

785.  Defendants made significant misrepresentations to physicians, patients, and the public at large through false and misleading advertising.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

786.    Defendants are jointly and severally liable for negligent misrepresentations by speakers funded by and/or employed by Defendants because the information provided was materially relied upon by individuals and physicians within Plaintiff County and thereby created the widespread public nuisance occurring in Plaintiff County and for which Plaintiff seeks damages. For example, Defendants negligently misrepresented that opioids were tested for long-term chronic pain use when they had not been; that OxyContin would prevent pain for 12 hours; and that opioids were not addictive but rather pseudoaddictive. Defendants intentionally provided information through their agents, employees, and organizations funded by Defendants and intended for this information to be relied upon by the public and medical professionals. As Defendants intended, the public and medical professionals, including prescribing physicians within Plaintiff County, justifiably relied upon Defendants' misrepresentations. The public and medical professionals, including those within Plaintiff County, suffered a pecuniary loss, which in turn caused or contributed to cause the loss suffered by Plaintiff County.

787.    Defendants acted with reckless indifference to human life, including individuals within Plaintiff County, resulting in the extensive damages incurred by Plaintiff and justifying an award of punitive damages.

788.    As a direct and proximate result of Defendants' conduct, individuals within Plaintiff County suffered from physical and mental injuries, including death, at the considerable expense of Plaintiff County. The full extent of the destruction caused by the misrepresentations of these drugs has not yet been quantified because the loss of human life, resources devoted to administering and trying to save those lives, and costs for the dealing with the problem in Plaintiff County is far reaching. As a direct and proximate result from the aforesaid conduct of

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

defendants, Plaintiff has sustained, and will sustain, significant costs to address and attempt to abate the nuisance including, but not limited to:

    a. costs for providing medical care and other treatments, including medical examiners to determine the cause of overdoses and deaths;

    b. costs for public safety, including law enforcement, paramedics, jail space, drug task forces, over time hours, and various costs related to combating the illegal diversion of opioids, fentanyl, as well as heroin trafficking;

    c. costs for treatment including counseling and drug rehabilitation services;

    d. costs for caring for children out of the care of their parent(s) who are addicted to opioids, heroin, and/or fentanyl, including, but not limited to, providing foster care, attorneys for parents, and costs of the parenting programs for returning children to biological parents;

    e. juvenile delinquency costs for juveniles addicted to opioids who have engaged in criminal behavior as a result of their addition to opioids, heroin, and/or fentanyl;

    f. drug court costs;

    g. costs for Drug Education programs for children;

    h. increased workers' compensation costs and health insurance for Plaintiff's employees; and

    i. costs in the future to attempt to abate the epidemic/nuisance as well as other damages to be specified in discovery.

    WHEREFORE, Plaintiff prays for a judgment against Defendants jointly and severally for:

    A.    A fair and just amount of damages in excess of $25,000;
    B.    A fair and just amount for future damages for abatement;
    C.    For their costs herein incurred; and
    D.    Such other and further relief that may be just and proper.

Electronically Filed - City of St. Louis - October 24, 2019 - 11:15 AM

Respectfully Submitted,

**CAREY DANIS & LOWE**

By: */s/ Jeffrey J. Lowe*
    Jeffrey J. Lowe, #35114
    John F. Garvey, #35879
    Sarah Shoemake Doles, #45747
    Alyson M. Petrick, #68323
    Attorneys for Plaintiff
    8235 Forsyth Blvd
    St. Louis, MO 63105
    (314) 725-7700
    (314) 721-0905 - Facsimile
    jlowe@careydanis.com
    jgarvey@careydanis.com
    sdoles@careydanis.com
    apetrick@careydanis.com

**PLEBAN & PETRUSKA LAW, LLC**

By: */s/ J.C. Pleban*
    J.C. Pleban, #63166
    jc@plebanlaw.com
    2010 South Big Bend Blvd.
    St. Louis, MO  63117
    Telephone: (314) 645-6666
    Facsimile: (314) 645-7376

*Attorneys for Plaintiff Camden County*

Electronically Filed - City of St. Louis - October 24, 2019 - 02:48 PM

In the
# CIRCUIT COURT
## City of St. Louis, Missouri

Camden County
_____
Plaintiff/Petitioner

vs.

Dannie E. Williams, M.D.
_____
Defendant/Respondent

For File Stamp Only

10/24/2019
_____
Date

1922-CC11834
_____
Case number

1
_____
Division

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now **Plaintiff** _____, pursuant
Requesting Party
to Local Rule 14, requests the appointment by the Circuit Clerk of

| John Houseman | 8235 Forsyth, Ste. 1100, St. Louis, MO | 314-392-3205 |
|---|---|---|
| Name of Process Server | Address | Telephone |

_____
Name of Process Server          Address                          Telephone

_____
Name of Process Server          Address                          Telephone

to serve the summons and petition in this cause on the below named parties.

SERVE:
See attached sheet with names and addresses
_____
Name

_____
Address

_____
City/State/Zip

SERVE:
_____
Name

_____
Address

_____
City/State/Zip

SERVE:
_____
Name

_____
Address

_____
City/State/Zip

SERVE:
_____
Name

_____
Address

_____
City/State/Zip

Appointed as requested:
**TOM KLOEPPINGER, Circuit Clerk**


By_____
Deputy Clerk


_____
Date

Jeffrey J. Lowe
_____
Attorney/Plaintiff/Petitioner
35114
_____
Bar No.
8235 Forsyth, Ste. 1100, St. Louis, MO 63105
_____
Address
314-678-3400
_____
Phone No.

Electronically Filed - City of St. Louis - October 24, 2019 - 02:48 PM

## SERVICE ADDRESSES FOR THE SUMMONS

**DANNIE E. WILLIAMS, M.D.**
**Serve: 5621 Delmar Blvd, Unit 108**
      **St. Louis, MO 63112**

**DELMAR PRIMARY CARE ASSOCIATES, LLC**
**Serve: Kenneth Hopson**
      **5621 Delmar Blvd, Unit 108**
      **St. Louis, MO 63112**

**GURPREET S. PADDA, M.D.**
**Serve: Harjot Padda**
      **3915 Brannon Ave.**
      **St. Louis, MO 63109**

**INTERVENTIONAL CENTER FOR PAIN MANAGEMENT, P.C., d/b/a PADDA**
**INSTITUTE CENTER FOR INTERVENTIONAL PAIN MANAGEMENT**
**Serve: Harjot Padda**
      **3915 Brannon Ave.**
      **St. Louis, MO 63109**

**COMPREHENSIVE PAIN ASSOCIATES, LLC**
**Serve: Harjot Padda**
      **3915 Brannon Ave.**
      **St. Louis, MO 63109**

**HUNT FITZ DRUG, INC. D/B/A KELLER APOTHECARY**
**Serve: Joe Fitzgerald**
**5346 Devonshire**
**St. Louis, MO 63109**

Electronically Filed - City of St. Louis - October 24, 2019 - 02:48 PM

In the
# CIRCUIT COURT
## City of St. Louis, Missouri

Camden County
_____
Plaintiff/Petitioner

vs.

Dannie E. Williams, M.D.
_____
Defendant/Respondent

10/24/2019
_____
Date

1922-CC11834
_____
Case number

1
_____
Division

For File Stamp Only

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now Plaintiff _____, pursuant
Requesting Party
to Local Rule 14, requests the appointment by the Circuit Clerk of

John Houseman                    8235 Forsyth, Ste. 1100, St. Louis, MO   314-392-3205
_____
Name of Process Server            Address                                Telephone

_____
Name of Process Server            Address                                Telephone

_____
Name of Process Server            Address                                Telephone

to serve the summons and petition in this cause on the below named parties.

SERVE:
See attached sheet with names and addresses
_____
Name

_____
Address

_____
City/State/Zip

SERVE:

_____
Name

_____
Address

_____
City/State/Zip

SERVE:

_____
Name

_____
Address

_____
City/State/Zip

SERVE:

_____
Name

_____
Address

_____
City/State/Zip

Appointed as requested:
**TOM KLOEPPINGER,** Circuit Clerk

By _____
Deputy Clerk

_____
Date

Jeffrey J. Lowe
_____
Attorney/Plaintiff/Petitioner
35114
_____
Bar No.
8235 Forsyth, Ste. 1100, St. Louis, MO 63105
_____
Address
314-678-3400
_____
Phone No.

## IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>REX M BURLISON | Case Number:  1922-CC11834 | |
|---|---|---|
| Plaintiff/Petitioner:<br> CAMDEN COUNTY                                      vs. | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO  63105 | J HOUSEMAN<br>SPECIAL PROCESS<br>SERVER |
| Defendant/Respondent:<br>DANNIE E. WILLIAMS, M.D. | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | |
| Nature of Suit:<br>CC Pers Injury-Prod Liab | | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to:   COMPREHENSIVE PAIN ASSOCIATES LLC
Alias:

HARJOT PADDA
3915 BRANNON AVE
ST. LOUIS, MO 63109

**SPECIAL PROCESS SERVER**

*COURT SEAL OF*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

**October 24, 2019**

_____
Date

_____
Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to: _____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____
Date

_____
Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

# IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| | |
|---|---|
| Judge or Division:<br>REX M BURLISON | Case Number:  1922-CC11834 |
| Plaintiff/Petitioner:<br> CAMDEN COUNTY<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO  63105 |
| Defendant/Respondent:<br>DANNIE E. WILLIAMS, M.D. | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD |
| Nature of Suit:<br>CC Pers Injury-Prod Liab | SAINT LOUIS, MO  63101 |

J HOUSEMAN
SPECIAL PROCESS
SERVER

(Date File Stamp)

## Summons in Civil Case

The State of Missouri to:  DANNIE E. WILLIAMS, M.D.
                    **Alias:**

5621 DELMAR BLVD., UNIT 108
ST. LOUIS, MO  63112

| SPECIAL PROCESS SERVER |
|---|

*COURT SEAL OF*

*CIRCUIT COURT OF MISSOURI*

*CITY OF ST LOUIS*

**You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.**

**October 24, 2019**
_____
Date

*Thomas Kloeppinger*
_____
Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.
I certify that I have served the above summons by: (check one)
☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with
_____, a person of the defendant's/respondent's family over the age of
15 years who permanently resides with the defendant/respondent.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:
_____ (name) _____ (title).
☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____                    _____
Printed Name of Sheriff or Server            Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____          _____
                          Date                              Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

**IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI**

| Judge or Division:<br>REX M BURLISON | Case Number: 1922-CC11834 | |
|---|---|---|
| Plaintiff/Petitioner:<br>CAMDEN COUNTY<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO 63105 | J HOUSEMAN<br>SPECIAL PROCESS<br>SERVER |
| Defendant/Respondent:<br>DANNIE E. WILLIAMS, M.D.<br><br>Nature of Suit:<br>CC Pers Injury-Prod Liab | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO 63101 | (Date File Stamp) |

## Summons in Civil Case

| | |
|---|---|
| The State of Missouri to: DELMAR PRIMARY CARE ASSOCIATES, LLC<br>                                        Alias:<br><br>C/O KENNETH HOPSON<br>5621 DELMAR BLVD UNIT 108<br>ST. LOUIS, MO 63112 | |

SPECIAL PROCESS SERVER

*COURT SEAL OF*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

**October 24, 2019**

_____          _____
            Date                                                    Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to: _____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____                          _____
Printed Name of Sheriff or Server                    Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____          _____
                                                    Date                                    Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (06-18) SM30 (SMCC) *For Court Use Only:* **Document Id # 19-SMCC-21697**          1 of 1          Civil Procedure Form No. 1; Rules 54.01 – 54.05,<br>54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

# IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>REX M BURLISON | Case Number: 1922-CC11834 | |
|---|---|---|
| Plaintiff/Petitioner:<br>CAMDEN COUNTY<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO 63105 | J HOUSEMAN<br>SPECIAL PROCESS<br>SERVER |
| Defendant/Respondent:<br>DANNIE E. WILLIAMS, M.D.<br>Nature of Suit:<br>CC Pers Injury-Prod Liab | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO 63101 | (Date File Stamp) |

## Summons in Civil Case

**The State of Missouri to:** GURPREET SINGH PADDA MD
**Alias:** DBA THE CENTER FOR INTERVENTIONAL PAIN MANAGEMENT

HARJOT PADDA
3915 BRANNON AVE
ST. LOUIS, MO 63109

**SPECIAL PROCESS SERVER**

*COURT SEAL OF*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

**October 24, 2019**

_____
Date

_____
Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to: _____ (name) _____ (title).
☐ other: _____.

Served at _____ (address)
in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____
Date

_____
Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $____10.00____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

**IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI**

| Judge or Division:<br>REX M BURLISON | Case Number: **1922-CC11834** | |
|---|---|---|
| Plaintiff/Petitioner:<br> CAMDEN COUNTY | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO 63105 | J HOUSEMAN<br>SPECIAL PROCESS<br>SERVER |
| vs. | | |
| Defendant/Respondent:<br>DANNIE E. WILLIAMS, M.D. | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO 63101 | |
| Nature of Suit:<br>CC Pers Injury-Prod Liab | | (Date File Stamp) |

## Summons in Civil Case

| The State of Missouri to: | HUNT FITZ DRUG, INC. |
|---|---|
| Alias: | DBA KELLER APOTHECARY |

JOE FITZGERALD
5346 DEVONSHIRE
SAINT LOUIS, MO 63109

**SPECIAL PROCESS SERVER**

*COURT SEAL OF*

**You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.**

*CITY OF ST LOUIS*

**October 24, 2019**                    *Thomas Kloppinger*
_____        _____
Date                                                        Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.
I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to: _____ (name) _____ (title).
☐ other: _____.

Served at _____ (address)
in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____                    _____
Printed Name of Sheriff or Server                    Signature of Sheriff or Server
**Must be sworn before a notary public if not served by an authorized officer:**
Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____        _____
Date                                                        Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

# IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>REX M BURLISON | Case Number:  1922-CC11834 | |
|---|---|---|
| Plaintiff/Petitioner:<br> CAMDEN COUNTY | Plaintiff's/Petitioner's Attorney/Address<br>JEFFREY J LOWE<br>8235 FORSYTH<br>SUITE 1100<br>SAINT LOUIS, MO  63105 | J HOUSEMAN<br>SPECIAL PROCESS<br>SERVER |
| vs. | | |
| Defendant/Respondent:<br>DANNIE E. WILLIAMS, M.D.<br>Nature of Suit:<br>CC Pers Injury-Prod Liab | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO  63101 | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to:  INTERVENTIONAL CENTER FOR PAIN MANAGEMENT PC
   Alias:  DBA PADDA INSTITUTE CENTER FOR INTERVENTIONAL PAIN MGMT

HARJOT PADDA
3915 BRANNON AVE
ST. LOUIS, MO 63109

**SPECIAL PROCESS SERVER**

*COURT SEAL OF*

*CITY OF ST LOUIS*

**You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.**

**October 24, 2019**

_____
Date

_____
Thomas Kloeppinger
Clerk

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to: _____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____

_____
Date

_____
Notary Public

| Sheriff's Fees, if applicable | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $____10.00_____ | |
| Mileage | $_____ | (_____ miles @ $._____ per mile) |
| **Total** | $_____ | |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.